Gary L. Eastman, Esq. (SBN 182518)
GARY L. EASTMAN, APLC
401 West A. Street, Ste. 1785
San Diego, CA 92101
Telephone: 619-230-1144
Facsimile: 619-230-1194

Attorney for Plaintiff Dr. Greens, Inc.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. GREENS, INC. a California corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>JAMES MATTHEW STEPHENS, an individual, and SPECTRUM LABORATORIES, LLC, an Ohio limited liability company,<br><br>            Defendants.<br><br>AND RELATED CROSS ACTION | Case No.: 11cv0638 JAH (CAB)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION TO REQUEST A TELEPHONIC DISCOVERY HEARING ON DR. GREENS' MOTION FOR PROTECTIVE ORDER**<br><br>Date:<br>Time:<br>Courtroom: E<br>Judge: Hon. Cathy Ann Bencivengo |

I.    INTRODUCTION

Dr. Greens and Spectrum Laboratories have a long history together. (See Green Dec ¶¶2-5, 13-26 and Eastman Dec ¶¶ 3-20). In the late 1990s and the early 2000s, Dr. Greens acted as the exclusive distributor for Spectrum Laboratories and James Matthew Stephens.[1] (See Green Dec. ¶2). However, by the end of 2001 Mr. Stephens ultimately

---

[1] Spectrum Laboratories, Inc. is the predecessor to Spectrum Laboratories, LLC. At all relevant times, both entities were owned and controlled by James Matthew Stephens. According to records filed with the Ohio Secretary of State, Spectrum Laboratories, Inc. was recently dissolved.

terminated the relationship. (See Green Dec. ¶3). Shortly thereafter, Dr. Greens began development of its own product line and became a competitor to Spectrum Laboratories. (See Green Dec. ¶3). A successful product for Dr. Greens is synthetic urine sold under the name Agent X. (See Green Dec. ¶5). Dr. Greens sells its synthetic urine as a fetish product to individuals and retail outlets. (See Green Dec. ¶5). In essence, Dr. Greens' product has more characteristics of real urine than the inferior product offered by Spectrum Laboratories and has been increasing its market share. (See Green Dec. ¶5).

Recently, Spectrum Labs served its disclosure of asserted claims and preliminary infringement contentions as required by the Case Management Order. (See Eastman Dec. ¶25). The preliminary infringement contentions contained no analysis, but instead claimed infringement on all claims pursuant to 35 U.S.C. § 295. During the meet and confer process regarding the inadequacy of the preliminary infringement contentions, counsel for Spectrum Labs has unequivocally demonstrated that they have done no pre-filing investigation to determine whether or not Agent X could possibly infringe any claim of the '776 Patent. (See Eastman Dec. ¶¶ 32-35). Counsel for Spectrum Labs has also unequivocally asserted that they are entitled to the formula of Agent X no matter what solely because it is relevant. (See Eastman Dec. ¶32). Finally, counsel for Spectrum Labs has propounded a variety of discovery requests seeking the complete chemical composition of Agent X as well as the identity of all suppliers' of Agent X. (See Eastman Dec. ¶¶ 26-27).

Fed. R. Civ. P. 26(c) provides that a court may grant a motion for protective order upon a showing of good cause. The Court should find that good cause exists here. In essence, Dr. Greens respectfully asserts that the source of its secret formula is a closely guarded trade secret and the disclosure of this trade secret will do nothing to advance this case. A protective order is required.

II.   AUTHORITY

The Federal Rules of Civil Procedure permit courts to order discovery of trade secrets or other confidential commercial information in a manner that restricts disclosure,

such as through a protective order, upon a showing of good cause. Fed. R. Civ. P. 26(c); see *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 554 (C.D. Cal. 2007). The court must strike a balance between the discovery-seeking party's entitlement to "all information reasonably calculated to lead to the discovery of admissible evidence" and the divulging party's need for protection from "undue burden . . ., including protection from misuse of trade secrets by competitors." *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) (citations & quotation marks omitted). In addition, the court should examine the discovery-seeking party's claims and whether it has "alternative discovery procedures" at its disposal to develop its case. *Id.*

III.  ARGUMENT

  A. THE IDENTITY OF DR. GREENS SUPPLIER OF AGENT X IS A PROTECTED AND VALUABLE TRADE SECRET

Civil Code section 3426.1(d) provides:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"[T]he test for a trade secret is whether the matter sought to be protected is information (1) that is valuable because it is unknown to others and (2) that the owner has attempted to keep secret. [I]n order to qualify as a trade secret, the information 'must be secret, and must not be of public knowledge or of a general knowledge in the trade or business.'" *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal.App.4th 241, 251 (2004). Dr. Greens has never publicly disclosed the source of its synthetic urine supplier. (See Green Dec. ¶7) Moreover, the laboratory from which Dr. Greens purchases its synthetic urine does not advertise, does not maintain a website, and is not generally known to Dr. Greens' customers, many of whom are retail stores, novelty shops and internet consumers.

(See Green Dec. ¶7) Further, the synthetic urine supplied to Dr. Greens is of a superior quality than that of Spectrum Labs, as well as products offered by other competitors. (See Green Dec. ¶8) If the identity of Dr. Greens' supplier were known, Dr. Greens' competitors could simply purchase from Dr. Greens supplier thereby eliminating Dr. Greens competitive edge because they would now face an equivalent product in the marketplace. (See Green Dec. ¶9) Also, if known to Dr. Greens' customers, many of the retail stores and novelty shops would simply cut Dr. Greens out as a "middle man" and attempt to buy from the supplier directly to increase their margins of profit. (See Green Dec. ¶9) Therefore, the identity of Dr. Greens' supplier is extremely valuable to Dr. Greens.

Dr. Greens has taken numerous steps to ensure that the secret identity of its supplier remains secret. The identity of Dr. Greens' suppliers is only known to the two shareholders of Dr. Greens and one employee at Dr. Greens. (See Green Dec. ¶9) Each of these persons has been specifically instructed by Matt Green to keep the identity of Dr. Greens' synthetic urine supplier confidential and the importance of keeping the identity of the supplier secret. (Id.) The sole employee that knows the identity of the supplier has been employed with Dr. Greens for years and is believed to be very trustworthy. (Id.) More importantly, this select employee is required to know the identity of the supplier in order to perform his job functions, such as receiving and processing invoices from the supplier and making orders to the supplier. (See Green Dec. ¶11) The remaining employees of Dr. Greens have no knowledge of the identity of Dr. Greens' supplier. (Id.)

The synthetic urine product is shipped to Dr. Greens by its supplier in unmarked one gallon jugs of concentrate whereby upon receipt, the concentrate is mixed with water in large unmarked chemical drums by Dr. Greens' employees. (See Green Dec. ¶12) The drums are stored in a separate room within the Dr. Greens' warehouse. (Id.) The warehouse itself is not accessible to the general public. (Id.) Nothing on the drums indicates the identity of the supplier specifically to guard against disclosure to non-essential employees. (Id.) The employees then drain the contents of these large

unmarked drums into small bottles for distribution under Dr. Greens' brand name Agent X. (Id.) Because of these reasonable precautions, Dr. Greens has safely kept the identity of its synthetic urine supplier secret from its competitors and consumers for years. (Id.)

### B. DISCLOSURE OF THE IDENTITY OF DR. GREENS' SUPPLIER IS NOT NECESSARY TO ALLOW SPECTRUM LABS TO PROVE NON-INFRIGEMENT.

#### 1. Non-Infringement can be established as to all Claims by a Simple Chemical Test that Costs $5,600 or less

The '776 patent at issue in this case has only three independent claims. All three independent claims include a Markush group[2] limitation that specifically limits the claims to a closed list of biocides. (See Eastman Dec. ¶50) The original application for the '776 patent at issue attempted to claim all biocides generally in combination with synthetic urine, but in order to overcome numerous prior art biocides cited by the Examiner in support of a rejection of all claims, Mr. Cupar was required to narrow the claims to include the Markush group limitation. (See Eastman Dec. ¶¶42-50)

"[T]he use of the doctrine of equivalents to establish infringement is limited by the doctrine of prosecution history estoppel." *Voda v. Cordis Corp.*, 536 F. 3d 1311, 1324-25 (Fed. Cir. 2008). Prosecution history estoppel operates by "barring an equivalents argument for subject matter relinquished when a patent claim is narrowed during prosecution." Id.

Under the Supreme Court's 2002 *Festo* decision, an estoppel arising from an amendment that narrows a claim limitation creates a rebuttable presumption that the doctrine of equivalents is unavailable for that limitation. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722(2002).

Spectrum Labs cannot now rely on any theory under the doctrine of equivalents to expand its list of biocides contained in the claims when it was required to specifically

---

[2] Claim language describing an element as being a member "selected from the group consisting of A, B, and C" is commonly referred to as a Markush group. See Manual of Patent Examining Procedure § 2173.05(h) (8th ed. 2003).

narrow the claims to the specific biocides listed in order to be allowed. Therefore, the express list of biocides claimed in the '776 patent is the exclusive list of biocides that can be potentially infringed. A synthetic urine without the presence of one of the biocides listed in the '776 patent cannot infringe any claim of the '776 patent. Thus, the most efficient and effective means for ruling out infringement is to conduct a chemical test seeking the presence of one of the biocides listed in the '776 patent. Contrary to the assertions of Spectrum, a simply chemical test for the finite and specific list of biocides set forth in the independent claims of the '776 patent is affordable and required.

    Dr. Greens obtained a quote from a local chemistry lab in San Diego, California that was willing to test a sample of Agent X for each biocide listed in the '776 patent for a mere $5,600. (See Eastman Dec. ¶51) Such a test should have been conducted by Spectrums' attorneys as part of their pre-filing Rule 11 investigations. *See generally Cambridge Prods. LTD v. Penn Nutrients Inc.*, 962 F.2d 1048 (Fed. Cir. 1992); *Judin v. United States*, 110 F.3d 780 (Fed. Cir. 1997); and *View Engineering, Inc. v. Robotic Vision Systems, Inc. and Morrison law Firm*, 208 F.3d 981 (Fed. Cir. 2000). Certainly, such a test should have been done prior to serving preliminary infringement contentions. However, during the recent meet and confer telephone conversation between the attorneys, counsel for Spectrum made it clear that no such testing was performed, and further refused to disclose he did anything on the grounds of attorney work product doctrine. (See Eastman Dec. ¶32) The fact that Spectrum and its attorneys refuse to conduct this simple test prior to receiving the Agent X formula, highlights their true intent to utilize this litigation as a means to uncover the Agent X formula, even in the absence of any evidence to support even an inference of infringement.

    2. Dr. Greens' Has Verified that the biocide used in its synthetic urine is Sodium Azide, which was specifically abandoned during prosecution of the '776 patent to overcome prior art synthetic urines using sodium azide.

    Although Dr. Greens does not manufacture Agent X and does not know the formula, it is confident that sodium azide is the biocide used in Agent X. Long before this litigation arose, Dr. Greens obtained a MSDS from its supplier that indicates that the

biocide in use in the Agent X synthetic urine is sodium azide. (See Green Dec. ¶6) Dr. Greens independently verified the presence of sodium azide in its Agent X by voluntarily submitting its Agent X for chemical testing. (See Eastman Dec. ¶¶ 52-53)

Any effort by Spectrum to claim that sodium azide is a biocide covered within the scope of any claim of the '776 patent would be futile. The Supreme Court has held that "[w]here the original application once embraced the purported equivalent but the patentee narrowed his claims to obtain the patent or to protect its validity, the patentee cannot assert that he lacked the words to describe the subject matter in question." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 734 (2002). Here, in order to place the patent application in a condition for allowance, Mr. Cupar specifically had to substantially narrow his claims in order to overcome rejections based on 35 USC §103(a) citing prior art references disclosing synthetic urines using sodium azide as a biocide. (See Eastman Dec. ¶47) Under the law, Spectrum and its attorneys are completely barred from asserting that the biocide sodium azide is covered, either literally or equivalently, by any claim in the '776 patent.

Spectrum merely has to spend $400 or less to run a simple chemical test to confirm the existence of sodium azide in Agent X. (See Eastman Dec. ¶51) Rather than confirm the obvious and risk loss of the right to discovery, Defendants and their counsel are blindly pressing forward in this case to obtain the formula for Agent X. The point here is that Mr. Stephens, Spectrum and their attorneys simply do not need to formula of Agent X in order to rule out infringement. A chemical test is a sufficient discovery procedure readily available to develop or disprove Spectrum's theory of patent infringement.

C. 35 U.S.C. § 295 DOES NOT EXCUSE SPECTRUM'S ATTORNEYS FROM THEIR RULE 11 OBLIGATIONS AND DOES NOT ENTITLE SPECTRUM TO UNFETTERED DISCOVERY INTO DR. GREENS' AFFAIRS WHEN THERE IS NO GOOD FAITH BASIS TO SUSPECT PATENT INFRINGEMENT

Spectrum, in lieu of any infringement analysis whatsoever, merely cited 35 U.S.C. § 295 in its Disclosure of Asserted Claims and Preliminary Infringement Contentions. That statute provides in full:

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds - (1) that a **substantial likelihood** exists that the product was made by the patented process, and (2) **that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine**, the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." 35 U.S.C. § 295 **(emphasis added)**

"Substantial likelihood" is not defined by the statute, but certainly it is a standard that requires at a minimum some reasonable grounds to suspect infringement before bringing a cause of action for patent infringement.

In the disclosure, Spectrum argued that "Dr. Greens' Accused Products…are synthetic urine products with a modest sales price and an extended shelf life, which – to Spectrum's knowledge – can only be achieved through the patented production process." (See Eastman Dec. ¶6) Spectrum provided absolutely no evidence that an extended shelf life can only be achieved through the patented production process. Indeed, the prior art cited in the relevant prosecution history is replete with numerous synthetic urine solutions using biocides and other preservatives to extend their shelf life.[3] (See Eastman Dec. ¶¶ 43 and 46) For Spectrum or its attorney to now claim that a modest sales price and extended shelf life can be achieved only through the patented process is not only unreasonable, it is demonstrably untrue based upon the very prior art cited against Mr. Stephens and Mr. Cupar. (Id.)

The only other argument advanced by Spectrum in support of a substantial likelihood that Agent X is made by the patented process is the mere fact that Dr. Greens refused to disclose the formula of Agent X to Spectrum. (See Eastman Dec. ¶6) James Matthew Stephens[4] first authored a letter alleging infringement back on July 22, 2009. (See Green Dec. ¶13) More than two years later, neither Mr. Stephens, his company

---

[3] See Adamczyk et al (U.S. Patent No. 5,105,07), Bernardin (U.S. Patent No. 5,176, 668), Melius et al (U.S. Patent No. 5,651, 778, Haddad (U.S. application No. 2004,0077107).
[4] Although the author was not disclosed, the letter was on Spectrum Labs letterhead while the '776 patent was owned by Mr. Stephens.

Spectrum Labs, nor his attorneys have done anything to substantiate or investigate their suspicion of infringement. (See Eastman Dec. ¶¶32-35)

35 U.S.C. § 295 also mandates that Spectrum must ultimately prove to this Court that it made reasonable efforts to learn the process used to make Agent X. Here, the refusal to perform any chemical testing is fatal to any claim of reasonableness. Moreover, if done, such chemical testing would have unequivocally established that Agent X is not made from the patented process because it lacks all of the specifically identified and claimed biocides.

Under all the circumstances, it is clear that no one on behalf of Spectrum has any basis, let alone reasonable grounds, to believe that 35 U.S.C. § 295 is available. The total absence of investigation coupled with no evidence to suggest the potential applicability of 35 U.S.C. § 295 strongly suggests that the claim for patent infringement is being made for an improper purpose, such as using litigation as a tool to discover the Agent X formula.

It is also important to specifically inform the Court that Mr. Cupar was the prosecuting attorney for the '776 patent, and remains the patent attorney for Spectrum and Mr. Stephens in this litigation. Should he learn the identity of the supplier of Agent X and ultimately the formula, he would forever be in a conflict between his duty to maintain secrecy and his duty to advocate on behalf of Mr. Stephens' synthetic urine pursuits.

This Court has been provided with the authority to control the flow of discovery under Fed. R. Civ. P. 26(c) for precisely the type of fact pattern presented here. The prosecution history giving rise to the '776 patent, as well as literal language of the claims themselves, presents to this Court a very narrow range of patent protection afforded to Spectrum.[5] This prosecution history and literal claim language emphasizes the importance of the biocide used by any alleged infringer. Thus, even if this Court determines that Spectrum may ultimately need the formula of Agent X, this Court can schedule the flow of discovery to first address the biocide issue and simultaneously protect Dr. Greens' valuable trade secret without prejudice to Spectrum. The identity of

---

[5] Dr. Greens of course maintains its contention that the '776 patent is invalid as a result of the on-sale provisions of 35 U.S.C. 102(b).

Dr. Greens' supplier and the related formula for Agent X are not needed by Spectrum in order to determine the biocides present in Agent X. Dr. Greens has already provided and verified the identity of the biocide used in its Agent X product. Spectrum and its counsel can easily confirm Dr. Greens' evidence through their own inexpensive chemical testing. If confirmed, then there can be no infringement and the claim for patent infringement would certainly be dismissed, either voluntarily or after a noticed motion for partial summary judgment.

IV.  CONCLUSION

The ultimate issue of infringement turns on the presence of one of the specifically claimed biocides in the '776 patent at issue. A protective order is required because Dr. Greens does not know the formula for its Agent X product, but holds the identity of its supplier as a closely guarded trade secret. Moreover, neither the identity of Dr. Greens synthetic urine supplier, nor the formula itself, is required to confirm the presence of one of the specific biocides claimed in the '776 patent. Dr. Greens has presented evidence to this Court that it does not use any biocide claimed in the '776 patent, but rather uses a biocide called sodium azide that was expressly abandoned during the prosecution history in order to overcome 35 U.S.C. §103(a) rejections. Thus, no colorable argument can be made by counsel for Spectrum that the biocide sodium azide is within the scope of any claim in the '776 patent. Opposing counsel's reliance on 35 U.S.C. § 295 as a discovery tool is misplaced when there has been an intentional effort to avoid all pre-litigation investigation, no matter how inexpensive. A protective order is absolutely required to preserve the secret identity of Dr. Greens' supplier in the face of such intentional ignorance and overstated discovery rights on the part of Spectrum and its attorneys.

Respectfully submitted:

Dated: 11/23/2011

Gary L. Eastman, APLC

By _____
Gary L. Eastman, Esq.
Attorney for Plaintiff

# PROOF OF SERVICE

I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above named person the following documents:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION TO REQUEST A TELEPHONIC DISCOVERY HEARING ON DR. GREENS' MOTION FOR PROTECTIVE ORDER**

in the following manner: (check one)

1. \_\_\_\_ By personally delivering copies to the person served.

2. \_\_\_\_ By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

3. \_\_\_\_ By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4. \_\_\_\_ By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at _____ on _____, 2011.

5. _XX_ By ECF Filing Service by filing the above-identified documents with the Court via ECF electronic filing to attorneys of record in the case.

David B. Cupar
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Matthew J. Cavanagh
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Executed on November 23, 2011, 2011 at San Diego, California.

/s/ Gary L. Eastman

Gary L. Eastman