```
1  Gary L. Eastman, Esq. (SBN 182518)
   GARY L. EASTMAN, APLC
2  401 West A. Street, Ste. 1785
   San Diego, CA 92101
3  Telephone: 619-230-1144
   Facsimile: 619-230-1194
4
   Attorney for Plaintiff Dr. Greens, Inc.
5
```

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. GREENS, INC. a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES MATTHEW STEPHENS, an individual, and SPECTRUM LABORATORIES, LLC, an Ohio limited liability company,<br><br>Defendants.<br><br>AND RELATED CROSS ACTION | Case No.: 11cv0638 JAH (CAB)<br><br>**DECLARATION OF MATTHEW GREEN IN SUPPORT OF EX PARTE APPLICATION TO REQUEST A TELEPHONIC DISCOVERY HEARING ON DR. GREENS' MOTION FOR PROTECTIVE ORDER**<br><br>Date:<br>Time:<br>Courtroom: E<br>Judge: Hon. Cathy Ann Bencivengo |

I, Matthew Green, declare:

1. I am an officer and majority shareholder of Dr. Greens, Inc. The other shareholder of Dr. Greens is Gregory Nahay.

2. I have known James Matthew Stephens and his company Spectrum Laboratories for more than a decade. In the late 1990s and the early 2000s, Dr. Greens acted as the exclusive wholesale distributor for Spectrum Laboratories and James Matthew Stephens.

1. Pursuant to this relationship, Dr. Greens sold Spectrum Laboratories' Quick Fix as early as 2001.

3. However, by the end of 2001 Mr. Stephens ultimately terminated the relationship. Once Dr. Greens was no longer the exclusive wholesale distributor for Spectrum Laboratories, Dr. Greens began development of its own product line and became a competitor to Spectrum Laboratories. However, Dr. Greens did continue to purchase product from Spectrum Laboratories even in the absence of an exclusive wholesale distributorship agreement. Thus, representatives of Dr. Greens have had numerous conversations with Mr. Stephens and other representatives of his company Spectrum Labs in the years since the termination of the exclusive wholesale distributorship agreement.

4. As Dr. Greens has grown, it has become one of Spectrum Laboratories main competitors and offers numerous product lines in direct competition with Spectrum Laboratories.

5. A recently successful product for Dr. Greens is synthetic urine sold under the name Agent X. Dr. Greens sells its synthetic urine as a fetish product to individuals and retail outlets. Agent X is offered in competition with Spectrum Lab's allegedly patented Quick Fix product. However, I believe that Agent X is a superior product to Quick Fix as well as other synthetic urines on the market. In simple terms, Dr. Greens' product has more chemical characteristics of real urine than the inferior product offered by Spectrum Laboratories and as a result has been increasing its market share.

6. Dr. Greens does not manufacture its synthetic urine sold under the brand name Agent X, but rather purchases its synthetic urine from a supplier. The identity of this supplier is a closely guarded trade secret of Dr. Greens. The representative of the supplier has never disclosed to me the formula for the synthetic urine sold to Dr. Greens and marketed by Dr. Greens as Agent X. I do not know the formula for Agent X. I am aware of no one at Dr. Greens that knows the formula for Agent X. However, I was provided a Material Safety Date Sheet from my supplier that listed sodium azide as a

CASE NO. 11cv0638 JAH (CAB)
DECLARATION OF MATTHEW GREEN IN SUPPORT OF A MOTION FOR A PROTECTIVE ORDER
- 2 -

biocide contained within the synthetic urine solution. A true and correct redacted copy of this Material Safety Data Sheet is attached hereto as Exhibit 1.

7. Dr. Greens has never publicly disclosed the source of its synthetic urine supplier. Moreover, the laboratory from which Dr. Greens purchases its synthetic urine does not advertise, does not maintain a website, and is not generally known to Dr. Greens' customers, many of whom are retail stores, novelty shops and internet consumers.

8. The synthetic urine supplied to Dr. Greens is of a superior quality than that of Spectrum Labs, as well as products offered by other competitors. I have been told by my supplier and I believe that the synthetic urine purchased by Dr. Greens contains certain additives that make it appear chemically more like real urine, which appeals to my fetish customers.

9. If the identity of Dr. Greens' supplier were known, Dr. Greens' competitors could simply purchase from Dr. Greens supplier thereby eliminating Dr. Greens competitive edge because they would now face an equivalent product in the marketplace. Also, if known to Dr. Greens' customers, many of the retail stores and novelty shops would likely cut Dr. Greens out as a "middle man" and attempt to buy from the supplier directly to increase their margins of profit. Therefore, the identity of Dr. Greens' supplier is extremely valuable to Dr. Greens.

10. I have taken numerous steps to ensure that the secret identity of Dr. Greens' supplier remains secret. The identity of Dr. Greens' suppliers is only known to me and my partner Greg Nahay, and only one other person at Dr. Greens. Each of these persons has been specifically instructed by me to keep the identity of Dr. Greens' synthetic urine supplier confidential and the importance of keeping the identity of the supplier secret. The sole employee that knows the identity of the supplier has been employed with Dr. Greens for years and I believe him to be very trustworthy.

11. This select employee is required to know the identity of the supplier in order to perform his job functions, such as receiving and processing invoices from the

1 supplier and making orders to the supplier. The remaining employees of Dr. Greens have
2 no knowledge of the identity of Dr. Greens' supplier.

3     12. The synthetic urine product is shipped to Dr. Greens by its supplier in
4 unmarked one gallon jugs of concentrate whereby upon receipt, the concentrate is mixed
5 with water in large unmarked chemical drums by Dr. Greens' employees. . The drums
6 are stored in a separate room within the Dr. Greens' warehouse. The warehouse itself is
7 not accessible to the general public. Nothing on the drums indicates the identity of the
8 supplier specifically to guard against disclosure to non-essential employees. The
9 employees then drain the contents of these large unmarked drums into small bottles for
10 distribution under Dr. Greens' brand name Agent X. Because of these reasonable
11 precautions, Dr. Greens has safely kept the identity of its synthetic urine supplier secret
12 from its competitors and consumers for years.

13     13. On July 22, 2009 I received a copy of notice of infringement from Mr.
14 Cupar on behalf of Spectrum Labs. A true and correct copy of this letter is attached
15 hereto as Exhibit 2. I was frankly shocked to receive such a notice and immediately
16 contacted my attorney Gary Eastman. Prior to my receipt of this notice I had no idea that
17 Mr. Stephens even had applied for a synthetic urine patent.

18     14. Spectrum Labs currently marks its Quick Fix product with the U.S. Patent
19 No. 7,192,776. I personally purchased Quick Fix from Spectrum Labs back in 2001
20 pursuant to Dr. Greens' exclusive distributorship relationship with Spectrum Labs.

21     15. Because of Dr. Greens' purchase of Quick Fix as early as 2001, and because Dr.
22 Greens' Agent X does not contain a biocide claimed in Mr. Stephen's patent, I authorized my
23 attorney to sue Spectrum Labs and Mr. Stephens because I knew their claims of infringement
24 were unfounded.

25     16. Sometime in the Summer of 2009, I received a copy of a document entitled
26 "NOTICE OF LEGAL ACTION" from one of my clients who received the document in the mail.
27 I learned shortly thereafter that several other Dr. Greens' clients received the same NOTICE OF
28

CASE No. 11cv0638 JAH (CAB)
DECLARATION OF MATTHEW GREEN IN SUPPORT OF A MOTION FOR A PROTECTIVE ORDER
- 4 -

LEGAL ACTION from Spectrum Labs. A true and correct copy of this NOTICE OF LEGAL ACTION is attached hereto as Exhibit 3.

17. This NOTICE OF LEGAL ACTION caused harm to Dr. Greens as certain customers opted to no longer carry Agent X for fear of being sued by Spectrum Labs for patent infringement.

18. In all my dealings with Spectrum Labs, James Matthew Stephens has been the owner and representative of Spectrum Labs. On many occasions Mr. Stephens has told me of his background in chemistry and I believe him to be an experienced chemist. Based on this knowledge and Dr. Greens prior business relationship with Mr. Stephens, I have no doubt that Mr. Stephens either authored or otherwise approved of the NOTICE OF LEGAL ACTION letter.

19. Although Dr. Greens sued Mr. Stephens, the case went nowhere. Mr. Stephens' attorney Mr. Cupar refused to respond to my attorneys letters regarding our claims of patent invalidity. None of Mr. Stephens' Spectrum entities ever filed an answer to the complaint and Mr. Stephens himself avoided service of the Complaint.

20. After more than a year of no activity in that case I assumed that Mr. Stephens accepted that pursuit of a claim of infringement against Dr. Greens would result in patent invalidity based on Dr. Greens purchase or Spectrum Labs' Quick Fix product. Based on that assumption, I came to the conclusion that Mr. Stephens had decided to leave Dr. Greens alone.

21. The case was dismissed and I assumed this dispute was behind Dr. Greens.

22. Then, a few months after the case was dismissed, I learned that Mr. Cupar renewed his claims of patent infringement on behalf of Spectrum Labs against Dr. Greens. I again authorized a lawsuit to be filed against Spectrum Labs and Mr. Stephens.

23. Unlike the first lawsuit, this time Mr. Stephens' attorneys have aggressively litigated this case and have made claims against my company and my attorney that Dr. Greens acted in bad faith by suing Mr. Stephens.

Case No. 11CV0638 JAH (CAB)
DECLARATION OF MATTHEW GREEN IN SUPPORT OF A MOTION FOR A PROTECTIVE ORDER
- 5 -

24. Based on all my dealings with Mr. Stephens, I know Mr. Stephens to have a ruthless approach to business transactions and litigation. Throughout the years, he regularly talked to me about his ongoing litigation that took place in a different patent infringement case brought on behalf of Spectrum Labs. He told me that he took that case all the way up the appeals court and won.

25. I believe that Agent X's recent success has motivated Mr. Stephens to follow this path of litigation with the hope of using litigation to uncover the secret of Agent X's success, which of course is in the formula. Although I am not a chemist, it is not difficult for me to understand that Agent X uses sodium azide, sodium azide is not listed in the patent claims, and sodium azide was specifically required to be excluded by the Examiner as a condition to allow the patent. Finally, Dr. Greens uses sodium azide as its one and only biocide. Even I understand as a layperson that there is no infringement here.

26. Mr. Stephens is an experienced chemist with expertise in the synthetic urine industry. Mr. Stephens' refusal to perform a simple inexpensive chemical test, which would prove Dr. Greens' Agent X does not infringe, reinforces my belief that Mr. Stephens and his attorneys have no intent to try to prove infringement. They just want Dr. Greens' Agent X formula.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct, and that this declaration was executed on _____ at San Diego, California.

_____
Matthew Green

Case No. 11cv0638 JAH (CAB)
DECLARATION OF MATTHEW GREEN IN SUPPORT OF A MOTION FOR A PROTECTIVE ORDER
- 6 -

# PROOF OF SERVICE

I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above named person the following documents:

**DECLARTION OF MATTHEW GREEN IN SUPPORT OF EX PARTE APPLICATION TO REQUEST A TELEPHONIC DISCOVERY HEARING ON DR. GREENS' MOTION FOR PROTECTIVE ORDER**

in the following manner: (check one)

1. ___ By personally delivering copies to the person served.

2. ___ By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

3. ___ By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4. ___ By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at _____ on _____, 2011.

5. _XX_ By ECF Filing Service by filing the above-identified documents with the Court via ECF electronic filing to attorneys of record in the case.

David B. Cupar
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Matthew J. Cavanagh
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Executed on November 23, 2011, 2011 at San Diego, California.

/s/ Gary L. Eastman

Gary L. Eastman

Proof of Service

- 1 -