Gary L. Eastman (CA BAR# 182518)
401 West "A" Street, Suite 1785
San Diego, CA 92101
Phone: 619.230.1144
Facsimile: 619.230.1194
Attorney for Plaintiff
Dr. Greens, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dr. Greens, Inc. a California Corporation<br><br>        Plaintiff,<br><br>-v-<br><br>James Matthew Stephens, an individual, and Spectrum Laboratories, LLC, an Ohio Limited Liability Company,<br><br>        Defendants. | ) Case No.:3:11-cv-638-JAH (CAB)<br>)<br>) FIRST AMENDED COMPLAINT FOR<br>) DECLARATORY JUDGMENT OF PATENT<br>) NON-INFRINGEMENT, PATENT<br>) INVALIDITY, MISUSE OF PATENT,<br>) FEDERAL STATUTORY UNFAIR<br>) COMPETITION, UNFAIR COMPETITION<br>) UNDER CALIFORNIA BUSINESS &<br>) PROFESSIONS CODE SECTION 17200,<br>) INTERFERENCE WITH BUSINESS<br>) RELATIONS, INTERFERENCE WITH<br>) PROSPECTIVE ECONOMIC ADVANTAGE,<br>) AND DEMAND FOR JURY TRIAL<br>)<br>)<br>)<br>) |

Plaintiff Alleges:

## Jurisdiction

1.    Plaintiff DR. GREENS, INC. (Hereinafter "DR. GREENS"), is and at all times herein mentioned was, is and at all times relevant hereto was, a corporation of the state of California and doing business in the County of San Diego, State of California.

2.     Plaintiff is informed and believes, and on the basis of such information and belief alleges, Defendant JAMES MATTHEW STEPHENS (hereinafter referred to as "STEPHENS") is an individual residing in Cincinnati, Ohio, and doing business as Spectrum Laboratories and/or Spectrum Labs(hereinafter referred to as "SPECTRUM").

3.     Plaintiff is informed and believes, and on the basis of such information and belief alleges, Defendant SPECTRUM LABORATORIES, LLC (hereinafter referred to as "SPECTRUM LLC") is a limited liability company formed in accordance with the laws of the State of Ohio and having a principal place of business of 550 Reading Road, Cincinnati, Ohio 45202. SPECTRUM LLC also does business as Spectrum Laboratories and/or Spectrum Labs.

4.     Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendant STEPHENS is one of only two members of SPECTRUM LLC. The other member of SPECTRUM LLC is Jacinda Stephens, who is the wife of Defendant STEPHENS. STEPHENS owns a majority membership interest in SPECTRUM LLC.

5.     Plaintiff is informed and believes, and on the basis of such information and belief alleges, that at all times relevant hereto, Stephens was the managing member of SPECTRUM LLC and in sole control of all day to day business activities of SPECTRUM LLC.

6.     Spectrum Laboratories, Inc. (hereinafter referred to as "SPECTRUM INC" is a corporation formed in accordance with the laws of the State of Ohio and having a principal place

of business of Cincinnati, Ohio.  SPECTRUM INC was
incorporated on September 9, 1992 and dissolved on May 18,
2010.  SPECTRUM INC. also did business as Spectrum
Laboratories and/or Spectrum Labs.

7.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that from on or about
September 9, 1992 to May 18, 2010, STEPHENS was the sole
shareholder of SPECTRUM INC, president of SPECTRUM INC. and
sole director of SPECTRUM INC.  From September 9, 1992 to
May 18, 2010 STEPHENS was in sole control of all day to day
business activities of SPECTRUM INC.

8.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that Defendant
STEPHENS is, and was at all times relevant hereto, a
resident of the State of Ohio.

9.    Defendants STEPHENS, SPECTRUM and SPECTRUM LLC are
collectively referred to herein as "Defendants".

10.    The court has jurisdiction of this action because this
litigation arises under the Patent Laws of the United
States of America, namely *35 U.S.C. § 1 et seq.* The Court
has jurisdiction over this action under *28 U.S.C. § 1331*
(federal question), and *28 U.S.C. § 1338(a)* (patents).

11.    The court has jurisdiction of this action for related
state law claims arising out of this litigation.  The court
has jurisdiction over this action under *28 U.S.C. § 1367(a)*
(supplemental jurisdiction).

12.    This Court has personal jurisdiction over the Defendants
because, on information and belief, Defendants conduct

business in the State of California and within this district, including contracts with California corporations and the advertising and sale of products within this State and through the Internet to California residents.

13.   Venue is proper in this district under *28 U.S.C. §§ 1391(b)* and *1391(c)*.

## General Allegations

14.   Prior to and including 1999, DR. GREENS acted as an exclusive distributor for STEPHENS, SPECTRUM and/or SPECTRUM INC and purchased and sold numerous products pursuant to that relationship. Beginning in 2001, DR. GREENS purchased synthetic urine from STEPHENS, SPECTRUM and/or SPECTRUM INC under the brand name Quick Fix.   DR. GREENS then sold Quick Fix to various retail customers throughout the United States.

15.   At the end of 2001, STEPHENS terminated the exclusive distributor relationship, however, DR. GREENS continued to purchase Quick Fix from STEPHENS, SPECTRUM and/or SPECTRUM INC and re-sale it to various Dr. GREENS customers.   From the end of 2001 up to the beginning of this dispute in 2009, Dr. GREENS had continually purchased Quick Fix from STEPHENS, SPECTRUM and/or SPECTRUM INC and offered the same as a product for sale to Dr. GREENS' various retail customers at a small mark up in price.

16.   Beginning in late 2003 or early 2004, Dr. GREENS sought out a new synthetic urine that could be sold under a Dr. GREENS' owned brand name. By mid 2004, Dr. GREENS began

marketing and selling synthetic urine under the Dr. GREENS owned brand name "Agent X." Notwithstanding Dr. GREENS' sales of Agent X, Dr. GREENS continued to purchase Quick Fix from STEPHENS and/or SPECTRUM INC and re-sell the same as an alternative product to Quick Fix.

17. On or about January 8th, 2004, defendant STEPHENS applied for a United States Patent for a "Synthetic Urine and Method Of Manufacturing Same."

18. The thrust of the patent application asserted that STEPHENS had invented a novel synthetic urine by using biocides to inhibit microbial growth and sepsis.

19. On or about March 20, 2007, patent number 7,192,776 for a "Synthetic Urine and Method Of Manufacturing Same" was issued to Defendant STEPHENS by the United States Patent and Trademark Office ("USPTO").

20. The registration of the patent number 7,192,776, "Synthetic Urine and Method Of Manufacturing Same" (herein after the "'776 Patent"), is attached hereto as exhibit "A" and is incorporated herein by reference the same as if set forth verbatim. All claims in the '776 Patent include a closed Markush Group of a list of biocides.

21. Plaintiff Dr. GREENS has never sold a synthetic urine under any of its brand names, including Agent X, that included a biocide set forth in any claim of the '776 Patent.

22. Because Agent X has never included one of the specific biocides claimed in the '776 Patent, there can be no infringement of any claim of the '776 Patent.

<u>First Claim of Infringement by Defendants</u>

23.   On or about July 22, 2009 Defendants, through STEPHENS'
      legal counsel Mr. Cupar, sent a cease and desist letter to
      Plaintiff DR. GREENS.   The cease and desist letter received
      by Plaintiff DR. GREENS from Mr. Cupar is attached hereto
      as exhibit "B" and is incorporated herein by reference the
      same as if set forth verbatim.   Exhibit B reads in part:
      "Spectrum believes that your Agent X product likely
      infringes the '776 Patent."   Exhibit B concludes with the
      following: "Please review the '776 Patent and let us know
      by Monday, August 3, 2009 any basis for which you do not
      believe that you infringe."

24.   As of July 22, 2009, STEPHENS was the owner of record of
      the '776 Patent.   The letter only referenced Spectrum
      Laboratories, and did not specifically state whether Mr.
      Cupar was writing on behalf of STEPHENS, SPECTRUM, SPECTRUM
      INC and/or SPECTRUM LLC.

25.   As of July 22, 2009, both SPECTRUM INC and SPECTRUM LLC
      existed and did business under the names Spectrum
      Laboratories and Spectrum Labs.

26.   Plaintiff is informed and believes and based thereon
      alleges that STEPHENS has an educational background in
      chemistry and at all times mentioned herein had the
      technical expertise to conduct and/or evaluate chemical
      testing of the composition of Agent X to discern the

presence or absence of any one of the biocides claimed in the '776 Patent.

27.  As of July 22, 2009 plaintiff is informed and believes and based thereon alleges that STEPHENS, SPECTRUM, SPECTRUM INC and SPECTRUM LLC had conducted no chemical testing to determine the presence of a biocide claimed in the '776 Patent in Agent X or deliberately ignored the results of such testing indicating that Agent X contained none of the biocides claimed in the '776 Patent.  Accordingly, as of July 22, 2009, STEPHENS, SPECTRUM INC and SPECTRUM LLC could have no reasonable basis to believe that Agent X infringed any claim of the '776 Patent.

28.  As of July 22, 2009, STEPHENS knew of the prior sales to Dr. GREENS that took place years before the filing date of the application giving rise to the '776 Patent and further knew that these sales constituted a bar to the validity of the '776 Patent.

29.  Because STEPHENS knew or should have known that the '776 Patent was invalid as a result of the prior sales of Quick Fix to Dr. GREENS, STEPHENS authorized Exhibit B with no good faith belief that Agent X actually infringed any claim in the '776 Patent.  Exhibit B was therefore sent to Dr. GREENS in bad faith.

30.  As of July 22, 2009, STEPHENS also knew that he had deliberately concealed from the USPTO a printed publication, which constitutes prior art and from which STEPHENS, or his authorized agent, copied the entire list of biocides set forth in the '776 Patent specification and

claims.  STEPHENS knew, or should have known, that his deliberate concealment of the printed publication prior art from which he, or his authorized agent, copied the entire list of biocides presented in the patent specification and claims constituted inequitable conduct before the USPTO and served as grounds for patent invalidity and/or renders the '776 patent unenforceable.  The printed publication prior art from which STEPHENS, or his authorized agent, copied the entire list of biocides was material to patentability and should have been disclosed to the USPTO. STEPHENS' failure to disclose information material to patentability during the prosecution of the application giving rise to the '776 patent is a breach of his duty of candor and constitutes inequitable conduct.

31.  Because STEPHENS knew or should have known that the '776 Patent was invalid as a result of his deliberate concealment of the printed publication prior art from the USPTO,  Stephens authorized Exhibit B with no good faith belief that Agent X actually infringed any claim in the '776 Patent.  Exhibit B was therefore sent to Dr. GREENS in bad faith.

32.  On August 3, 2009, Plaintiff, through counsel, responded to Defendants' attorney Mr. Cupar denying any infringement, and also raised substantive issues surrounding the questionable validity of the '776 Patent.  A copy of the denial letter to Mr. Cupar is attached as Exhibit "C". This letter put STEPHENS, SPECTRUM, SPECTRUM INC and SPECTRUM LLC on notice that Dr. GREENS contested the

1 validity of the '776 Patent.  Notwithstanding such notice,
2 no effort was ever made in 2009 to deny Dr. GREENS claims
3 that the '776 Patent was invalid.

4 33.  On August 6, 2009, counsel for Defendant Mr. Cupar
5 responded that he had been out of town, but that he "… will
6 work with you regarding this mater over the next few
7 weeks."  A copy of the letter from Mr. Cupar, counsel for
8 Defendant, is attached as Exhibit "D."

9 <u>Legal Action Notification Letter</u>

10 34.  On September 16, 2009, Dr. GREENS received a copy of a
11 letter entitled "Legal Action Notification" (hereinafter
12 the "Legal Action Notification") dated September 8, 2009
13 from one of Dr. GREENS' customers who had received the
14 Legal Action Notification letter from "Spectrum Labs" on or
15 shortly after September 8, 2009.  A copy of this Legal
16 Action Notification letter is attached as Exhibit "E".

17 35.  STEPHENS, as the then '776 Patent holder, was responsible
18 for the creation and transmission of the Legal Action
19 Notification as set for more fully below. STEPHENS either
20 personally authored or otherwise authorized as the
21 president of SPECTRUM INC or manager of SPECTRUM LLC the
22 Legal Action Notification letter.  STEPHENS approved of the
23 content and widespread circulation of Legal Action
24 Notification letters to the synthetic urine retail industry
25 with content identical to the Legal Action Notification
26 letter attached as Exhibit "E".  When the Legal Action
27 Notification letter was created, STEPHENS intended on
28 personally owning the '776 Patent because he had not

1      assigned the '776 Patent to either SPECTRUM INC or SPECTRUM

2      LLC, both of which existed as of that time.

3 36.      At the direction of STEPHENS, letters identical in form

4      to the Legal Action Notification letter were widely

5      circulated to many thousands of businesses located

6      throughout the United States that engage in retail sales of

7      synthetic urine, including customers and prospective

8      customers of Dr. GREENS.  These Legal Action Notification

9      letters were circulated in the fall of 2009, including but

10      not limited to August of 2009 and September of 2009.

11 37.      The language of the thousands of Legal Action

12      Notification letters was intentionally designed to chill

13      competition through a combination of overbroad, vague and

14      untrue statements as set forth more fully below.

15 38.      The Legal Action Notification letters read in part: "[a]s

16      you know, Spectrum Labs' "Quick Fix" synthetic urine is the

17      only patented product of its kind in the market."  This

18      statement was false, created a false impression and was

19      misleading because STEPHENS was aware of several synthetic

20      urine patents in existence that disclosed the use of a

21      known biocide in the synthetic urine solution.

22 39.      The Legal Action Notification letters failed to reference

23      any specific pending litigation or anticipated litigation

24      against any particular synthetic urine manufacturer.

25      Instead, the Legal Action Notification letters indicated

26      that "Spectrum Labs is in the process of taking action

27      against all synthetic urine manufactures who are

28      potentially violating our patent" without providing the

recipient any information as to what specific synthetic urine manufacturer "Spectrum Labs" suspected infringed. This language was specifically selected and/or approved by STEPHENS with the specific intent that the recipient be deprived of any ability to independently discern whether the synthetic urine purchased by them infringed the '776 Patent.

40.    The Legal Action Notification letter threatened legal action against "whoever", without authority, makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therfor." This language was specifically selected and/or approved by STEPHENS with the specific intent that the recipient be concerned of the possibility that he or she could be held responsible for selling a synthetic urine that possibly infringed the '776 Patent.

41.    The Legal Action Notification letter instructed the recipient that "[t]o avoid potential liability, please avoid offering for sale, or selling, any potentially infringing products."    This language was specifically selected and/or approved by STEPHENS with the specific intent that the recipient would construe the Legal Action Notification letter to mean that he or she would become involved in litigation if he or she purchased or sold any synthetic urine other than synthetic urine covered by the '776 Patent and sold by Spectrum Labs.

42. STEPHENS intended that the Legal Action Notification letter coupled with its widespread circulation in the synthetic urine industry would chill competition from all of Defendants' competitors and particularly from Dr. GREENS.

43. STEPHENS intended that the Legal Action Notification letter, when read by a recipient, would mislead said recipient to conclude that purchasing synthetic urine from anyone other than Spectrum Labs, including Dr. GREENS, would subject the recipient to legal action.

44. STEPHENS intended that the Legal Action Notification letter, when read by a recipient, would mislead said recipient to conclude the only safe course to avoid liability would be to purchase synthetic urine directly from Spectrum Labs.

45. The language selected and/or approved by STEPHENS in the Legal Action Notification letter, was broad enough to plainly imply that Dr. GREENS' product, another synthetic urine on the market, infringes the '776 Patent.

46. The Legal Action Notification Letter was false, created a false impression and/or was misleading to its recipients because the '776 Patent was invalid under 35 USC 102(b) resulting from STEPHENS', SPECTRUMS' and/or SPECTRUM INC's sales of Quick Fix to Dr. GREENS in 2001 and 2002, and thus precluding the possibility of liability for infringement upon the '776 Patent.

47. The Legal Action Notification Letter was false, created a false impression and/or was misleading to its recipients

because the '776 Patent was invalid resulting from STEPHENS inequitable conduct before the USPTO during prosecution of the patent application giving rise to the '776 Patent, and thus precluding the possibility of liability for infringement upon the '776 Patent.

48. The Legal Action Notification Letter was false, created a false impression and/or was misleading to its recipients because Dr. GREENS' Agent X did not infringe any claim of the '776 Patent.

49. The Legal Action Notification Letter was false, created a false impression and/or was misleading because neither STEPHENS, SPECTRUM, SPECTRUM INC nor SPECTRUM LLC initiated legal action against anyone for patent infringement in 2009 or 2010, nor did they intend to do so at the time the Legal Action Notification Letters were circulated to the entire synthetic urine retail industry.

50. The Legal Action Notification Letter was false, created a false impression and/or was misleading because there were other synthetic urines on the market that did not infringe any claim in the '776 Patent.

51. As a result of the false and misleading language contained in the thousands of Legal Action Notification letters, coupled with its indiscriminate and widespread circulation throughout the entire synthetic urine retail industry, STEPHENS, SPECTRUM, SPECTRUM INC and/or SPECTRUM LLC enjoyed a substantial increase in sales of synthetic urine from recipients of the Legal Action Notification

letter, including customers and prospective customers of Dr. GREENS.

52. The Legal Action Notification letters have misled and continue to mislead thousands of Dr. GREENS customers and prospective customers into wrongly believing that Dr. GREENS' Agent X and all other synthetic urine products infringe the '776 Patent.

53. The Legal Action Notification letters were created and circulated in bad faith because at the time the Legal Action Notification letter was created and circulated, STEPHENS knew that the '776 Patent was invalid.

54. At the time the Legal Action Notification letters were circulated, STEPHENS knew that synthetic urine covered by one or more of the claims of the '776 Patent had been sold to numerous persons and companies, including Dr. GREENS, more than one year before the filing date of the application giving rise to the '776 Patent. STEPHENS knew that these prior sales constituted an on sale bar and invalidated the '776 Patent.

## Exchanged Correspondence

55. On September 19, 2009, counsel for Plaintiff sent Mr. Cupar, attorney for Defendants, a follow up letter to Plaintiff's August 3rd letter, again requesting specifics of the allegations of infringement and further warning of Defendants' patent misuse and unfair competition through the mailing of false claims to Plaintiff's current and potential customers. A copy of this letter is attached as Exhibit "F".

56. On September 21, 2009, Mr. Cupar, counsel for Defendant, responded, requesting information regarding the basis for non-infringement, and specific proof of letters sent to Plaintiff's customers regarding the threats of infringement. A copy of this E-mail letter is attached as Exhibit "G".

57. The September 21, 2009 letter was sent on behalf of STEPHENS by his authorized agent. The demand for information regarding Dr. GREENS' basis for concluding non-infringement was written with the specific objective to obtain the chemical formula of Agent X. This demand was made without any reasonable subjective or objective basis to support a belief of infringement on the part of STEPHENS, his agents, SPECTRUM, SPECTRUM INC or SPECTRUM LLC. This demand was therefore made in bad faith.

58. No effort was made by STEPHENS, or any of his agents, or anyone else on behalf of Defendants, to evaluate Dr. GREENS claims of patent invalidity under 35 USC 102(b) from July 22, 2009 to September 21, 2009.

59. No effort was made by STEPHENS, or any of his agents, or anyone else on behalf of Defendants to chemically test Agent X for the presence of any one of the biocides claimed in the '776 Patent from July 22, 2009 to September 21, 2009.

60. On September 23, 2009, counsel for Plaintiff responded to Mr. Cupar with specifics regarding a 35 U.S.C. §102 basis for the non-infringement, namely, that the patent is invalid based on a prior sale of the product by Defendants

more than a year before the earliest filing date of the application for patent. Also, Plaintiff provided Mr. Cupar with a copy of the "Legal Action Notification" letter that had been received by one of Plaintiff's customers. A copy of this Response is attached as Exhibit "H". Mr. Cupar never responded to or otherwise acknowledged this letter or the attached Legal Action Notification letter.

61. On October 23, 2009, counsel for Plaintiff sent a letter to follow up on the September 23, 2009 letter that had provided a complete response to Defendant's request, and demanded that Defendants provide the identities of companies that had received Defendants "Legal Action Notification". A copy of Plaintiff's letter is attached as Exhibit "I". Mr. Cupar never responded to or otherwise acknowledged this letter.

## First Lawsuit

62. On or about August 2009, Plaintiff filed suit in this Court for Declaratory Judgment of Non Infringement and other related causes of action against SPECTRUM INC, SPECTRUM LLC, and STEPHENS personally, Case No. 09-cv-01673-MMA-JMA (hereinafter the "First Lawsuit").

63. After hearing nothing further from Mr. Cupar, on December 2, 2009, SPECTRUM INC was served with a copy of the original complaint in the First Lawsuit; however, service was never made on Defendants STEPHENS or SPECTRUM LLC. Notwithstanding said service, SPECTRUM INC never filed an answer to the original complaint. Notwithstanding said

service, no telephone call, letter, email or any other communication was received by STEPHENS' lawyer Mr. Cupar.

64. Plaintiff is informed and believes and based thereon alleges that STEPHENS took deliberate steps to avoid personal service of the prior complaint in the First Lawsuit because STEPHENS knew that if he were served, he would have been compelled as the '776 Patent owner to file a compulsory counterclaim alleging patent infringement. STEPHENS also knew, as alleged above, that the '776 Patent was not valid and any claim of patent infringement based upon the '776 Patent would be false and would subject STEPHENS to further personal liability. STEPHENS elected to continue to avoid personal service and caused SPECTRUM INC and Defendants' lawyer Mr. Cupar to cease all communications with counsel for Dr. GREENS and avoid participation in the First Lawsuit.

65. Plaintiff received no further correspondence from Defendant or its Attorney, Mr. Cupar, in 2009 or 2010, nor did SPECTRUM INC file an Answer to the prior Complaint in the First Lawsuit. Despite Dr. GREENS' efforts to locate and serve STEPHENS, he successfully avoided personal service of the prior complaint in the First Lawsuit.

66. At no time in 2009 or 2010 did STEPHENS or anyone acting on behalf of SPECTRUM INC or SPECTRUM LLC ever deny Dr. GREENS contention that the early sales of Quick Fix to Dr. GREENS constituted an on sale bar under 35 USC 102(b). The failure to respond to these claims or to otherwise participate in the First Lawsuit by STEPHENS, SPECTRUM INC

or SPECTRUM LLC evidences that STEPHENS authorized a letter campaign claiming an unfounded belief in patent infringement with no intent to file suit. The failure to respond to these claims or to otherwise participate in the First Lawsuit by STEPHENS, SPECTRUM INC or SPECTRUM LLC evidences that the Legal Action Notification letter was created and circulated with no good faith intent to initiate any legal action against Dr. GREENS.

## Nunc Pro Tunc Assignment

67.  On January 4, 2010, Unbeknownst to Plaintiff, STEPHENS recorded a document with the USPTO purporting to assign his interest in the '776 Patent to SPECTRUM LLC, effective, nunc pro tunc, on March 4, 2008. (Hereinafter the "Nunc Pro Tunc Assignment). Plaintiff is informed and believes and based thereon alleges that all Legal Action Notification Letters were drafted after March 4, 2008.

68.  The Nunc Pro Tunc Assignment was created by an authorized agent of STEPHENS as part of a tactical plan to shield STEPHENS from additional personal liability that would arise from filing a compulsory counterclaim based upon the '776 Patent that STEPHENS knew to be invalid as set forth above, and to shield STEPHENS from the liabilities associated with the many thousands of Legal Action Notification letters sent on behalf of "Spectrum Labs."

69.  STEPHENS knew that the Nunc Pro Tunc Assignment could not retroactively convey standing to SPECTRUM LLC to assert a counterclaim in response to the prior Complaint, therefore

STEPHENS made a calculated decision to continue to avoid service in the First Lawsuit with the expectation that Dr. GREENS would be forced to dismiss the prior complaint because it was unsuccessful in serving STEPHENS, as the indispensable party owner of the '776 Patent.

70.    After the passage of nearly 17 months with no further communications from Defendants' attorney, Mr. Cupar, after no successful service on STEPHENS, and after no answer having been filed by SPECTRUM INC, plaintiff believed the misguided allegations of infringement had been abandoned by STEPHENS, SPECTRUM, SPECTRUM INC and SPECTRUM LLC.  Based on this belief, Plaintiff dismissed the prior action without prejudice on November 17, 2010.  At the time of this dismissal, Plaintiff was not aware of the existence of the Nunc Pro Tunc Assignment.

Current Dispute

71.    On February 11, 2011, Counsel for Plaintiffs received a renewed demand alleging patent infringement of the '776 Patent from Mr. Cupar.  A copy of the February 11, 2011 letter is attached as Exhibit "J". Exhibit J reads in pertinent part:

"Spectrum again asks that Dr. GREENS identify any reasons why it does not believe it is infringing. Specifically, if Dr. GREENS contends that its Agent X product does not infringe, please provide the formula and method used to manufacture that product so we can

test the accuracy of that contention in accordance
with 35 U.S.C. § 295."

72.   Exhibit J was the first letter written by Mr. Cupar that
specifically referenced his client as the entity SPECTRUM
LLC.

73.   As of February 11, 2011 plaintiff is informed and
believes and based thereon alleges that STEPHENS, SPECTRUM
INC and SPECTRUM LLC had conducted no chemical testing to
determine the presence of any biocide claimed in the '776
Patent in Agent X or deliberately ignored the results of
such testing indicating that Agent X contained none of the
biocides claimed in the '776 Patent.  Accordingly, as of
February 11, 2011, STEPHENS, SPECTRUM and SPECTRUM LLC
could have no reasonable basis to believe that Agent X
infringed any claim of the '776 Patent.

74.   As of February 11, 2011, STEPHENS knew of the prior sales
to Dr. GREENS that took place years before the filing date
of the application giving rise to the '776 Patent and
further knew that these sales constituted a bar to the
validity and enforcement of the '776 Patent.

75.   Because STEPHENS knew or should have known that the '776
Patent was invalid as a result of the prior sales of Quick
Fix to Dr. GREENS, STEPHENS authorized Exhibit J with no
good faith belief that Agent X actually infringed any claim
in the '776 Patent.  Exhibit J was therefore sent to Dr.
GREENS in bad faith.

76.   As of February 11, 2011, STEPHENS also knew that he had
deliberately concealed from the USPTO the printed

publication prior art from which STEPHENS, or his
authorized agent, copied the entire list of biocides set
forth in the '776 Patent specification and claims.
STEPHENS knew, or should have known, that his deliberate
concealment of the printed publication prior art from which
he, or his authorized agent, copied the entire list of
biocides presented in his patent constituted misconduct
before the USPTO and served as grounds for patent
invalidity.

77.    Because STEPHENS knew or should have known that the '776
Patent was invalid as a result of his deliberate
concealment of the printed publication prior art from the
USPTO,   Stephens authorized Exhibit J with no good faith
belief that Agent X actually infringed any claim in the
'776 Patent.  Exhibit J was therefore sent to Dr. GREENS in
bad faith.

78.    Exhibit J failed to respond to Dr. GREENS multiple
letters claiming the applicability of the on sale bar under
35 U.S.C. § 102(b) or otherwise even acknowledge the
letters that had been sent in September and October of 2009
by counsel for Dr. GREENS.

79.    Because Exhibit J was sent to Dr. GREENS without any good
faith belief in infringement by STEPHENS and SPECTRUM LLC,
Exhibit J is not protected by any privilege under the
patent laws of the United States.

80.    Exhibit J was sent to Dr. GREENS for the specific purpose
of discovering the chemical formula of Agent X to enable

STEPHENS and his company SPECTRUM LLC to obtain a competitive advantage over their competitor Dr. GREENS.

81. Defendants knew the '776 Patent was invalid at the time the Legal Action Notification letters were created and widely circulated because:

    a. Defendants entirely failed to respond to Dr. GREENS' claim that it purchased synthetic urine from Defendants' that was covered by the '776 Patent years before STEPHENS filed the patent application giving rise to the '776 Patent;

    b. Defendants' refused to provide to Dr. GREENS any factual basis to support the alleged belief of that Dr. GREENS' Agent X infringed the '776 Patent;

    c. The Legal Action Notification letter was widely disseminated to the entire retail synthetic urine industry, including the customers and prospective customers of Dr. GREENS, without Defendants having taken any reasonable steps to confirm that Dr. GREENS' Agent X in fact infringed one or more claims of the '776 Patent;

    d. Defendants failed to take any action in 2009 against Dr. GREENS after the widespread circulation of the Legal Action Notification letter to the retail synthetic urine industry, including Dr. GREENS' customers and prospective customers;

e. Defendants knew that the Dr. GREENS claims of patent invalidity would have been tested in the First Lawsuit;

f. SPECTRUM INC refused to participate in the First Lawsuit even though STEPEHNS was the president, sole shareholder and one of only two directors for SPECTRUM INC at the time the prior complaint in the First Lawsuit was served on SPECTRUM INC;

g. Defendants resumed their claims that Dr. GREENS' Agent X infringed the '776 Patent only after the complaint in the First Lawsuit was dismissed in 2011.

## Claim for Relief

### COUNT I.a. PATENT NON-INFRINGEMENT.

82. Plaintiff re-alleges and incorporates herein by reference, the same as if set forth verbatim, the allegations contained in paragraphs 1 through 81.

83. Plaintiff is informed and believes and based thereon alleges that the Nunc Pro Tunc Assignment is unsupported by consideration, therefore the purported assignment of the '776 Patent is null and void. Accordingly, STEPHENS remains the true owner of the '776 Patent.

84. Defendants have alleged that the '776 Patent is infringed by Plaintiff's DR. GREEN'S AGENT X product.

85. Plaintiff, however, asserts that Plaintiff's products do not infringe the claims of the '776 Patent.

86.     Plaintiff asserts that the DR. GREEN'S AGENT X product
        manufactured by Plaintiff does not fall within any of the
        claims of the '776 Patent.

87.     There is a continuing judiciable controversy between
        Plaintiff and Defendants as to Defendants' right to
        threaten or maintain suit for infringement of the '776
        Patent, and as to the scope and enforceability thereof, and
        as to whether any of Plaintiffs' products infringes any
        valid claim thereof.

88.     Plaintiff has not infringed, willfully infringed,
        contributorily infringed, or induced others to infringe,
        any claim of the '776 Patent.

89.     Plaintiff desires a judicial determination of its rights
        and duties, and declarations by this Court of non-
        infringement of the '776 Patent.

### COUNT I.b. PATENT INVALIDITY

90.     Plaintiff re-alleges and incorporates herein by
        reference, the same as if set forth verbatim, the
        allegations contained in paragraphs 1 through 89.

91.     Defendants have asserted that the '776 Patent is valid
        and infringed by one or more of Plaintiff's products.

92.     Plaintiff is informed and believes and based thereon
        alleges that the Nunc Pro Tunc Assignment is unsupported by
        consideration, therefore the purported assignment of the
        '776 Patent is null and void.  Accordingly, STEPHENS
        remains the true owner of the '776 Patent.

93. On information and belief, Plaintiffs assert that Defendants manufactured and sold product covered by one or more claims of the '776 Patent years before the filing date of the '776 Patent, and hence in violation of 35 U.S.C. §102(b), resulting in any issued patent being invalid on its face.

94. Plaintiff further asserts that the solutions described in the '776 Patent are well known in the industry, and thus, would be obvious in light of the prior art which results in the claims for the '776 Patent being anticipated and thus not patentable under 35 U.S.C §103.

95. Plaintiff is informed and believes, and on the basis of such information and belief alleges, that the claims of the '776 Patent are invalid and therefore cannot be infringed by any of Plaintiff's products as a result of STEPHENS failure to disclose a prior art printed publication reference material that is relevant and material to patentability from which either STEPHENS or his authorized agent copied the entire list of biocides claimed in the '776 Patent.

96. There is a continuing judiciable controversy between Plaintiff and Defendants as to Defendants' right to threaten or maintain suit for infringement of the '776 Patent, and as to the validity and enforceability thereof.

97. Plaintiff asserts that the 7,192,776 Patent is invalid for failing to comply with the patent laws of the United States, including but not limited to *35 U.S.C. §§ 102, 103, 112*, and/or *132*.

98.   Plaintiffs desire a judicial determination of their rights and duties, and declarations by this Court of invalidity of the 7,192,776 Patent.

### COUNT II. MISUSE OF PATENT

99.   Plaintiff re-alleges and incorporates herein by reference, the same as if set forth verbatim, the allegations contained in paragraphs 1 through 98.

100.   Plaintiff is informed and believes and based thereon alleges that the Nunc Pro Tunc Assignment is unsupported by consideration, therefore the purported assignment of the '776 Patent is null and void. Accordingly, STEPHENS remains the true owner of the '776 Patent.

101.   Defendants repeated threats of patent infringement against Dr. GREENS were made with the specific intent to coerce Dr. GREENS into providing the formula of Agent X in order to give Defendants a competitive advantage against Dr. GREENS.

102.   Defendants repeated threats of patent infringement against Dr. GREENS were unfounded and unsupported by any objective or subjective reasonable belief that Dr. GREENS' Agent X infringed any claim of the '776 Patent because:

    a. STEPHENS had either conducted chemical testing that conclusively established that Agent X did not infringe any claim of the '776 Patent or deliberately avoided such chemical testing to feign a belief that Agent X did infringe the '776

Patent wherein said belief was unfounded in fact, both objectively and subjectively.

b. STEPHENS knew that he had sold Quick Fix to Dr. GREENS years before filing the patent application giving rise to the '776 Patent. STEPHENS knew that these sales gave rise to an on sale bar that invalidated the '776 Patent.

c. STEPHENS failed to deny, either through counsel or through SPECTRUM INC or SPECTRUM LLC, Dr. GREENS' claims of patent invalidity resulting from the prior sales of Quick Fix to Dr. GREENS.

d. STEPHENS was aware of Dr. GREENS' sales of Agent X since 2004 and took no steps to assert any belief of patent infringement at any time from when the '776 Patent issued in March of 2007 to July 22, 2009.

e. STEPHENS evaded personal service of the prior complaint during the First Lawsuit.

f. After authoring and/or authorizing the widespread circulation of the Legal Action Notification letters, STEPHENS executed the Nunc Pro Tunc Assignment, unsupported by any consideration, in an effort to shield himself from personal liability.

g. STEPHENS failed to ever provide any basis in fact as to why "Spectrum" believed that Agent X infringed the '776 Patent in 2009.

h. STEPHENS failure to ever provide any basis in fact as to why "Spectrum" believed that Agent X infringed the '776 Patent in 2010.

i. STEPHENS failure to ever provide any basis in fact before the original complaint in this action was filed in 2011 as to why "Spectrum" believed that Agent X infringed the '776 Patent.

j. STEPHENS failed to take any legal action as the patent owner of the '776 Patent against Dr. GREENS in 2009 or 2010, notwithstanding the wide circulation of the Legal Action Notification letter that represented that ""Spectrum Labs" is in the process of taking against all synthetic urine manufactures who are potentially violating our patent."

k. STEPHENS knew that Dr. GREENS' invalidity argument would have been tested in the First Lawsuit and therefore he declined to participate in that action in order to protect the '776 Patent and avoid personal liability that would ultimately arise from bringing a baseless compulsory counterclaim alleging infringement of the '776 Patent by Dr. GREENS.

l. SPECTRUM INC, although served, failed to file an answer to the original complaint or otherwise participate in the First Lawsuit.

m. Only after the Nunc Pro Tunc Assignment was executed and after the original complaint in the

First Lawsuit was dismissed did SPECTRUM LLC
first assert a claim of infringement against Dr.
GREENS.

103.  Because Defendants knew or should have known that Agent X
could not and did not infringe any claim in the '776
Patent, the repeated demands for Dr. GREENS formulas were
made in bad faith and impermissibly expanded the scope of
the '776 Patent.  The repeated claims of patent
infringement and demands for the formula constitute patent
misuse.

104.  The widespread circulation of the Legal Action
Notification letter is a violation of U.S. anti-trust laws
because the Legal Action Notification letter falsely
implies that "Spectrum Labs" holds an exclusive monopoly to
all synthetic urine. The violation of U.S. anti-trust law
as herein alleged constitutes patent misuse.

105.  The Legal Action Notification Letter improperly and
willfully expanded the scope of the claims of the '776
Patent with the specific intent to exclude others from
selling synthetic urine, including Dr. GREENS.

106.  The Legal Action Notification Letter was widely
circulated to the retail synthetic urine industry in bad
faith because Defendants, and STEPHENS specifically, knew
during the time period that the Legal Action Notification
letters were circulated:

  a. that Dr. GREENS' synthetic urine does not
     infringe any claim of the '776 Patent;

b. that the '776 Patent was invalid;

c. that numerous synthetic urines were on the market by third parties prior to the issuance of the '776 Patent and that these synthetic urines did not infringe the '776 Patent;

d. that multiple United States patents had been granted on synthetic urine solutions prior to the issuance of the '776 Patent;

e. that Defendants did not intend on taking legal action for patent infringement against Dr. GREENS or any other synthetic urine manufacturer for infringement of the '776 Patent;

f. that Defendants did not intend on taking legal action against any retail synthetic urine recipients of the Legal Action Notification letter;

g. that recipients of the Legal Notification letter whom purchased Agent X from Dr. GREENS would in fact not be liable for infringement of the '776 Patent;

h. that recipients of the Legal Action Notification letter would likely be deceived into believing that "Spectrum Labs" was in the process of taking action against synthetic urine manufacturers for patent infringement;

i. that recipients of the Legal Action Notification letter would likely be deceived into believing

that Dr. GREENS synthetic urine infringes the
'776 Patent;

    j. that recipients of the Legal Action Notification
letter would likely be deceived into believing
that the '776 Patent is valid and enforceable;
and

    k. that recipients of the Legal Action Notification
letter would likely be deceived into believing
that said recipients could only buy synthetic
urine from "Spectrum Labs" to avoid legal action.

107.    The widespread circulation of the Legal Action
Notification letters is an abuse of the inherent rights
granted upon the issuance of the '776 Patent and
constitutes patent misuse.

108.    At the time the Legal Action Notification letters were
created and widely circulated, STEPHENS had already engaged
in inequitable conduct relating to the '776 Patent because
he intentionally failed to disclose a prior art publication
material to patentability to the USPTO during prosecution
of the application giving rise to the '776 Patent.
STEPHENS or his authorized agent intentionally copied the
list of biocides set forth in the specification and claims
of the '776 Patent from a printed publication and
intentionally failed to disclose the existence of this
printed publication as prior art during the prosecution of
the application giving rise to the '776 Patent.  Widespread
circulation of the Legal Action Notification letter after

1  having engaged in inequitable conduct before the USPTO
2  constitutes patent misuse.

3  109.  Plaintiffs desire a judicial determination of their
4       rights and duties, and declarations by this Court of
5       unenforceability of the '776 Patent under the doctrine of
6       patent misuse.

7

8  **COUNT III. FEDERAL STATUTORY UNFAIR COMPETITION**

9  110.  Plaintiff re-alleges and incorporates herein by
10      reference, the same as if set forth verbatim, the
11      allegations contained in paragraphs 1 through 109.

12 111.  Plaintiff is informed and believes, and on the basis of
13      such information and belief alleges, that Defendants have
14      mischaracterized Plaintiff's products as an infringement of
15      the '776 Patent in a deliberate effort to coerce Dr. GREENS
16      into disclosing the formula for its synthetic urine.

17 112.  Plaintiff is informed and believes, and on the basis of
18      such information and belief alleges, that Defendants'
19      mischaracterization of Plaintiff's products has and will
20      continue to lead to the loss of reputation and goodwill
21      associated with Plaintiff's products.

22 113.  Plaintiff is informed and believes, and on the basis of
23      such information and belief alleges, Defendants'
24      mischaracterization of Dr. GREENS' Agent X product
25      constitutes Federal Unfair Competition under *15 U.S.C.*
26      *§1125(a),* commonly known as *§43(a) of the Lanham Act.*

27 114.  At the time The repeated allegations of infringement and
28      demands for the formula of Agent X were made by Defendants,

1  STEPHENS knew that Agent X did not infringe any claim

2  because:

3  a. STEPHENS had either conducted chemical testing

4     that conclusively established no infringement

5     took place or deliberately avoided such chemical

6     testing to feign his belief of infringement that

7     was in truth unfounded in fact, both objectively

8     and subjectively;

9  b. STEPHENS knew that he had sold Quick Fix to Dr.

10    GREENS years before filing the patent application

11    giving rise to the '776 Patent and also knew that

12    these sales gave rise to an on sale bar that

13    invalidated the '776 Patent;

14 c. STEPHENS knew that he had engaged in inequitable

15    conduct during the prosecution of the patent

16    application giving rise to the '776 Patent by

17    failing to disclose a prior art printed

18    publication from which STEPHENS, or his

19    authorized agent, copied the list of biocides set

20    forth in the specification and claims of the

21    patent application giving rise to the '776

22    Patent;

23 d. STEPHENS failed to deny, either through counsel

24    or through SPECTRUM INC or SPECTRUM LLC, Dr.

25    GREENS' claims of patent invalidity resulting

26    from the prior sales of Quick Fix to Dr. GREENS;

27 e. STEPHENS was aware of Dr. GREENS' sales of Agent

28    X since 2004 and took no steps to assert any

belief of patent infringement at any time from when the '776 Patent issued in March of 2007 to July 22, 2009;

f. STEPHENS evaded personal service of the prior complaint during the First Lawsuit;

g. After authoring and/or authorizing the widespread circulation of the Legal Action Notification letters, STEPHENS executed the Nunc Pro Tunc Assignment, unsupported by any consideration, in an effort to shield himself from personal liability;

h. STEPHENS failed to ever provide any basis in fact as to why "Spectrum" believed that Agent X infringed the '776 Patent in 2009;

i. STEPHENS failure to ever provide any basis in fact as to why "Spectrum" believed that Agent X infringed the '776 Patent in 2010;

j. STEPHENS failure to ever provide any basis in fact before the original complaint in this action was filed in 2011 as to why "Spectrum" believed that Agent X infringed the '776 Patent;

k. STEPHENS failed to take any legal action as the patent owner of the '776 Patent against Dr. GREENS in 2009, notwithstanding the wide circulation of the Legal Action Notification letter that represented that ""Spectrum Labs" is in the process of taking against all synthetic

urine manufactures who are potentially violating the '776 Patent";

l. STEPHENS knew that Dr. GREENS' invalidity argument would have been tested in the prior Complaint and therefore he declined to participate in the First Lawsuit in order to protect the '776 Patent and avoid personal liability that would ultimately arise from bringing a baseless compulsory counterclaim alleging infringement of the '776 Patent by Dr. Greens;

m. SPECTRUM INC, although served, failed to participate or otherwise file an answer to original complaint or otherwise participate in the First Lawsuit; and

n. only after the Nunc Pro Tunc Assignment was executed, after SPECTRUM INC was dissolved in 2010 and after the original complaint in the First Lawsuit was dismissed did SPECTRUM LLC first assert a claim of infringement against Dr. GREENS.

115.  Plaintiff is informed and believes, and on the basis of such information and belief alleges, Defendants' creation and widespread circulation of thousands of Legal Action Notification letters to the retail synthetic urine community constitutes Federal Unfair Competition under *15 U.S.C. §1125(a)*, commonly known as *§43(a) of the Lanham Act.*

116.    The Legal Action Notification Letters were created and circulated in bad faith and with the specific intent to chill competition and increase revenues for STEPHENS and his companies as more fully set forth herein.

117.    At the time the Legal Action Notification letters were created and widely circulated, STEPHENS knew that the '776 Patent was invalid because he intentionally failed to disclose prior art to the USPTO during prosecution of the application giving rise to the '776 Patent.  Specifically, STEPHENS, or his authorized agent, intentionally copied the list of biocides set forth in the specification and claims of the patent application giving rise to the '776 Patent from a printed publication and intentionally failed to disclose the existence of this printed publication as prior art.

118.    At the time the Legal Action Notification letters were created and widely circulated STEPHENS also knew that biocides had been used regularly in synthetic urine solutions to inhibit bacterial growth long before application giving rise to the '776 Patent was filed.

119.    At the time the Legal Action Notification letters were widely circulated throughout the synthetic urine industry, STEPHENS knew that Agent X did not infringe any claim because:

  a. STEPHENS had either conducted chemical testing that conclusively established no infringement took place or deliberately avoided such chemical testing to feign his belief of infringement that

was in truth unfounded in fact, both objectively
and subjectively;

b. STEPHENS knew that he had sold Quick Fix to Dr.
GREENS years before filing the patent application
giving rise to the '776 Patent and also knew that
these sales gave rise to an on sale bar that
invalidated the '776 Patent;

c. STEPHENS knew that he had engaged in inequitable
conduct during the prosecution of the patent
application giving rise to the '776 Patent by
failing to disclose a prior art printed
publication from which STEPHENS, or his
authorized agent, copied the list of biocides set
forth in the specification and claims of the
patent application giving rise to the '776
Patent;

d. STEPHENS failed to deny, either through counsel
or through SPECTRUM INC or SPECTRUM LLC, Dr.
GREENS' claims of patent invalidity resulting
from the prior sales of Quick Fix to Dr. GREENS;

e. STEPHENS was aware of Dr. GREENS' sales of Agent
X since 2004 and took no steps to assert any
belief of patent infringement at any time from
when the '776 Patent issued in March of 2007 to
July 22, 2009;

f. STEPHENS evaded personal service of the prior
complaint during the First Lawsuit;

g. STEPHENS executed the Nunc Pro Tunc Assignment unsupported by any consideration in an effort to shield himself from personal liability;

h. STEPHENS failed to ever provide any basis in fact as to why "Spectrum" believed that Agent X infringed the '776 Patent in 2009;

i. STEPHENS failed to ever provide any basis in fact as to why "Spectrum" believed that Agent X infringed the '776 Patent in 2010;

j. STEPHENS failure to ever provide any basis in fact before the original complaint in this action was filed in 2011 as to why "Spectrum" believed that Agent X infringed the '776 Patent;

k. STEPHENS failed to take any legal action as the patent owner of the '776 Patent against Dr. GREENS in 2009, notwithstanding the wide circulation of the Legal Action Notification letter that represented that "Spectrum Labs" is in the process of taking against all synthetic urine manufactures who are potentially violating the '776 Patent;

l. STEPHENS knew that Dr. GREENS' invalidity argument would have been tested in the prior Complaint and therefore he declined to participate in the First Lawsuit in order to protect the '776 Patent and avoid personal liability that would ultimately arise from bringing a baseless compulsory counterclaim

alleging infringement of the '776 Patent by Dr.
GREENS;

    m. SPECTRUM INC, although served, failed to file an
answer to the original complaint or otherwise
participate in the First Lawsuit; and

    n. Only after the Nunc Pro Tunc Assignment was
executed, after SPECTRUM INC was dissolved in
2010 and after the original complaint in the
First Lawsuit was dismissed did Spectrum LLC
first assert a claim of infringement against Dr.
GREENS.

120.   The Legal Action Notification Letters were widely
circulated to the retail synthetic urine industry in bad
faith because Defendants, and STEPHENS specifically, knew
during the time period that the Legal Action Notification
letters were circulated:

    a. that Dr. GREENS' synthetic urine does not
infringe any claim of the '776 Patent;

    b. that the '776 Patent was invalid;

    c. that numerous synthetic urines were on the market
by third parties prior to the issuance of the
'776 Patent and that these synthetic urines did
not infringe the '776 Patent;

    d. that multiple United States patents had been
granted on synthetic urine solutions prior to the
issuance of the '776 Patent;

e. that Defendants did not intend on taking legal action for patent infringement against Dr. GREENS or any other synthetic urine manufacturer;

f. that Defendants did not intend on taking legal action against any retail synthetic urine recipients of the Legal Action Notification letter;

g. that recipients of the Legal Notification letter whom purchased Agent X from Dr. GREENS would in fact not be liable for infringement of the '776 Patent;

h. that recipients of the Legal Action Notification letter would likely be deceived into believing that Spectrum Labs was in the process of taking action against synthetic urine manufacturers for infringement of the '776 Patent;

i. that recipients of the Legal Action Notification letter would likely be deceived into believing that Dr. GREENS synthetic urine infringes the '776 Patent;

j. that recipients of the Legal Action Notification letter would likely be deceived into believing that the '776 Patent is valid and enforceable; and

k. that recipients of the Legal Action Notification letter would likely be deceived into believing that said recipients could only buy synthetic urine from "Spectrum Labs" to avoid legal action.

121.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that Defendants knew,
or should have known, that the '776 Patent is invalid and
unenforceable and further knew, or should have known that
no product of Dr. GREENS had infringed any claim of the
'776 Patent, and as a result, the various actions set forth
above were malicious, oppressive and despicable willful and
without a reasonable basis, and therefore Plaintiff is
entitled to an award of treble damages.

**COUNT IV. UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS &
PROFESSIONS CODE SECTION 17200**

122.    Plaintiff re-alleges and incorporates herein by
reference, the same as if set forth verbatim, the
allegations contained in paragraphs 1 through 121.

123.    Defendants have mischaracterized Plaintiff's products as
an infringement of the '776 Patent in both the Legal Action
Notification letters as well as in repeated demands for the
formula of Agent X under the falsely asserted claim that
Agent X infringed the '776 Patent.

124.    The Legal Action Notification Letter was created and
circulated in bad faith and with the specific intent to
chill competition and increase revenues for STEPHENS and
his companies.

125.    The creation and wide spread circulation of the Legal
Action Notification letter is an unlawful business act or
practice under California Business & Profession Code
Section 17200 in that it violated Section 43(a) of the

1   Lanham Act and further constituted an act of interference
2   with business relations and prospective economic advantage
3   as set forth more fully below.
4   126.   The creation and wide spread circulation of the Legal
5   Action Notification letter is an unfair business practice
6   under California Business & Professions Code Section 17200
7   because it implies that Dr. GREENS synthetic urine product
8   infringes the '776 Patent when in fact Defendants had no
9   information to hold such a belief and knew the '776 Patent
10  was invalid as a result of prior sales of Quick Fix to Dr.
11  GREENS and the inequitable conduct of STEPHENS.
12  127.   The creation and wide spread circulation of the Legal
13  Action Notification letters is a fraudulent business
14  practice under California Business & Professions Code
15  Section 17200 in that thousands of recipients of the Legal
16  Action Notification letter are likely to be deceived into
17  believing (i) that "Spectrum Labs" was in the process of
18  taking action against synthetic urine manufacturers for
19  patent infringement, (ii) that Dr. GREENS synthetic urine
20  infringes the '776 Patent, (iii) that the '776 Patent is
21  valid and enforceable, and (iv) that said recipients could
22  only buy synthetic urine from "Spectrum Labs" to avoid
23  legal action.
24  128.   The creation and wide spread circulation of the Legal
25  Action Notification letters constitutes unfair, deceptive,
26  untrue and misleading advertising.
27  129.   Plaintiff is informed and believes, and on the basis of
28  such information and belief alleges, that Defendants'

mischaracterization of Plaintiff's products has and will continue to lead to the loss of reputation and goodwill associated with Plaintiff's products.

130.    Defendants' repeated demands for the formula of Agent X under the threat of patent infringement constituted unfair competition under California Business & Profession Code Section 17200 because Defendants had no good faith belief in the validity of the '776 Patent and because Defendants had no good faith belief that Agent X infringed any claim of the '776 Patent.

131.    At the time The repeated allegations of infringement and demands for the formula of Agent X were made by Defendants, STEPHENS knew that Agent X did not infringe any claim because:

      a. STEPHENS had either conducted chemical testing that conclusively established no infringement took place or deliberately avoided such chemical testing to feign his belief of infringement that was in truth unfounded in fact, both objectively and subjectively;

      b. STEPHENS knew that he had sold Quick Fix to Dr. GREENS years before filing the patent application giving rise to the '776 Patent and also knew that these sales gave rise to an on sale bar that invalidated the '776 Patent;

      c. STEPHENS knew that he had engaged in inequitable conduct during the prosecution of the patent application giving rise to the '776 Patent by

failing to disclose a prior art printed
publication from which STEPHENS, or his
authorized agent, copied the list of biocides set
forth in the specification and claims of the
patent application giving rise to the '776
Patent;

d. STEPHENS failed to deny, either through counsel
or through SPECTRUM INC or SPECTRUM LLC, Dr.
GREENS' claims of patent invalidity resulting
from the prior sales of Quick Fix to Dr. GREENS;

e. STEPHENS was aware of Dr. GREENS' sales of Agent
X since 2004 and took no steps to assert any
belief of patent infringement at any time from
when the '776 Patent issued in March of 2007 to
July 22, 2009;

f. STEPHENS evaded personal service of the prior
complaint during the First Lawsuit;

g. STEPHENS executed the Nunc Pro Tunc Assignment
unsupported by any consideration in an effort to
shield himself from personal liability;

h. STEPHENS failed to ever provide any basis in fact
as to why "Spectrum" believed that Agent X
infringed the '776 Patent in 2009;

i. STEPHENS failure to ever provide any basis in
fact as to why "Spectrum" believed that Agent X
infringed the '776 Patent in 2010;

j. STEPHENS failure to ever provide any basis in
fact before the original complaint in this action

was filed in 2011 as to why "Spectrum" believed that Agent X infringed the '776 Patent;

k. STEPHENS failed to take any legal action as the patent owner of the '776 Patent against Dr. GREENS in 2009, notwithstanding the wide circulation of the Legal Action Notification letter that represented that "Spectrum Labs" is in the process of taking against all synthetic urine manufactures who are potentially violating the '776 Patent;

l. STEPHENS knew that Dr. GREENS' invalidity argument would have been tested in the prior Complaint and therefore he declined to participate in the First Lawsuit in order to protect the '776 Patent and avoid personal liability that would ultimately arise from bringing a baseless compulsory counterclaim alleging infringement of the '776 Patent by Dr. Greens;

m. SPECTRUM INC, although served, failed to participate or otherwise file an answer to original complaint or otherwise participate in the First Lawsuit; and

n. only after the Nunc Pro Tunc Assignment was executed, after SPECTRUM INC was dissolved in 2010 and after the original complaint in the First Lawsuit was dismissed did SPECTRUM LLC

1                  first assert a claim of infringement against Dr.

2                  GREENS.

3 132.    As a result of the of the acts of unfair competition as

4         set forth above, Plaintiff is entitled to restitution and

5         an injunction prohibiting further circulation of the Legal

6         Action Notification letter and requiring a formal

7         retraction to be circulated to all persons that received a

8         Legal Action Notification letter.

9

10          **COUNT V. INTERFERENCE WITH BUSINESS RELATIONS**

11 133.    Plaintiff re-alleges and incorporates herein by

12         reference, the same as if set forth verbatim, the

13         allegations contained in paragraphs 1 through 132.

14 134.    Plaintiff is informed and believes, and on the basis of

15         such information and belief alleges, that Defendants have

16         mischaracterized Plaintiff's products as an infringement of

17         the '776 Patent through widespread circulation of the Legal

18         Action Notification letters to thousands of recipients in

19         the retail synthetic urine sales industry.

20 135.    Plaintiff is informed and believes, and on the basis of

21         such information and belief alleges, that some number of

22         Plaintiff's current and prospective customers were among

23         those to whom Defendants mischaracterized Plaintiff's

24         products and services. The Legal Action Notification Letter

25         was created and circulated in bad faith and with the

26         specific intent to chill competition and increase revenues

27         for STEPHENS and his companies.

28

136. Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendants were aware the mischaracterizations of Plaintiff's products and services were reaching current and prospective customers of Plaintiff.

137. Plaintiff is informed and believes, and on the basis of such information and belief alleges, Defendants' creation and transmission of the Legal Action Notification letter was for the purpose of damaging Plaintiff's business by discouraging Plaintiff's customers from doing business with Plaintiff under the false fear of patent infringement litigation by Defendants.

138. Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendants intended the mischaracterizations of Plaintiff's products to discourage current customers from using Plaintiff's products.

139. Plaintiff is informed and believes, and on the basis of such information and belief alleges, that some of Plaintiff's current customers were discouraged from using Plaintiff's products by Defendants' mischaracterization of Plaintiff's products and services.

140. Plaintiff is informed and believes, and on the basis of such information and belief alleges, that mischaracterizations by Defendants of Plaintiff's products by the defendants were the cause of some number of lost sales by Plaintiff.

1    141.    Plaintiff is informed and believes, and on the basis of

2        such information and belief alleges, that Defendants knew,

3        or should have known, that the '776 Patent is invalid and

4        unenforceable and further knew, or should have known that

5        no product of Dr. GREENS had infringed any claim of the

6        '776 Patent, and as a result, such actions were fraudulent,

7        malicious, oppressive and despicable willful and without a

8        reasonable basis, and therefore Plaintiff is entitled to an

9        award of Punitive Damages.

10

11  **COUNT VI. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

12  142.    Plaintiff re-alleges and incorporates herein by

13        reference, the same as if set forth verbatim, the

14        allegations contained in paragraphs 1 through 141.

15  143.    Plaintiff is informed and believes, and on the basis of

16        such information and belief alleges, that Defendants have

17        mischaracterized Plaintiff's products as an infringement of

18        the '776 Patent by widespread circulation of the Legal

19        Action Notification letter to Dr. GREENS' current, former

20        and prospective customers.  The Legal Action Notification

21        Letter was created and circulated in bad faith and with the

22        specific intent to chill competition and increase revenues

23        for STEPHENS and his companies.

24  144.    Plaintiff is informed and believes, and on the basis of

25        such information and belief alleges, that some number of

26        Plaintiff's current and potential future customers were

27        among those to whom Defendants mischaracterized Plaintiff's

28        products.

145.    Plaintiff is informed and believes, and on the basis of
        such information and belief alleges, that Defendants were
        aware the mischaracterizations of Plaintiff's products were
        reaching current and potential future customers of
        Plaintiff.

146.    Plaintiff is informed and believes, and on the basis of
        such information and belief alleges, that Defendants
        intended the mischaracterizations of Plaintiff's products
        to discourage Plaintiff's current and potential future
        customers from using Plaintiff's products.

147.    Plaintiff is informed and believes, and on the basis of
        such information and belief alleges, that some of
        Plaintiff's potential future customers were discouraged
        from using Plaintiff's products by Defendants'
        mischaracterization of Plaintiff's products.

148.    Plaintiff is informed and believes, and on the basis of
        such information and belief alleges, that
        mischaracterizations by Defendants of Plaintiff's products
        by the Defendants were the cause of some number of lost
        sales by Plaintiff.

149.    Plaintiff is informed and believes, and on the basis of
        such information and belief alleges, that Defendants knew,
        or should have known, that the '776 Patent is invalid and
        unenforceable and further knew, or should have known that
        no product of Dr. GREENS had infringed any claim of the
        '776 Patent, and as a result, such actions were fraudulent,
        malicious, oppressive and despicable willful and without a

reasonable basis, and therefore Plaintiff is entitled to an award of Punitive Damages.

**WHEREFORE, plaintiff prays for relief as follows:**

a.      The Court declare that United States Patent number 7,192,776, and each claim thereof, is invalid;

b.      The Court declare that United States Patent number 7,192,776, and each claim thereof, is not infringed by Plaintiff;

c.      The Court declare that United States Patent number 7,192,776 is unenforceable;

d.      A permanent injunction issue against Defendants' further assertion of allegations of patent infringement against Plaintiff;

e.      A permanent injunction prohibiting further circulation of the Legal Action Notification letter and requiring a formal retraction to be circulated to all persons that received a Legal Action Notification letter;

f.      Plaintiff be awarded damages in an amount to be determined by the Court;

g.      Plaintiff be awarded its attorneys' fees.

h.      Plaintiff be awarded its costs of suit herein;

i.      That a determination be made that Defendants have acted intentionally, knowingly, and willfully to mislead the public and customers of Plaintiff, entitling Plaintiff to an award of punitive damages to discourage future like conduct;

j.             That a determination be made that this is an exceptional case and that Plaintiff be awarded its reasonable attorneys' fees, costs and treble damages; and

k.             Plaintiff be awarded such other and further relief as the Court deems just and proper.


Dated: April 19, 2012       Gary L. Eastman, APLC

_____

Gary L. Eastman (CA BAR# 182518)
Attorney for Plaintiff Dr. Greens, Inc.

## JURY TRIAL DEMANDED

Plaintiff hereby requests trial by jury on Counts II through VI of this first amended complaint.

Dated: April 19, 2012

_____
Gary L. Eastman (CA BAR# 182518)
Attorney for Plaintiff Dr. Greens, Inc.

EXHIBIT "A"



US007192776B2

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 7,192,776 B2**

Stephens　　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Mar. 20, 2007**

(54) **SYNTHETIC URINE AND METHOD OF MANUFACTURING SAME**

(76) Inventor: **James Matthew Stephens**, 550 Wards Corner Rd., Unit 102, Cincinnati, OH (US) 45140

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/766,165**

(22) Filed: **Jan. 28, 2004**

(65) **Prior Publication Data**

US 2005/0164395 A1　　Jul. 28, 2005

(51) **Int. Cl.**
　　*G01N 31/00*　　　(2006.01)
(52) **U.S. Cl.** ............................ **436/8;** 436/18; 436/98; 252/408.1; 424/545
(58) **Field of Classification Search** .................. 436/8, 436/18, 98, 19; 252/408.1; 424/545
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,880,646 | A | * | 4/1975 | Mc Connell et al. ....... 504/113 |
| 4,146,644 | A | | 3/1979 | Griffith et al. |
| 4,714,564 | A | * | 12/1987 | Lynch et al. ................. 510/402 |
| 4,825,851 | A | * | 5/1989 | Cocks et al. .................. 601/4 |
| 4,989,607 | A | * | 2/1991 | Keusch et al. .............. 600/391 |
| 5,036,013 | A | | 7/1991 | Wood et al. |
| 5,105,007 | A | * | 4/1992 | Adamczyk et al. .... 562/450 |
| 5,176,668 | A | * | 1/1993 | Bernardin .................. 604/368 |
| 5,328,954 | A | | 7/1994 | Sarangapani |
| 5,489,281 | A | | 2/1996 | Watanabe et al. |
| 5,651,778 | A | * | 7/1997 | Melius et al. .......... 604/385.19 |
| 5,993,840 | A | * | 11/1999 | Fawkes et al. .............. 424/404 |
| 6,306,422 | B1 | | 10/2001 | Batich et al. |
| 6,716,632 | B1 | * | 4/2004 | Dorn ........................... 436/18 |
| 2002/0106807 | A1 | | 8/2002 | Novinski et al. |
| 2004/0077106 | A1 | * | 4/2004 | Haddad ...................... 436/536 |

* cited by examiner

*Primary Examiner*—Maureen M. Wallenhorst
(74) *Attorney, Agent, or Firm*—McDonald Hopkins LLC

(57)　　　　　　　**ABSTRACT**

A synthetic urine solution and method of its manufacture are disclosed. The solution includes water having a pH between 3 and 10. The solution further includes creatinine and means for removing bacteria from the solution so as to control or eliminate sepsis of the urine solution, preferably through the use of biocide. The solution exhibits a specific gravity of from 1.005 g/cm³ to 1.025 g/cm³. Additional compounds may also be included to further enhance the aesthetics or apparent authenticity of the synthetic urine produced according to this invention.

**13 Claims, No Drawings**

**1**

# SYNTHETIC URINE AND METHOD OF MANUFACTURING SAME

## BACKGROUND OF THE INVENTION

This invention relates to a composition and method of manufacturing synthetic urine.

The kidneys remove unwanted substances circulating in the blood by way of producing urine, which is excreted from the body. Consequently, diverse waste substances and other substances unwanted by the body find their way into urine for subsequent removal from the body. Urinalysis is the testing of the composition and amounts of waste substances in urine, and provides a tremendously powerful diagnostic tool for the medical profession. In particular, many of these substances are indicative of certain medical conditions or other substances which have been metabolized by a person's kidneys.

Using current urinalysis techniques, unwanted substances in a urine sample can mask existing medical conditions, while still some others can masquerade as non-existent medical conditions. In each instance, these unwanted substance undermine the usefulness of urinalysis as a medical diagnostic tool. Some of the unwanted substances that find their way into a urine sample are drugs (both legal and illegal) and metabolites thereof, along with other chemical residues or contaminants that may be present or otherwise contacted during the handling procedures. These substances can disturb the sensitive tests, making the actual state of the body difficult or impossible to determine.

For example, insulin levels, para-aminohippuric acid, phenol sulfonphthalein, phosphate, arylsulfatase-A, lysosome, urine amylase, total urine estrogens, specific estrogens, progestins, aldosterone, catecholamines, 5-hydroxyindoleacetic acid, cortisol, homovanillic acid, human chorionic gonadotrophin, creatine, urea, uric acid, bilirubin, hemoglobin, hydroxyproline, melanin, porphorins, total protein, acid mucopolysaccharide, copper, glucose oxidase and urine ketone can all influence the results of most standard urinalysis testing methods in unintended or unpredictable ways.

Essentially, these testing methods include a variety of immunoassays or assays by other techniques, such as isolation followed by gas or liquid chromatography followed by mass spectrometry. These tests make urinalysis a powerful diagnostic tool for identifying a whole range of conditions. For example, substance abuse and other indicia of disease or bodily state can easily be detected by urinalysis. However, in order to accurately establish standards of comparison for such tests, reliable urine samples are needed which are entirely free from any of the aforementioned substances. Thus, the development of a suitable, synthetic urine substitute would improve testing methods by providing researchers, potential urine donors and testing technicians with an accurate baseline reading for "clean" urine samples to compare against other suspect samples.

To illustrate, a method for detecting this compound is described in U.S. Pat. No. 5,036,013, issued to El Sohly et al., where various deuterated cannabinoids are synthesized to help determine the quantitative amount of tetrahydrocannabinol in a urine sample. One method in particular involves spiking a clean urine sample with known amount of deuterated tetrahydrocannabinol and analyzing the resultant sample with gas chromatography/mass spectrometry in order to establish set standards of comparison. However, a failure to possess a truly clean sample could substantially influence and negatively affect the results of these methods.

**2**

Another example of the problems created by interfering chemicals in urine is exemplified by the case of ibuprophan. Ibuprophan is a prostaglandin synthetase inhibitor that may be taken in large doses to relive pain and inflammation characteristic of arthritis. When a patient taking these massive doses is subjected to urinalysis, it may mask other drugs being taken by the donor, or may even be mistaken for tetrahydrocannabinol (a metabolite which many testing technicians classify as being indicative of marijuana use).

Any misidentification of controlled substance use/abuse, personal information (pregnancy, use of cigarettes, etc.) or any of the numerous medical conditions that can be determined using urinalysis can have devastating personal consequences for the urine donor. Thus, some companies sell inexpensive home testing kits in order to provide some level or reassurance to potential urine donors whether they may have such a misidentification. However, given the potential liability for a misidentified or positive test, many lay persons feel intimidated by testing procedures, and these persons would welcome the ability to utilize a known sample, free from unwanted or unknown substances, for the sake of comparison.

In response to the need for a reliable source of relatively inexpensive, "clean" urine samples which are free from any unwanted or unknown substances, numerous attempts to formulate synthetic urine have been made. For example, U.S. Pat. No. 6,306,422 to Batich et al. (table 3, col. 16, line 50 et seq.), U.S. Pat. No. 5,328,954 to Sarangapani (table 1, col. 9, line 29 et seq.), U.S. Pat. No. 5,489,281 to Watanabe et al. (col. 12, example 6) and U.S. Pat. No. 4,146,644 to Griffith et al. (table 1, col. 10). However, none of these references appears to address a simple composition which can be manufactured in an inexpensive manner.

Additionally, all of these references require the use of creatinine or other compounds which can be consumed by bacteria present in the sample. Accordingly, all of these samples will undergo sepsis unless they are immediately used, thereby making these compounds as unattractive candidates for mass production and/or consumer sales.

## SUMMARY OF THE INVENTION

It is an object of this invention to provide a reliable source of synthetic urine, along with a method for its manufacture, which is free from any and all unwanted or unknown substances.

It is a further object of this invention to provide a synthetic urine, along with a method for its manufacture, which is capable of retaining its viability and utility for extended periods of time.

Still further uses for such a synthetic urine can and will be devised by a prospective user based upon her or her own personal disposition, interests and privacy concerns.

Accordingly, a composition of synthetic urine is claimed. This composition includes water, having a pH between 3 and 10 with creatinine and biocide dissolved therein. The composition further includes any compound which dissolves and dissociates in a water solution in a manner which insures that the specific gravity of the resulting solution mixture is between 1.005 g/cm³ and 1.025 g/cm³. Urea can be added as another possible element of the invention, and those skilled in the art will readily identify appropriate specific types of biocide oxiders, organics or in situ agents, along with a host of carbonates, halide salts, hydroxide salts and other chemicals which could serve as ideal ionic compounds within the meaning of the invention.

A method for manufacturing synthetic urine is also disclosed. The method involves providing water, dissolving creatinine and biocide in the water, adjusting the resulting solution's specific gravity to be between 1.005 and 1.025 and, if necessary, the pH level of the solution. In another aspect, the method contemplates providing water with a pH between 3 and 10, mixing creatinine and at least one dissociating ionic compound to adjust the specific gravity of the resulting solution to be between 1.005 g/cm³ and 1.025 g/cm³ and removing bacteria from the solution so as to avoid sepsis of the creatinine. In each of these embodiments the same types of biocides and ionic compounds can be used as were identified in the composition embodiment above.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

While human urine may at varying times reflect a wide range of chemical compounds, almost all current urinalysis rely upon observation of three basic traits: pH level, specific gravity and the presence of creatinine. Consequently, it was discovered that an effective, yet cost efficient, synthetic urine solution having a final specific gravity between 1.005 g/cm³ and 1.025 g/cm³ needed only to contain three basic components: water with a pH between 3 and 10; creatinine; and some means for controlling or eliminating the unwanted sepsis of the creatinine. With respect to this final element, this bacteria control/elimination is most readily accomplished through the use of a biocide.

Examining each of these traits separately, the need for a water-based solution should be apparent. However, it is significant to note that human urine displays a wide range in terms of pH variation—anywhere from 3 to 10. This variation can be attributed to any number of factors regarding regional water quality, metabolic idiosyncrasies displayed by each individual and the like. Thus, the water supplied for the composition and method may need to have its pH adjusted accordingly. Significantly, while use of distilled, deionized water will produce the most reliable synthetic urine solutions in terms of elimination of unwanted substances, the invention may be practiced with equal efficacy using distilled water, deionized water or even regular tap water (drawn from any fresh water source having an appropriately low specific gravity—discussed below). Unless specifically noted to the contrary, use of the term "water" throughout this specification and appended claims is intended to embrace the broadest array of appropriate water sources available.

The final synthetic urine solution must also have a specific gravity between 1.005 g/cm³ and 1.025 g/cm³. Insofar as specific gravity is a measure of relative ionic content of a solution, it should be as apparent to those familiar with body chemistry or kidney functioning that certain ions and compounds will be commonly found in human urine, especially those commonly encountered in food and water sources (for example, sodium, potassium, chloride, etc.). In contrast, other elements will be inherently unwise choices at anything beyond a trace level (for example Lanthanoid and Actinoid series ions). The precise amount of the particular compound or compounds selected to adjust the specific gravity will depend directly on the concentration of compound (if in solution), the molecular weight of its constituents, water temperature, relative volume of water solvent being used and other similar factors. With respect to the water used to manufacture the synthetic urine of the present invention, it is anticipated that significant increases will need to be made to the specific gravity, as distilled, deionized water has a

specific gravity of 1.000 g/cm³ and tap water, while likely to vary by region, has a specific gravity around 1.003 g/cm³.

In terms of the best compounds to utilize in adjusting the specific gravity, the single most important trait is that the compound must dissociate when dissolved in water. Additionally, it is preferred to find an inexpensive, widely available compound so as to minimize production costs. To that end, it is believed that carbonate salts, halide salts, hydroxide salts and certain bromides will have particular applicability. By way of illustration rather than limitation, these salts might include sodium bicarbonate, sodium, potassium, magnesium or calcium chlorides; sodium, potassium, or calcium hydroxides; and other similarly inexpensive and widely available salts.

Creatinine is a protein created in connection with muscular activity. As such, medical science recognizes creatinine as an important constituent in the human bloodstream and, to the extent that the kidneys cleanse and purify the bloodstream, in the waste stream expelled from the kidneys in the form of urine. Significantly, because creatinine is a protein, it is the subject of sepsis and decomposition. Thus, creatinine serves as an excellent indicator in urinalysis because it is indicative of human origin and, by virtue of its septic disposition, creatinine also provides a natural measure to determine whether or not a sample was, in fact, recently produced.

In order to insure stable creatinine levels in synthetic urine, it is therefore essential to remove or control the presence of sepsis-causing bacteria. However, whatever method of control is applied must also not interfere with the processes underpinning most urinalysis techniques. Thus, the use of an appropriate biocide is absolutely critical to the proper practice of the present invention. To the extent that human urine is sterile when excreted (under normal body conditions), the use of biocide represents a distinct departure from previous approaches to the manufacture of synthetic urine which relied solely on mimicking the compounds in actual urine without any regard for the long term shelf life of the synthetic solution. Moreover, it further demonstrates the need to select a biocide which is biologically active, yet does not interfere overtly with the chemistry of the synthetic urine solution itself (either through its chemical signature or by virtue of an abnormally large amount being detectable in the solution).

Biocide can be generically defined as substances used to control or eliminate microbial populations in a sample. Three general classes have been identified as having particular applicability when used in connection with the present invention: oxidizing biocides, organic biocides and a somewhat more generalized category referred to as in situ agents. Each will be discussed briefly below, although it should be understood that biocides are a term of art, known to those familiar with water chemistry processes.

Oxidizing biocides are generally self explanatory. This class includes any biologically effective agent which relies upon an oxidation process, including but not limited to various peroxides, hypochlorites, bromides and super oxides. Organic biocides encompass an expansive list of proteins and cyclical compounds known to those skilled in the art. In situ agents can be chemical compounds or actual physical processes designed to kill bacteria in a manner which is either self-generating or effective enough to prevent future degradation of the urine. Generic examples of such in situ agents include ozone, chlorine dioxide (or other dioxides), and ultraviolet radiation or irradiation processes followed by hermetic sealing of the sample.

Specific examples of various biocides contemplated above include: BHAP (such as 2-Bromo-4-hydroxyacetophenone, an organo-bromine group); Bronopol (such as 2-Bromo-2-nitropropane-1,3 diol, an organo-bromine group); Carbamates (such as a mix of sodium dimethyldithiocarbamate (DIBAM) and disodium ethylene bis-dithiocarbamate (NIBAM), or single product, such as potassium n-hydroxymethyl-n-methyldithiocarbamate, an organo-sulfur group); Chlorothioether (such as 2,2 Dihydroxy-5,5-dichlorodiphenyl monosulfide, a chlorinated phenolic thioether); DBNPA (such as 2-2-Dibromo-3-nitriloropionamide, an organo-bromine group); DTEA, DTEA II (such as 2-(Decylthio)ethanamine, an alkylthioamine group); Guanides (including Guanidine and Biguanides) (such as dodecylguanidine hydrochloride and acetate, also polyhexamethylene biguanide hydrochloride, and tetradecylguanidine, all aliphatic guanadines); Glutaraldehyde (such as Pentane-1,5-dial., an aldehyde group); Isothiazolines (such as Alkyl isothiazolin-3-ones, an organo-sulfur group); MBT (such as Methylene bis(thiocyanate), an organo-sulfur group); Polyquat (such as broad-spectrum, cationic polymers of low molecular weight); Quats (AD-BACs) (such as Alkyldimethylbenzylammonium chloride (also known as alkylbenzyldimethyl ammonium chloride or benzalkonium chloride), a quaternary ammonium compound group); Sulfone (such as Bis(trichloromethyl)sulfone, an organo-sulfur group); TBTO (such as Bis(tributyltin) oxide, an organo-tin group); TBZ (Tertbuthylazine) (such as 2-(tert-butylamino)-4-chloro-6-(ethylamino)-s-triazine, a Triazine group); TCCBN (such as Tetrachloro-2,4,6-cyano-3-benzonitrile, TCCBN functions similarly to the chlorophenols); TCMTB (such as 2(thiocyanomethylthio)benzothiazole); Thione (such as Tetrahydro-3,5,dimethyl-2H-1,3,5-thiadiazine-2-thione, an organo-sulfur group); THPS (TKHPS) (such as Tetrakish(hydroxymethyl)phosphonium sulfate, an alkyl phosphonium group); and TTPC (such as Tributyltetradecylphosphonium chloride, an alkylphosphonium group). Additionally, with respect to more commonly understood items, such as peroxides, hypochlorites and the like, it should be understood that this specification encompasses all forms of such compounds (for example, hydrogen peroxide, sodium peroxide, sodium hypochlorite, potassium hypochlorite, etc.). Other examples of biocides may exist and are expressly encompassed within the purvey of this specification.

Notably, as embraced by this specification, oxidizing biocides—and hypochlorite in particular—should not be confused with the agents that are employed to oxidize metabolites in urine samples. Such metabolite oxidizers are often referred to as "adulterants" within the urinalysis industry. Adulterants are substances deliberately added to actual urine samples to chemically alter the metabolites indicative of certain conditions so as to render these metabolites undetectable by standard urinalysis techniques.

Even though some substances like hypochlorite may possess utility as both a biocide and an adulterant, the intended use of that substance (as either a biocide or an metabolite oxidizer) will substantially influence the conditions, concentration and manner in which the substance is provided. In particular, use as a biocide requires smaller concentrations and little to no regard for when the biocide is added during the manufacturing process. To illustrate, an oxidizing biocide such as sodium hypochlorite can be added in amounts as small as 1 mL per 3.8 L of water. Similar concentrations of other oxidizing biocides will have equal efficacy, as recognized by those skilled in the art.

In contrast, use of hypochlorite as an adulterant as taught, inter alia, in U.S. patent application Ser. No. 2002/0106807 must occur at higher concentrations and in a specific manner so as to oxidize certain metabolites or compounds. Thus, hypochlorite (and other oxidizing biocides) found in the present solution prevents the unwanted growth of bacteria. Moreover, to the extent that adulterants are often added to actual urine samples, the composition of the resulting mixture is substantially more complex, in terms of the variety of chemical species present, than the simplified composition of the present invention.

Another aspect of the present urine solution relates to the addition of urea in some form to the synthetic urine sample. While urea is not presently accounted for in most urinalysis techniques, its presence within a synthetic urine could add an additional level of realism for some applications. Notably, to the extent that urea is provided, it will need to be considered in the calculations of the amount of ionic dissociating compounds required to adjust the specific gravity and/or pH to the desired levels.

Other functionally inconsequential additives or steps may also be included without departing from the principles of this invention. While these additives and steps expressly cover all foreseeable equivalents of the elements recited above, additional variations are probable. For example, it is possible to include a coloring agent and or olfactory substances to enhance the aesthetics or apparent authenticity of the synthetic urine produced according to this invention.

The foregoing detailed description has been given for clearness of understanding only and no unnecessary limitations should be understood therefrom as some modifications will be obvious to those skilled in the art without departing from the scope and spirit of the appended claims.

I claim:

1. A synthetic urine solution comprising:

water having a pH between 3 and 10;

creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis;

at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³; and

wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitriloropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2,4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

2. The synthetic urine solution of claim 1, further including urea dissolved within said solution.

3. The synthetic urine solution of claim 1, wherein said at least one ionic compound is selected from the group consisting of carbonate salts, halide salts, hydroxide salts and bromides.

4. The synthetic urine solution of claim 3, further including urea dissolved within said solution.

5. A method of manufacturing a synthetic urine solution comprising:

providing water;

dissolving creatinine and biocide into said water to form a solution exhibiting a specific gravity level, said

creatinine and biocide being selected in relative concentrations to minimize sepsis, wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethvlbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio) benzothiazole, thiones, Tetrakish(hydroxymethyl) phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides; and

adjusting said specific gravity level of said solution to between 1.005 $g/cm^3$ and 1.025 $g/cm^3$.

**6.** The method of claim 5 further comprising sealing said synthetic urine solution within a container so as to further minimize sepsis of said synthetic urine solution.

**7.** The method of claim 6 further comprising adding urea to said synthetic urine solution.

**8.** The method of claim 5 further comprising adding urea to said synthetic urine solution.

**9.** The method of claim 5, further comprising the step of adjusting the pH level of the solution between 3 and 10.

**10.** A method of manufacturing a synthetic urine solution comprising:

providing water having a pH between 3 and 10;

dissolving creatinine and at least one dissociating ionic compound in the water to form a solution exhibiting a

specific gravity, said creatinine and at least one dissociating ionic compound selected in relative concentrations to adjust said specific gravity to between 1.005 $g/cm^3$ and 1.025 $g/cm^3$; adding a biocide into said solution, said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylamnionium chloride, sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides; and

removing bacteria from said solution.

**11.** The method of claim 10 wherein the step of dissolving creatinine and at least one dissociating ionic compound also includes dissolving urea in the water, said urea selected in a concentration relative to that of said creatinine and at least one dissociating ionic compound so as to maintain the specific gravity of the solution between 1.005 $g/cm^3$ and 1.025 $g/cm^3$.

**12.** The method of claim 11, further comprising the step of sealing said synthetic urine solution within a container.

**13.** The method of claim 10, further comprising the step of sealing said synthetic urine solution within a container.

* * * * *

EXHIBIT "B"



McDonald Hopkins LLC
Attorneys at Law

600 Superior Avenue, East
Suite 2100
Cleveland, Ohio 44114

P 216.348.5400
F 216.348.5474

July 22, 2009

**VIA EXPRESS MAIL**

Dr. Green's
Matt Green
4901 Morena Blvd., Suite 1106
San Diego, CA 92117

Re:   Spectrum Laboratories' U.S. Patent No. 7,192,776

Dear Mr. Green:

For nearly two decades Spectrum Laboratories has prided itself on creating and having innovative and original products were an original idea to the market. Spectrum has spent significant resources on the research and development of such products.

Consistent with this, Spectrum owns U.S. Patent No. 7,192,776, a copy of which is enclosed. Spectrum believes that your Agent X product likely infringes the '776 patent. Please review the '776 patent and let us know by *Monday, August 3, 2009* any basis for which you do not believe that you infringe.

Sincerely,

David B. Cupar

EXHIBIT "C"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Focusing on Start-Up and
Emerging Company Counseling
Patent, Trademark, Copyright
and Related Litigation

401 West "A" Street, Suite 1785
San Diego, California 92101
Telephone (619) 230-1144
Facsimile (619) 230-1194

GARY L. EASTMAN, Esq.
Registered Patent Attorney

garyeastman@sbcglobal.net

August 3, 2009

David B. Cupar, Esq.
McDonald Hopkins, LLC
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114

RE: Spectrum Laboratories adv. Dr. Greens, Inc.
United States Patent No. 7,192,776

Dear Mr. Cupar:

I represent Mr. Matt Green and Dr. Greens, Inc., in their intellectual property matters. I have been forwarded your letter dated July 22, 2009. Please direct all future communications regarding this matter to me at the address and telephone indicated above.

I have reviewed the allegations of patent infringement made in your July 22, 2009, letter, and have reviewed both United States Patent No. 7,192,776, and its rather substantial file history. While I have not yet finished my analysis of the claims for the '776 patent, it is my preliminary assessment that each of the independent claims includes an element or process step which is not included in any product of Dr. Greens, Inc., and particularly not in the AGENT X product. Thus, on first impression, it is my belief that Dr. Greens in no way infringes any claims of the '776 patent.

In addition to the technical aspects of an infringement analysis of the claims which lead me to an impression of non-infringement, my investigation has also revealed that the alleged inventor Mr. Stephens and Spectrum Laboratories had sold the solution specified in the '776 patent long before the January 24, 2004 filing date. As you may know, under 35 U.S.C. §102, any offer for sale or public disclosure more than one year before the earliest filing date renders any invention unpatentable. It is our strong belief that for this, and other, reasons the '776 patent is invalid.

It has also been brought to my attention that your clients have been publicizing their bold claim that Agent X infringes the '776 patent. Specifically, many of Dr. Greens' existing clients have notified Dr. Greens that they had been warned of the "infringement" by Spectrum Laboratories, and instructed not to purchase any AGENT X product from Dr. Greens. As you know, your clients' mischaracterization of Dr. Greens' AGENT X product constitutes Federal Unfair Competition under *15 U.S.C. §1125(a), commonly known as §42(a) of the Lanham Act,* as well as many other related causes of action for misuse of patents, common law unfair competition, and interference with prospective economic advantage. More seriously, however, is that this gross mischaracterization has already resulted in lost sales and substantial harm to Dr. Greens' business.

Please provide us with a listing of all customers, potential customers, businesses and individuals that have been contacted by Spectrum Laboratories, and/or Mr. Stephens, regarding these claims of patent infringement. We will also require an immediate retraction be sent by Spectrum Laboratories to each of these contacts in order to avoid any further economic harm to Dr. Greens. Please provide the list of contacts to me no later than Friday, August 7, 2009.

It is our sincere hope that this matter may be resolved amicably. To this end, should you have any details which might support your allegations of patent infringement, please feel free to forward them to me as I will be finalizing my evaluation of your infringement claims. Dr. Greens and Matt Green specifically reserve all rights and remedies, and this letter shall not be construed as a waiver of any kind.

I look forward to your early response.

Very truly yours,

Gary L. Eastman

GLE:

EXHIBIT "D"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Gary Eastman

| | |
|---|---|
| **From:** | Cupar, David B. [dcupar@mcdonaldhopkins.com] |
| **Sent:** | Thursday, August 06, 2009 12:13 PM |
| **To:** | garyeastman@sbcglobal.net |
| **Cc:** | Baiers, Amanda |
| **Subject:** | Spectrum Matter |

Gary,

Thank you for your August 3, 2009 letter. I have been out of town and am about to head out of town again in a few minutes. While I can't get back to you by tomorrow for the information you requested, I will work with you regarding this matter over the next few weeks. Thank you for your cooperation.

Best regards,
Dave

**David B. Cupar, Esq.**
**Direct: 216.430.2036 | Fax: 216.348.5474**
dcupar@mcdonaldhopkins.com



**600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 44114-2653**
**Chicago | Cleveland | Columbus | Detroit | West Palm Beach**
**www.mcdonaldhopkins.com**

IRS CIRCULAR 230 DISCLOSURE:

To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments), was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding any penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction matter addressed herein.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY ME BY TELEPHONE AND PERMANENTLY DELETE THE ORIGINAL AND ANY COPY OF THIS E-MAIL AND DESTROY ANY PRINTOUT THEREOF.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.392 / Virus Database: 270.13.45/2285 - Release Date: 08/06/09 05:57:00

9/19/2009

EXHIBIT "E"

# Legal Action Notification

Dear Valued Retailer,

We wanted to make you aware of legal actions Spectrum Labs is in the process of taking against all synthetic urine manufacturers who are potentially violating our patent. As you know, Spectrum Labs' "Quick Fix" synthetic urine is the only patented product of its kind in the market. Other companies have brought similar products into the marketplace. It has come to our attention that these products potentially violate Spectrum's U.S. Patent No. 7,192,776.

According to our attorneys, patent laws are very clear on protecting the patent holder against "*whoever*", without authority, makes, uses, *offers to sell, or sell* any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271. Violators whether the manufacture *or* seller — can be held legally and financially responsible for any losses to Spectrum due to infringement.

While we do not wish to place any financial hardships on our customers, we must take action to protect our patented products. Due to the number of companies flooding the market with inferior products, knock-offs and potentially infringing formulas we have no option but to consider moving forward with legal action.

To avoid potential liability, please avoid offering for sale, or selling, any potentially infringing products. If you have any questions regarding this matter please contact us.



P.O. Box 8401   Cincinnati, Ohio 45208   (513) 321-7747   Fax (513) 879-5392

EXHIBIT "F"

# GARY L. EASTMAN, APLC

Focusing on Start-Up and
Emerging Company Counseling
Patent, Trademark, Copyright
and Related Litigation

401 West "A" Street, Suite 1785
San Diego, California 92101
Telephone (619) 230-1144
Facsimile (619) 230-1194

GARY L. EASTMAN, Esq.
Registered Patent Attorney

garyeastman@sbcglobal.net

September 19, 2009

David B. Cupar, Esq.
McDonald Hopkins, LLC
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114

RE:     Spectrum Laboratories adv. Dr. Greens, Inc.
        United States Patent No. 7,192,776

Dear Mr. Cupar:

I represent Mr. Matt Green and Dr. Greens, Inc., in their intellectual property matters. I was forwarded your letter dated July 22, 2009, in which you allege Dr. Greens is infringing the above-referenced patent. A copy of your letter is attached as Exhibit 1 for your reference. Your letter requested a response no later than August 3, 2009. In response to your allegations, I sent you a responsive letter on August 3, 2009. A copy of my response letter is attached as Exhibit 2 for your reference. In this letter, we denied all allegations of infringement, and in fact asserted that the patent was invalid.

In my letter dated August 3, 2009, I also cautioned you that your clients, Spectrum Laboratories, is actively sending out letters containing bold claims of Dr. Greens' alleged infringement, and that these claims are actionable under the Federal Unfair Competition of the Lanham Act 15 U.S.C. §1125(a). It was requested that your client immediately cease sending out such misleading letters, and provide a listing of all customers, potential customers, businesses and individuals that have been contracted by Spectrum Laboratories and/or Mr. Stephens, regarding the allegations of infringement no later than August 7, 2009.

I received an E-mail from you on August 7, 2009, in which you indicated you received my letter of August 3, 2009, are preparing to leave town, but "[w]hile [you] can't get back to [me] by tomorrow for the information [I] requested, [you] will work with [me] regarding this matter over the next few weeks." A copy of your E-mail is attached as Exhibit 3 for your reference.

To date, I have not received any further communication from you, nor have I received the listing of all customers, potential customers, businesses and individuals that have been contacted by Spectrum Laboratories, and/or Mr. Stephens, regarding the claims of patent infringement.

It has been brought to my attention that your clients, Spectrum Laboratories, are continuing to send out the "LEGAL ACTION NOTIFICATION" letters alleging patent infringement by "all synthetic urine manufacturers..."  A copy of the "LEGAL ACTION NOTIFICATION" is attached as Exhibit 4.  This letter clearly rises to patent misuse, unfair competition, and is causing harm to my clients' business.

From your lack of response, and your client's continuing acts of unfair competition, it is becoming apparent that you do not share our hope that this matter will be resolved amicably.  Nevertheless, we are making this one final attempt to resolve the situation.

Please provide us with an immediate response to our demands of August 3, 2009, and confirm that your clients Spectrum Laboratories and/or Mr. Stephens will immediately cease sending out the "LEGAL ACTION NOTIFICATION".  If we do not receive these items within ten (10) days from the date of this letter, we will have no alternative but to take further action. Meanwhile, please note that Dr. Greens and Matt Green specifically reserve all rights and remedies, and this letter shall not be construed as a waiver of any kind.

Very truly yours,

Gary L. Eastman

GLE:

Exhibits
1)  Mr. Cupar's Letter of July 22, 2009
2)  My Letter of August 3, 2009
3)  Mr. Cupar's E-mail of August 7, 2009
4)  "LEGAL ACTION NOTIFICATION"

EXHIBIT "G"

# Gary Eastman

**From:** Cupar, David B. [dcupar@mcdonaldhopkins.com]
**Sent:** Monday, September 21, 2009 6:00 AM
**To:** garyeastman@sbcglobal.net
**Subject:** Spectrum Matter

Gary,

I am in receipt of your facsimile letter of 10:22 pm ET Friday night on September 19, 2009. I also received your 8:30 pm ET call last week as well. If you would like to reach me while I am in the office, please contact me between normal business hours - I am on EDT. I am available until 9:30 am EDT this morning to discuss. Otherwise, I am traveling for and taking depositions out of town for nearly the rest of the week. If you are not available this morning to discuss, then I am available Friday, 9/25 at 4 pm EDT for a call.

Spectrum respects your client is willing to work amicably to ensure that your client's products are outside of Spectrum's patent. You mentioned that in your August 3 letter that you performed only a preliminary assessment at that time. I have not received any further information from you since then. Therefore, in advance of our call, I proposed the following action items to make our meeting productive:

- Your final assessment regarding your client's product and reasons why it does not believe that its product does not fall within the claims of Spectrum's patent. If you believe that your client needs an NDA with me to view the formulation under "attorney's eye's only" so that Spectrum does not see the formulation, my client is willing to do so.
- Please provide the letters supporting your claim in your September 19 letter that Spectrum "is actively sending out letters containing bold claims of Dr. Greens' alleged infringement" in violation of the Lanham Act. That is a very strong claim that requires significant evidence - I just want to make sure that I am not missing any letters or correspondence that supports your client's threat. As you know, Spectrum has not threatened anything against your client and I want to continue handling this in a professional, amicable manner instead.

Further, your letter and your client's demands appear as though Spectrum has made an infringement claim with the threat of litigation. This is untrue. Spectrum has not made any specific threat of infringement and has not threatened any litigation whatsoever against your client. Rather, Spectrum has and continues to work with your client amicably without any legal threat. I hope that you and your client do not take Spectrum's willingness to work amicably with your client out of context to make a number of unfounded legal threats against Spectrum. I have found that such needless fingerpointing just gets in the way of working together. I raise this to the extent that your client may have the incorrect legal and factual belief that it somehow has jurisdiction for a declaratory judgment claim - rest assured that it does not.

Thank you for your help with this. Please let me know if you have any questions or concerns.

Best regards,
Dave

**David B. Cupar, Esq.**
**Direct: 216.430.2036 | Fax: 216.348.5474**
dcupar@mcdonaldhopkins.com

☒

**600 Superior Avenue, East, Suite 2100, Cleveland, Ohio  44114-2653**

**Chicago | Cleveland | Columbus | Detroit | West Palm Beach**
www.mcdonaldhopkins.com

IRS CIRCULAR 230 DISCLOSURE:

To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments), was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding any penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction matter addressed herein.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY ME BY TELEPHONE AND PERMANENTLY DELETE THE ORIGINAL AND ANY COPY OF THIS E-MAIL AND DESTROY ANY PRINTOUT THEREOF.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.409 / Virus Database: 270.13.112/2390 - Release Date: 09/23/09 05:52:00

3/29/2011

EXHIBIT "H"

# GARY L. EASTMAN, APLC

Focusing on Start-Up and
Emerging Company Counseling
Patent, Trademark, Copyright
and Related Litigation

401 West "A" Street, Suite 1785
San Diego, California 92101
Telephone (619) 230-1144
Facsimile (619) 230-1194

GARY L. EASTMAN, Esq.
Registered Patent Attorney

garyeastman@sbcglobal.net

September 23, 2009

David B. Cupar, Esq.
McDonald Hopkins, LLC
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114

RE:  Spectrum Laboratories adv. Dr. Greens, Inc.
United States Patent No. 7,192,776

Dear Mr. Cupar:

Thank you for your letter dated September 21, 2009.  I apologize for the tone taken in my recent letter as I was under the belief your lack of any response for the past six weeks since your initial E-mail of August 6, 2009, was an indication of your and your clients' lack of interest in resolving this issue.

Your letter to Mr. Green dated July 22, 2009, included the statement that "Spectrum believes that your Agent X product likely infringes the '776 patent." Your client has also sent multiple letters to many of Dr. Greens' customers that "[W]e wanted to make you aware of legal actions Spectrums Labs is in the process of taking against all synthetic urine manufacturers who are potentially violating our patent. … To avoid potential liability, please avoid offering for sale, or selling, any potentially infringing products."

A copy of a recent "Legal Action Notification" is attached to this letter.  The basic concern of Dr. Greens is that the "Legal Action Notification" gives Dr. Greens' customers the false impression that all synthetic urine products infringe the '776 patent.  This impression has resulted in lost sales to Dr. Greens.

Before we even finalized our analysis of the Agent X product and the claims of the '776 patent, we discovered that the most critical analysis is with respect to 35 U.S.C. §102(b).  As you may know, any sale of a product more than one year prior to the earliest application filing date renders the invention unpatentable.

**35 U.S.C. 102**

**Conditions for patentability; novelty and loss of right to patent.**

A person shall be entitled to a patent unless —
...
    (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or **_on sale in this country, more than one year prior to the date of the application for patent in the United States..._** (emphasis added).

Our investigation reveals that Spectrum Laboratories has been selling its QUICK FIX synthetic urine product long before the filing date of the '776 patent. In fact, Dr. Greens has been purchasing that exact product from Spectrum Laboratories since as early as 2001, more than three years prior to Mr. Stephens' application for patent.

I find it perplexing that, on the one hand, you assert Dr. Greens' product "likely infringes the '776 patent" and your clients has sent notices to many of Dr. Greens' customers and potential customers warning them not to buy any synthetic urine products. Yet, on the other hand, you assert in your E-mail letter of September 21, 2009, that Spectrum has not made any specific threat of infringement. I find these two positions fundamentally inconsistent.

Based on the above, and the continuing harm that your clients' misrepresentations are having to Dr. Greens' business, we request that you provide us with a listing of all customers, potential customers, businesses and individuals that have been contacted by Spectrum Laboratories, and/or Mr. Stephens, regarding these "potential" claims of patent infringement. We also request an immediate retraction be sent by Spectrum Laboratories to each of these contacts in order to avoid any further economic harm to Dr. Greens.

Thank you for your cooperation. Meanwhile, please note that Dr. Greens and Matt Green specifically reserve all rights and remedies, and this letter shall not be construed as a waiver of any kind.

Very truly yours,

Gary L. Eastman

GLE:

# Legal Action Notification

September 8, 2009

Dear Valued Retailer,

We wanted to make you aware of legal actions Spectrum Labs is in the process of taking against all synthetic urine manufacturers who are potentially violating our patent. As you know, Spectrum Labs' "Quick Fix" synthetic urine is the <u>only</u> patented product of its kind in the market. Other companies have brought similar products into the marketplace. It has come to our attention that these products potentially violate Spectrum's U.S. Patent No. 7,192,776.

According to our attorneys, patent laws are very clear on protecting the patent holder against "*whoever*", without authority, makes, uses, *offers to sell, or sells* any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271. Violators — whether the manufacture *or* seller — can be held legally and financially responsible for any losses to Spectrum due to infringement.

While we do not wish to place any financial hardships on our customers, we must take action to protect our patented products. Due to the number of companies flooding the market with inferior products, knock-offs and potentially infringing formulas we have no option but to consider moving forward with legal action.

To avoid potential liability, please avoid offering for sale, or selling, any potentially infringing products. If you have any questions regarding this matter please contact us.



P.O. Box 8401   Cincinnati, Ohio 45208   (513) 321-7747   Fax (513) 979-5392

EXHIBIT "I"

# GARY L. EASTMAN, APLC

Focusing on Start-Up and
Emerging Company Counseling
Patent, Trademark, Copyright
and Related Litigation

401 West "A" Street, Suite 1785
San Diego, California 92101
Telephone (619) 230-1144
Facsimile (619) 230-1194

GARY L. EASTMAN, Esq.
Registered Patent Attorney

garyeastman@sbcglobal.net

October 23, 2009

David B. Cupar, Esq.
McDonald Hopkins, LLC
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114

     RE:   Spectrum Laboratories adv. Dr. Greens, Inc.
             United States Patent No. 7,192,776

Dear Mr. Cupar:

It has been a month since my letter to you dated September 23, 2009, and I have yet to receive any meaningful response from your office regarding to the allegations of patent invalidity, and the request for information concerning the dissemination of the misleading "Legal Action Notification" sent from your clients, Spectrum Labs.

I find it extraordinarily unprofessional, and in fact wholly irresponsible, to flatly ignore our requests for information regarding the "Legal Action Notification", particularly since our request is based primarily on the highly misleading propaganda campaign by your client that is resulting in actual lost sales and undoubtedly cause additional future harm to Dr. Greens' business ventures.

I wish that I could genuinely thank you for your cooperation; however, there has been none. Please provide us with the information requested in our earlier correspondence, not the least of which is the identity of all recipients of the "Legal Action Notification" letters.

Meanwhile, please note that Dr. Greens and Matt Green specifically reserve all rights and remedies, and this letter shall not be construed as a waiver of any kind.

Very truly yours,

Gary L. Eastman

GLE:

EXHIBIT "J"



McDonald Hopkins LLC
Attorneys at Law

600 Superior Avenue, East
Suite 2100
Cleveland, Ohio 44114

P 216.348.5400
F 216.348.5474

Direct Dial: 216.430.2036
E-mail: dcupar@mcdonaldhopkins.com

February 11, 2011

Gary L. Eastman
401 West "A" Street, Suite 1785
San Diego, CA 92101

Re:   **U.S. Patent No. 7,192,776**
      **Titled: SYNTHETIC URINE AND METHOD FOR MANUFACTURING SAME**

Dear Mr. Eastman:

We represent Spectrum Laboratories, LLC, which owns U.S. Patent No. 7,192,776 ("the '776 patent"), which claims a synthetic urine and a method for manufacturing synthetic urine. A copy of the '776 patent is enclosed for your reference.

I previously wrote to your client, Dr. Greens, Inc., on July 22, 2009, expressing Spectrum's belief that Dr. Greens' Agent X product potentially infringes the '776 patent. My letter asked that Dr. Greens provide to us any basis for its believing that it does not infringe the '776 patent. Although you responded on behalf of Dr. Greens with a letter dated August 3, 2009, generally denying infringement, neither you nor Dr. Greens have ever provided any specific information identifying why it believes it does not infringe.

While a rash of counterfeiting in California has continued to occupy Spectrum's litigation and business resources, Spectrum remains committed to ensuring there is no infringement of its '776 patent. Consequently, Spectrum again asks that Dr. Greens identify any reasons why it does not believe it is infringing. Specifically, if Dr. Greens contends that its Agent X product does not infringe, please provide the formula and method used to manufacture that product so we can test the accuracy of that contention in accordance with 35 U.S.C. § 295.

Sincerely,

David B. Cupar

Enclosure

**PROOF OF SERVICE**

I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above named person the following documents:

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT, PATENT INVALIDITY, MISUSE OF PATENT, FEDERAL STATUTORY UNFAIR COMPETITION, UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, INTERFERENCE WITH BUSINESS RELATIONS, INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, AND DEMAND FOR JURY TRIAL

in the following manner:  (check one)

1. _____ By personally delivering copies to the person served.

2. _____ By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

3. _____ By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4. _____ By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at _____ on _____, 2012.

5. __XX__ By ECF Filing Service by filing the above-identified documents with the Court via ECF electronic filing to attorneys of record in the case.

David B. Cupar
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Matthew J. Cavanagh
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Executed on April 19, 2012, 2011 at San Diego, California.

/s/  Gary L. Eastman

Gary L. Eastman

11cv0638 JAH (CAB)