1  Gary L. Eastman, Esq. (SBN 182518)
   GARY L. EASTMAN, APLC
2  401 West A. Street, Ste. 1785
   San Diego, CA 92101
3  Telephone: 619-230-1144
   Facsimile: 619-230-1194
4
   Attorney for Plaintiff Dr. Greens, Inc.
5  And Matthew Green

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  DR. GREENS, INC. a California corporation, | Case No.: 11cv0638 JAH (KSC) |
| 12 | **DR. GREENS, INC. AND MATTHEW GREEN'S CLAIM CONSTRUCTION BRIEF** |
| 13         Plaintiff, | |
| 14  vs. | FILED: MARCH 29, 2011 |
| 15  JAMES MATTHEW STEPHENS, an individual, and SPECTRUM | |
| 16  LABORATORIES, LLC, an Ohio limited liability company, | Courtroom: Hon. John A. Houston |
| 17         Defendants. | |
| 18  AND RELATED CROSS ACTION | |

19

20                    **I.  INTRODUCTION**

21        This case has come before the court initially as an Unfair Competition and

22  Declaratory Action for Non-Infringement brought by Plaintiffs Dr. Greens, Inc. for

23  the misuse of United States Patent No. 7,192,776 ("the '776 patent"), and

24  genuflectively morphed into a Patent Infringement Claim by Defendants James

25  Matthew Stephens and Spectrum Laboratories, LLC, based solely on the

26  presumption under 35 USC §295 which provides for a presumption of

27  infringement for a product made by a presumably patented process.

28

---

In addition to the misuse of patent claim, Plaintiffs seek Declaratory Relief for invalidity based on Defendant's blatant copying of known §102(b) prior art references in a textbook into the claim language (including the typo's), thereby rendering the invention unpatentable under 35 U.S.C. §102(b), among several other reasons.

Since the beginning of this case in March of 2011, despite Plaintiffs' repeated requests for clarification of the allegations of infringement, Defendants have relied on the §295 presumption as a sole means for alleging infringement in this action. Consequently, the Parties have been unable to narrow the claim terms to be construed by the Court, and thus the Joint Claim Construction Chart (Docket #71) includes each and every term listed in the claims of the '776 patent.

Miraculously, days before the Claim Construction Briefs are due, Defendants choose to reveal that they have apparently "tested" a sample of Plaintiff's product to identify that the sample includes "a carbamate." Interestingly, the Declaration of Mr. Cavanagh conveniently failed to indicate the date upon which the alleged testing occurred (See Docket #72-2, Declaration of Mr. Cavanagh, Paragraphs 27-28). Notwithstanding Plaintiff's prior discovery request which requested all documents related to proof of infringement and all evidence of testing, Defendants have frustrated the entire claim construction process through their deceitful withholding of information despite valid discovery requests seeking clarification.

## III. LEGAL ANALYSIS

The construction of a patent is a matter of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). "To ascertain the meaning of claims, we [the Court] consider three sources: The claims, the specification, and the prosecution history." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir.1995) (en banc), *aff'd*, *Markman*, 517 U.S. 370. The starting point for an inquiry into the proper construction of particular claim terms is the claims themselves. *Phillips v. AWH Corp.*, 415 F.3d 1303,

1313 (Fed. Cir. 2005); *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim.").

In general, the Court ascribes to the words of a claim their ordinary and customary meaning. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13. However, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582. "It is a well established axiom in patent law that a patentee is free to be his or her own lexicographer, and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." *Hormone Research Foundation, Inc. v. Genentech, Inc*. 904 F.2d 1558, 1563 (Fed. Cir. 1990).

The claims "must be read in view of the specification, of which they are a part." *Markman.*, 52 F. 3d at 979. The specification "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F. 3d at 1582. "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317. In addition to the specification, the Court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. (Attached as Exhibit 1 is the Prosecution History of the '776 Patent.)

In most cases, the Court can construe claims based solely on this intrinsic evidence. See *Vitronics*, 90 F.3d at 1583. Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language may the court then rely on extrinsic evidence. *Id.* ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper."). While the Court is

in those instances permitted to rely on extrinsic evidence, including dictionaries and learned treatises, such evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317. "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## A. The Claims of the '776 Patent

The first level of analysis requires a review of the claims, and the claims speak for themselves:

The independent claims in the '776 patent are claims 1, 5, and 10. Claim 1 contains a limitation for "a biocide." *Not* "one or more biocides." Claim 5 contains a limitation for "…and biocide…, wherein *said* biocide…". Claim 10 contains a limitation for "adding *a* biocide". (emphasis added). (See Exhibit 1, U.S. Pat. No. 7,192,776).

Nowhere in the claims does it even contemplate that more than one biocide is included. Indeed, in each instance where a biocide is identified, it is particularly identified in the singular, not plural, rendering Defendants claims for a broad claim construction to be inherently flawed, and clearly self-serving.

> CLAIM 1: "A SYNTHETIC URINE SOLUTION COMPRISING: … **A BIOCIDE**, SAID CREATININE AND BIOCIDE DISSOLVED WITHIN SAID WATER TO FORM A SOLUTION EXHIBITING A SPECIFIC GRAVITY AND SAID CREATININE AND BIOCIDE SELECTED IN RELATIVE CONCENTRATIONS TO MINIMIZE SEPSIS; … WHEREIN **SAID BIOCIDE** IS SELECTED FROM …"

> CLAIM 5: "A METHOD OF MANUFACTURING A SYNTHETIC URINE SOLUTION COMPRISING: … DISSOLVING CREATININE AND BIOCIDE INTO SAID WATER TO FORM A SOLUTION EXHIBITING A SPECIFIC GRAVITY LEVEL, SAID CREATININE AND BIOCIDE BEING SELECTED IN RELATIVE CONCENTRATIONS TO MINIMIZE SEPSIS, WHEREIN **SAID BIOCIDE** …"

CLAIM 10: "A METHOD OF MANUFACTURING A
SYNTHETIC URINE SOLUTION COMPRISING: … **ADDING A
BIOCIDE** INTO SAID SOLUTION, **SAID BIOCIDE** IS
SELECTED…"

The claim limitation of "a biocide" is clearly a reference to a singular biocide in the chemical composition; no combination of biocides is intended.

## B. The Specification of the '776 Patent

The second level of analysis requires a review of the specification, and the specification speaks for itself:

The '776 patent (Column 5, lines 5-9) specifically lists:

> Carbamates (such as a mix of sodium dimethyldithiocarbamate
> (DIBAM) and disodium ethylene bisdithiocarbamate (NIBAM), or
> single product, such as potassium n-hydroxymethyl-n-
> methyldithiocarbamate, an organo-sulfur group);

Following the well-known doctrine of ejusdem generis[1], Defendants are limited **ONLY** to the specific chemical compounds listed as exemplars. Indeed, Defendants listing of a general term "carbamante" followed by specific terms "sodium dimethyldithiocarbamate (DIBAM) and disodium ethylene bisdithiocarbamate (NIBAM), or single product, such as potassium n-hydroxymethyl-n-methyldithiocarbamate, an organo-sulfur group" intrinsically limits the claim construction to the specific terms listed.

## C. The Prosecution History of the '776 Patent

In the Examiner's Notice of Allowance and statement of allowability, the Examiner indicated that the specific reasons for allowance were the specific limitation of

---

[1] The Latin phrase ***ejusdem generis*** means of the same kind, class, or nature. In the context of legal instruments, "the '***ejusdem generis*** rule' is that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest context, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary 517 (7th ed. 1999).

"… a biocide selected from one of the specific biocides recited in independent claims 1, 7, and 13." See Prosecution History excerpt in Exhibit 2, Page 10, Paragraph No. 2.

> 2. The following is an examiner's statement of reasons for allowance: Application serial no. 10/766,165 is being allowed since none of the prior art of record teaches or fairly suggests a synthetic urine composition comprising water having a pH of between 3 and 10, creatinine, an ionic compound dissolved in the composition so as to give the composition a specific gravity of between 1.005 and 1.025 g/cm3, and a biocide selected from one of the specific biocides recited in independent claims 1, 7 and 13. Specifically, none of the prior art of record teaches or fairly suggests a synthetic or artificial urine solution that mimics urine and has one of the recited biocides therein.

The Examiner specifically states that "none of the prior art of record teaches or fairly suggests a synthetic or artificial urine solution …. and has *one of the* recited biocides therein." (emphasis added).

The Defendants are clear in their drafting style. Indeed, in each instance they have indicated a possibility of more than one compound, they have used "at least one". For instance, Defendants have referred to "*at least one* dissociating ionic compound…" multiple times (Claim 1, Claim 3, Claim 10, Claim 11, Specification Column 3, lines 7-8). On the other hand, nowhere in the entire specification does Defendant assert that there can be more than one biocide in the formula. In fact, in each instance where a biocide is identified, it is listed as "a biocide", implicitly limiting the claim scope to a *single* biocide.

### D. The '776 Patent Does Not Cover A "Multiple Biocide" Product

Defendants have gone to great lengths to mislead the Court to rely on the 35 U.S.C. §295 presumption, all the while holding their "testing" results close to the vest in hopes of distracting Plaintiffs in their analysis. Only now, a day before the Claim Construction Briefs are due, does Defendant file for leave to amend their Preliminary Infringement Contentions to identify "carbamate". Clearly this is an underhanded attempt

to circumvent the true claim construction process, and instead force Plaintiffs to play hide-and-seek with regard to the allegations of infringement.

Defendants are overreaching in this matter. Their first attempt to sweep up all biocides into what they hope to be a generic claim for all biocides was flatly rejected by the Examiner in the prosecution history of this case. (See Exhibit 2, Prosecution History page 148, and Exhibit 2, Prosecution History page 111). For instance, the Examiner forced a limitation into the claims to eliminate all "preservatives," and all but a few "biocides'". (See Exhibit 2, Prosecution History Page 61)

Indeed, Defendants went to great lengths to distinguish their "biocides" from the "preservatives" cited by the Examiner. (See Exhibit 2, Prosecution History Page 105) However, their attempt flatly failed, and the Examiner required a severe limitation to a single specific biocide, from a specific group of biocides.

### E. Plaintiffs's need for Construction of the "Single Biocide" Limitation

Plaintiffs have acknowledged through discovery and deposition, that the synthetic urine products previously provided by Dr. Greens, Inc. include either sodium benzoate, a well-known and clearly un-patentable preservative, or sodium azide, a chemical specifically deleted from the patent claims during prosecution (See Exhibit 2, page 61). As a result of these known ingredients, it is of paramount importance to Plaintiff that the specific limitations of "a biocide" be construed by this Court.

### F. Plaintiffs's Request Opportunity to Address Additional Biocides

Plaintiff addresses the specific limitations of "carbamate" most recently identified in Defendants Motion for Leave to Amend (Docket No. 72). Given that Defendants originally identified all biocides listed in the '776 patent as being possibly infringed, and failing to identify the specific terms of the claims requiring construction until last Friday, Plaintiff respectfully reserves the opportunity to present additional proof and support with regard to any other claim elements which may be asserted by Defendants.

## V. CONCLUSION

This case is simple: Defendants copied the salient portions of a widely distributed textbook into the claims of a patent application, and failed to provide the Examiner with a copy of the reference textbook in violation of the Information Disclosure requirements under §609 of the Manual of Patent Examination and Procedure. This deceitful conduct resulted in the Examiner allowing the Application, but only following the extreme limitation to a single biocide from a specific group, of which the Defendant limited further through his specificity of the particular carbamate compounds in the Specification. Defendants now seek to impermissibly expand the scope of the patent coverage to include multiple biocides outside the disclosure of the specification, and well outside the specific claim coverage.

The Defendants wrote the '776 patent, not the Plaintiffs. Had they intended to aggregate multiple biocides into the specific patent claims, the time to do so was during the prosecution of the patent, not during subsequent patent infringement litigation. Defendants narrowed their claims to achieve patentability, and are now impermissibly attempting to expand the scope of protection. That approach, simply, is not how the patent system works. They previously narrowed the scope of their patent claims, and now must live with that narrowing to a single biocide.

Plaintiff Dr. Greens, Inc. and Matt Green respectfully request that the Court find that the claims are to be construed as presented above, and that Defendants cannot now expand the coverage to serve their needs.

DATED: March 4, 2013          GARY L. EASTMAN, APLC


By: _/s/  Gary L. Eastman_
Gary L. Eastman, Esq.
Attorney for Plaintiffs and Cross-
Defendants, DR. GREENS, INC., a
California corporation and Matt Green

**PROOF OF SERVICE**

I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above named person the following documents:

**DR. GREENS, INC.'S CLAIM CONSTRUCTION BRIEF**

in the following manner:  (check one)

1.        ____                By personally delivering copies to the person served.

2.        ____                By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

3.        ____                By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4.        ____                By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at _____ on _____, 2010.

5.        _XX_                By ECF Filing Service by filing the above-identified documents with the Court via ECF electronic filing to attorneys of record in the case.

David  B. Cupar
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Matthew J. Cavanagh
McDonald Hopkins, LLP
600 Superior Avenue East
Cleveland, OH 44114

Executed on March 4, 2013, 2011 at San Diego, California.

/s/  *Gary L. Eastman*_____

Gary L. Eastman