Gary L. Eastman (CSB #182518)
Matthew C. McCartney (CSB #226687)
EASTMAN & MCCARTNEY LLP
401 West "A" Street, Suite 1785
San Diego, CA 92101
Telephone:   (619) 230-1144
Facsimile:   (619) 230-1194

Attorneys for Plaintiff
DR. GREENS, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. GREENS, INC., a California corporation,<br><br>Plaintiff,<br><br>        v.<br><br>JAMES MATTHEW STEPHENS, an individual, and SPECTRUM LABORATORIES, LLC, an Ohio limited liability company,<br><br>Defendants. | Case No. 11cv0638 JAH (KSC)<br><br>**PLAINTIFF'S OPPOSITION TO SPECTRUM LABORATORIES, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: June 2, 2014<br>Time: 2:30 p.m.<br>Judge: Hon. John A. Houston<br>Courtroom: 13(B) (Annex) |

I.     STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT                    1

III.   LEGAL STANDARD FOR SUMMARY JUDGMENT                               2

IV.    EVIDENTIARY OBJECTIONS                                            3

       A.     Broken Chain of Custody                                    3

       B.     Failure to meet the requirements of Rules 702 and 703 of the   4
       Federal Rules of Evidence

       i.     Unreliable sample                                         4

       ii.    Lack of specialized knowledge                             8

       iii.   Unreliable testing method/application of testing method   9

       iv.    Unreliable secondhand information                         10

V.     ARGUMENT                                                         11

   I.  Dr. Greens' does not literally infringe independent claim 1
       of the '776  patent.                                             12

       A.     Limitation not met: Water having a pH between 3 and 10    12

       B.     Limitation not met: Creatinine and a biocide dissolved to exhibit
              specific gravity and selected in relative concentrations to minimize
              sepsis                                                    14

              i.     "contain a creatine and a biocide"                 14

              ii.    "dissolved within said water"                      16

              iii.   "to form a solution exhibiting a specific gravity"  17

              iv.    "selected in relative concentrations to minimize sepsis"   17

       C.     Limitation not met: dissociated ionic compound dissolved to
              adjust the specific gravity of the solution to between 1.005 g/cm$^3$
              and 1.025 g/cm$^3$                                        18

       D.     Limitation not met: Carbamates                            19

   II. Dr. Greens' does not literally infringe dependent claims 2

       through 4 of the '776 patent.                                    20

   III. Summary judgment should be denied under Rule 56(d) of the

       Federal Rules of Civil Procedure.                                21

VI.    CONCLUSION                                                       22

# TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)                2, 3

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)                       2

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 US 579, 592 (1993)     8, 10

Hochen v. Bobst Group, Inc., 290 F3d 446, 452 (1st Cir. 2002)            9

Kumho Tire Co., Ltd. v. Carmichael 526 US 137, 147–148 (1999)            8

Markman v. Westview Instruments, Inc., 517 U.S. 370, 372–74 (1996).)     11

Mas–Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed.Cir.1998)   12

Read Corp. v. Portec, Inc., 970 F.2d 816, 821 (Fed.Cir.1992)             11

U.S. v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970)                       21


Fed.R.Civ.P. 56(c)                                                       2, 3

Fed. R. Evid. 702                                                        4, 8, 9

Fed. R. Evid. 703                                                        10

Dr. Greens, Inc. ("Dr. Greens") hereby submits its response in opposition to Spectrum Laboratories, LLC's ("Spectrum") motion for summary judgment for direct and literal infringement of United States Patent No. 7,192,776, entitled, "Synthetic Urine and Method of Manufacturing Same" ("the '776 patent"). Spectrum's motion must be denied because genuine disputes of material fact exist as to whether Dr. Greens' synthetic urine powder sold as "Agent X" literally infringes the '776 patent.

## I.      STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

Beginning in late 2003/early 2004, Dr. Greens began selling its own synthetic urine products.  (Decl. Green at ¶ 2.)  In early 2004, Dr. Greens hired DSBR as the supplier for its synthetic urine products.  (Decl. Green at ¶ 3; see also, Doc. No. 101-9 at 17:9-12 [excerpts from Transcript of Deposition of David A. Short ("Short Dep.")].)  From early 2004 through early 2011, DSBR was the exclusive supplier for Dr. Greens' synthetic urine products.  (Decl. Green at ¶ 3; see also, Short Dep. at 21:22-25.)  All of the synthetic urine product DSBR supplied to Dr. Greens from 2004 through 2011 was in **powder** form only, i.e., not premixed with water.   (Decl. Green at ¶ 3; see also, Short Dep. at 26:19-23.)

Back in 2004, when Dr. Greens first started selling its synthetic urine products, the only product offered was Dr. Greens' "Agent X."  (Decl. Green at ¶ 4; see also,  Ex. 1 to Decl. Eastman at 195:12-13 [excerpts from Transcript of 30(b)(6) Deposition of Matthew R. Green ("Green Dep.")].)  The synthetic urine product sold as "Agent X" comes in **powder** form only, i.e. **not** premixed with water.   (Decl. Green at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 193:5-6].)  Overtime, Dr. Greens learned that some customers disliked the fact that "Agent X" did not come premixed with water.  (Decl. Green at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 195:15-22].)  As a result of popular demand in 2005, Dr. Greens began offering for sale a new synthetic urine product, "Agent X

Premixed," allowing customers to choose between a synthetic urine product in powder form versus a liquid form.  (Decl. Green at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 195:15-25].)   To help customers distinguish between the two different products, "Agent X" is sold in a black box, whereas "Agent X Premixed" is sold in a grey box with the term "Premixed" clearly labeled on the front.  (Decl. Green at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 193:16-18].)

For purposes of Spectrum's summary judgment motion, however, **only** "Agent X" is at issue—i.e., the **powder** form.  Specifically, Spectrum contends that Dr. Greens' synthetic urine powder called "Agent X" literally infringes upon independent claim 1 and dependent claims 2 through 4 of the '776 patent. Spectrum alleges that it obtained a box of Dr. Greens' "Agent X" product back in 2004, and eight years later, in 2012, Spectrum sent the "Agent X" box to Avomeen Analytical Services ("Avomeen") for chemical testing.  (*See* Doc. No. 101-2 at ¶ 13 [Decl. Kusala].)  The "Agent X" product tested by Avomeen in 2012 is not a true and correct representation of Dr. Greens' accused "Agent X" synthetic urine powder.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  (Fed.R.Civ.P. 56(c).)  Material facts are those which may affect the outcome of the proceedings.  (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).)  The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. (*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).)  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only

point out "that there is an absence of evidence to support the nonmoving party's case." (*Id.* at 325.)

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." (Fed.R.Civ.P. 56(e).)  The court may not make credibility determinations and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. (*Anderson, supra*, 477 U.S. at 249.)

Spectrum's motion for summary judgment must be denied because genuine disputes of material fact exist as to whether Dr. Greens' synthetic urine powder sold as "Agent X" literally infringes the '776 patent.

## IV.    EVIDENTIARY OBJECTIONS

Spectrum relies on the declaration of Shri Thanedar to introduce purported expert opinion testimony that Greens' "Agent X" synthetic urine powder contains a biocide.  Mr. Thanedar's declaration testimony should be excluded as unreliable because (1) Spectrum failed to establish proper authentication and chain of custody for the alleged 2004 "Agent X" sample at issue, and (2) his purported expert testimony does not meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

### A.    Broken Chain of Custody

Spectrum relies on the declaration of Fran Kusala to establish a chain of custody for the alleged "Agent X" product tested by Avomeen.  Mr. Kusala's attempt to trace the whereabouts of the "Agent X" box from the date on which it was obtained by Spectrum in 2004 to the date on which Spectrum sent the box to Avomeen for chemical testing in 2012 is ineffective and improper.

Critically, Mr. Kusala testified that she left her job with Spectrum on December 31, 2004 "to pursue outside interests." (Doc. No. 101-2 at ¶ 4.)  She testified that she was rehired by Spectrum on January 1, 2008.  (Doc. No. 101-2 at ¶ 4.)  Thus, Mr. Kusala cannot possibly establish a proper chain of custody for the subject "Agent X" box because she has no personal knowledge of what happened to the box between December 31, 2004 and January 1, 2008.  **Four years** of the chain of custody analysis are entirely unaccounted for by Spectrum.    There is no evidence before the court of anyone having personal knowledge of who acquired the sample, nor has any evidence that the sample was unadulterated been presented to the court.

### B.    Failure to meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence

### i.    Unreliable sample

Mr. Thanedar's expert opinion testimony that the alleged "Agent X" synthetic urine product obtained by Spectrum in 2004 contains a biocide should be excluded as unreliable under Rule 702 of the Federal Rules of Evidence because his expert opinion is based on the unfounded, uncorroborated, and unduly speculative assumption that the (1) the "Agent X" product was not tampered with prior to testing, and (2) that the eight-year delay in testing the "Agent X" product did not materially affect and/or alter the structural and compositional integrity of the product.

As mentioned above, Dr. Greens sells both "Agent X" (i.e., synthetic urine powder) and "Agent X Premixed" (i.e., synthetic urine liquid).  "Agent X" is sold in a black box, whereas "Agent X Premixed" is sold in a grey box with the term "Premixed" clearly labeled on the front:




(Decl. Green at ¶ 5-6; see also, Ex. 1 to Decl. Green)  The declaration of Mr. Thanedar includes a photograph of the "Agent X" box obtained by Spectrum in 2004 that Spectrum sent to Avomeen in 2012, specifically:



        According to the declaration of Mr. Kusala, the "Agent X" box obtained by Spectrum in 2004 contained "a capped plastic bottle holding a liquid."  (Doc. No. 101-2 at ¶ 15.)  Mr. Kusala's testimony cannot be accurate because, as discussed above, the synthetic urine product sold as "Agent X" comes in ***powder*** form only,

i.e. **not** premixed with water.   (Decl. Green at ¶ 6; see also, Ex. 1 to Decl. Green; and Ex. 1 to Decl. Eastman [Green Dep. at 193:5-6].)  Therefore, if Mr. Kusala's testimony is true—that the "Agent X" box obtained by Spectrum in 2004 contained a liquid solution—then one of two things had to have occurred: (1) prior to Spectrum's receipt of the "Agent X" box, the box was opened and water was added to the synthetic urine powder by an unknown third-party, or (2) after Spectrum's receipt of the "Agent X" box, the box was opened and water was added to the synthetic urine powder by Spectrum personnel—either way, the "Agent X" product at issue was materially tampered with.  (*Id.*)  On this basis alone, Mr. Thanedar's expert opinion should be excluded as unreliable.

The likelihood that Dr. Greens' "Agent X" product was in fact tampered with prior to Avomeen's testing is underscored by the vague and ambiguous declaration of Mr. Kusala.  Notably absent from Mr. Kusala's declaration is any description of where Spectrum obtained the "Agent X" box, how it was obtained, who it was obtained from, or when in 2004 it was obtained.  Mr. Kusala's use of the term "obtained," rather than the term "purchased," suggests that Spectrum itself did not purchase the "Agent X" box from Dr. Greens or any other reliable source. Spectrum failed to produce any contemporaneous documentary evidence to corroborate Mr. Kusala's testimony, such as an invoice, purchase order, receipt, shipping confirmation, etc. for the subject "Agent X" box.  As demonstrated above, there is no question that **somebody** opened the "Agent X" box, took out the synthetic urine powder inside the box, and mixed the powder with water to create a liquid solution.

The doubt surrounding the genuineness of the "Agent X" product at issue here is strengthened by the fact that Mr. Kusala does not identify who from "*Spectrum personnel*" first received the "Agent X" box back in 2004.  Mr. does not identify the specific "*Spectrum personnel*" that first opened the "Agent X" box. Mr. Kusala does not identify the specific "*Spectrum personnel*" that participated in the 2004 inspection of the "Agent X" box.  Mr. Kusala does not provide any

description of the specific location within Spectrum's offices at which the "Agent X" box was stored, who had access to said location, or the types of security procedures implemented by Spectrum to keep the location secure from unwanted intrusion.  Mr. Kusala has no personal knowledge of whether "*Spectrum Personnel*" tampered with and materially altered Dr. Greens' "Agent X" synthetic urine product during her **four-year** departure from Spectrum, i.e., December 31, 2004 to January 1, 2008.

In addition, a serious issue exists here as to whether the structural and compositional integrity of the "Agent X" product was materially affected by the **eight-year** delay in chemical testing.  Mr. Kusala testified that the date on the instruction sheet for the "Agent X" states "June 2004."  (Doc. No. 101-2 at ¶ 15.)  Avomeen did not test the "Agent X" product until "October 9th, 2012."  (Doc. No. 101-3 ¶ 7.)  There is a strong likelihood that this eight-year lapse in time would result in the spoliation of the accused "Agent X" product.  Indeed, the shelf-life of Dr. Greens' accused "Agent X" product is only two years.  (Decl. Green at ¶ 14; see also, Ex. 2 to Decl. Green.)  This 2-year shelf life is standard in the synthetic urine industry.  (*Id.*)  For example, Spectrum's synthetic urine product sold as "Quick Fix" also has a 2-year shelf life.  (Decl. Green at ¶ 14; see also, Ex. 3 to Decl. Green.)

Based on the totality of circumstances, Spectrum failed to establish the reliability of the "Agent X" test results procured by Avomeen in 2012.  In all cases where expert testimony is offered, the trial judge must find that the testimony is "properly grounded, well-reasoned and not speculative before it can be admitted." (See FRE 702, Adv. Comm. Notes (2000).)   As demonstrated above, Mr. Thanedar's expert opinion is highly speculative because a genuine dispute exists as to whether the alleged "Agent X" product tested by Avomeen is a true and correct representation of Dr. Greens' accused "Agent X" synthetic urine powder. Therefore, Mr. Thanedar's opinion testimony that Dr. Greens' "Agent X" contains a biocide should be excluded as unreliable.

### ii.    Lack of specialized knowledge

Mr. Thanedar's expert opinion testimony that the alleged Dr. Greens' "Agent X" synthetic urine powder obtained by Spectrum in 2004 contains a biocide should be excluded as unreliable under Rule 702 of the Federal Rules of Evidence because the evidence is insufficient to conclude that Mr. Thanedar is qualified to provide expert testimony on the specific testing method employed by Avomeen.

Mr. Thanedar testified in his declaration that "under [his] direction and supervision" Avomeen personnel tested the "Agent X" solution provided by Spectrum using "gas chromatography coupled with mass spectrometry (GC-MS)." (See Doc. No. 101-3 at ¶ 8.)  Exhibit 1 to the declaration of Mr. Thanedar has a section entitled, "Areas Of Expertise."  (Doc. No. 101-4.)  Notably, CG-MS is not listed as an area of Mr. Thanedar's expertise.  (Doc. No. 101-4.)   In fact, Exhibit 1 confirms that Mr. Thanedar is only "familiar with" CG-MS.  (Doc. No. 101-4.) Mere familiarity with the instrumental technique known as CG-MS *in general* does not render Mr. Thanedar qualified to provide expert analysis and opinion on the *specific* testing technique unnamed Avomeen personnel applied to the alleged "Agent X" sample.

Moreover, even if for argument purposes, Mr. Thanedar is qualified to discuss the instrumental technique of CG-MS in general, he must still have *specific* knowledge regarding the technical equipment actually used by Avomeem personnel to test the alleged "Agent X" sample.  (*See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael* 526 US 137, 147–148 (1999) [The trial court's general "gatekeeping" role established under FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 592 (1993) applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."].)   Mr. Thanedar identified the technical or diagnostic equipment used by Avomeen personnel as follows:

An Agilent 6890N Gas Chromatography coupled with an Agilent 5973N Mass Spectrometer was used to analyze the sample after being diluted 1:10 in methanol.  An Agilent DB-200 30 m x 250 μm x 0.25 μm capillary column was used to separate the different components in the sample.

(Doc. No. 101-3 at ¶ 8.)

Spectrum failed to offer any reliable and meaningful evidence that Mr. Thanedar has specialized knowledge of, and/or experience with, the particular technical equipment used by Avomeen personnel.  Consequently, the evidence is insufficient to establish that Mr. Thanedar is qualified to provide an expert opinion on whether the alleged "Agent X" sample contains a biocide.  (*See*, *e.g.*, *Hochen v. Bobst Group, Inc.*, 290 F3d 446, 452 (1st Cir. 2002) (holding engineer's testimony inadmissible because of lack of knowledge about specific printing press in question).)

### iii.    Unreliable testing method/application of testing method

Mr. Thanedar's expert opinion testimony that the alleged Dr. Greens' "Agent X" synthetic urine powder obtained by Spectrum in 2004 contains a biocide should be excluded as unreliable under Rule 702 of the Federal Rules of Evidence because the evidence is insufficient to conclude that Mr. Thanedar's expert opinion is the product of reliable principles and methods when applied to the facts of this case.

General knowledge in the industry teaches that "[I]n order for a compound to be analyzed by GC/MS, it must be sufficiently volatile and thermally stable." (Exhibit 2 to Decl. Eastman.)  In this case, there is no evidence that Dr. Greens' "Agent X" product is "sufficiently volatile and thermally stable" for the purposes of CG-MS.   Mr. Thanedar does not identify any of the factors that should be considered in evaluating whether CG-MS is a proper testing technique for the accused product.  Mr. Thanedar does not identify or explain why Avomeen used CG-MS, as opposed to alternative testing techniques, to test the "Agent X"

product.  There is no evidence to suggest that CG-MS is a reliable instrumental technique to test the presence of biocides in the "Agent X" product.  Mr. Thanedar's conclusory declaration testimony that the testing method used by Avomeen personnel "is a standard, reliable method used by chemical testing laboratories to test for biocides" (Doc. No. 101-3 at ¶ 8), without more, is insufficient to establish that his declaration opinion testimony is the product of reliable principles and methods reasonably applied to the facts of this case.  Rule 702 assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical, or other specialized knowledge "both rests on a reliable foundation and is relevant to the task at hand."  (*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).)  Here, Spectrum has failed to establish that CG-MS is a reliable testing technique for Dr. Greens' accused "Agent X" synthetic urine powder.

### iv.    Unreliable secondhand  information

Mr. Thanedar's expert opinion testimony that the alleged Dr. Greens' "Agent X" synthetic urine powder obtained by Spectrum in 2004 contains a biocide should be excluded as unreliable under Rule 703 of the Federal Rules of Evidence because his testimony is based on undisclosed, unfounded, and unduly speculative secondhand information.  Rule 703 of the Federal Rules of Evidence requires that the facts or data relied upon by Mr. Thanedar must be of a type that "experts in the particular field would reasonably rely on" in forming opinions or inferences on the subject.  (Fed. R. Evid. 703.)

In this case, Mr. Thanedar cites to a vague and ambiguous "library reference" or "library match" to support his conclusion:

The first chart in Figure 2 is the mass spectrum of the peak at 4.6 minutes in the sample of Dr. Greens Agent X.  The second chart in Figure 2 compares the fragmentation pattern of the compound detected in the sample of Dr. Greens Agent X (on the top) to the fragmentation pattern of the ***library reference*** for carbamic acid

methyl ester (on the bottom).  The third chart in Figure 2 is a mass spectrum of the ***library match*** to carbamic acid methyl ester.  Because the mass spectral results perfectly mirror each other for the peak in the sample of Dr. Greens Agent X and the ***library match*** to carbamic acid methyl ester, the test confirms without a doubt that the Agent X sample contains a carbamic acid methyl ester.

(Doc. No. 101-3 at ¶10 (emphasis added).)

Notably absent from Mr. Thanedar's declaration, however, is any information sufficient to identify the particular "library reference" or "library match" he relied upon in forming his conclusion.  The terms "library reference" and "library match" standing alone mean nothing.  Absent identification of the specific "library reference" or "library match" relied upon by Mr. Thanedar in forming his conclusion, it is impossible for this Court to evaluate whether experts in the relevant scientific field would have reasonably relied on the same.   Without more, the evidence is insufficient to establish that Mr. Thanedar's expert opinion is based on facts or data that "experts in the particular field would reasonably rely on" in forming opinions or inferences on the subject.  Therefore, the charts disclosed in Figure 2 of Mr. Thanedar's declaration and the expert opinion testimony related thereto should be excluded as unreliable and unduly prejudicial.


## V.    ARGUMENT


A patent infringement analysis involves two steps.  First, the court determines the scope and meaning of the asserted claims.  (*See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372–74 (1996).)  Second, the properly construed claims are compared to the allegedly infringing device.  (*See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821 (Fed.Cir.1992).)

In this case, Spectrum contends Dr. Greens' synthetic urine powder sold as "Agent X" literally infringes independent claim 1 and dependent claims 2 through 4 of the '776 patent.  To prove literal infringement, Spectrum must prove that Dr.

Greens' "Agent X" powder contains each limitation of the disputed claims.  (*See Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed.Cir.1998).)  If any claim limitation is absent from Agent X, there is no literal infringement as a matter of law.   (*See id.*)

## I.   Dr. Greens' does not literally infringe independent claim 1 of the '776 patent.

Independent claim 1 requires:
A synthetic urine solution comprising:
  water having a pH between 3 and 10;
  creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis;
  at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³; and
  wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(decylthio)ethanamine, guanides, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, terbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

### A.   Limitation not met: Water having a pH between 3 and 10

To prove literal infringement, Spectrum must prove that Dr. Greens' accused "Agent X" synthetic urine powder contains "water having a pH between 3 and 10." ('776 patent col. 6 l. 36.)  Spectrum failed to satisfy its burden.

As discussed above, the synthetic urine product sold as "Agent X" comes in **powder** form only, i.e. **not** premixed with water.   (Decl. Green at ¶¶ 4-6; see also, Exhibit 1 to Decl. Green; Ex. 1 to Decl. Eastman [Green Dep. at 193:5-6].)  In this case, Spectrum obtained a box of "Agent X" (i.e., a synthetic urine powder), **not** "Agent X Premixed" (i.e., a synthetic urine liquid solution).  (Decl. Green at ¶¶ 4-6; see also, Exhibit 1 to Decl. Green.)  This fact is confirmed by Mr. Thanedar's declaration, which includes a photograph of the "Agent X" box Avomeen received from Spectrum.  (See Doc. No. 101-3 at ¶ 6.)  Dr. Greens' accused "Agent X" product cannot literally infringe the '776 patent because, indisputably, the product at issue is sold as synthetic urine **powder** only—it does not contain "water."  (Decl. Green at ¶¶ 4-6; see also, Exhibit 1 to Decl. Green.)

In addition, the evidence offered by Spectrum is insufficient to establish that Dr. Greens' accused "Agent X" synthetic urine powder has "**a pH between 3 and 10**."  Notably, Avomeen did not test the pH level of the alleged "Agent X" sample Spectrum obtained in 2004.  Further, Spectrum's reliance on the deposition of David Short from DSBR and his "formula sheets" to prove that the accused "Agent X" product has "**a pH between 3 and 10**" is misplaced.

Mr. Short testified that Dr. Greens did not require DSBR to test, and DSBR did not test, the synthetic urine powder it supplied to Dr. Greens for a desired or acceptable pH level.  (Decl. Green at ¶ 8; see also, Doc. No. 101-9 [Short Dep. at 80:3-7].)  Rather, DSBR would periodically spot-check the synthetic urine powder sold as "Agent X" for consistency by taking "a sample of one of the batches and dissolve a small portion in water to test the pH of the resultant solution."  (Doc. No. 101-9 [Short Dep. at 60:25 -61:2].)  DSBR would perform these pH spot-checks "to ensure that it was reasonably consistent with what [they] observed in previous batches."  (Doc. No. 101-9 [Short Dep. at 80:3-7].)  It was consistency, not a specific pH level, that DSBR was aiming for.  (Doc. No. 101-9 [Short Dep. at (61:6-9, 61:17-23, 80:3-7.)  DSBR never rejected a sample batch of Agent X as having an unacceptable pH level.  (*Id*.)  The fact that DSBR periodically tested the

pH level of random batches of synthetic urine solution does not mean that the synthetic urine powder *actually* sold by Dr. Greens as "Agent X" has "a pH between 3 and 10."

The evidence is insufficient to establish that Dr. Greens' accused "Agent X" synthetic urine powder contains "water having a pH between 3 and 10." ('776 patent col. 6 l. 36.)  Therefore, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of the '776 patent.

> **B.  Limitation not met: Creatinine and a biocide dissolved to exhibit specific gravity and selected in relative concentrations to minimize sepsis**

To prove literal infringement, Spectrum must prove that Dr. Greens' accused "Agent X" synthetic urine powder contains "creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis." ('776 patent col. 6 ll. 37-40.)  Spectrum failed to satisfy its burden.

> **i.  "contain a creatine and a biocide"**

Dr. Greens does not dispute that "Agent X" contains a creatinine.  However, the issue of whether Agent X contains a biocide, specifically, a carbamate, is a disputed material fact that Spectrum failed to prove.

First, the construction of the term "carbamate" is strongly disputed by the parties.  Dr. Greens contends that the '776 patent includes a very specific Markush group claim naming several specific biocides.  Further, Dr. Greens asserts in its claims construction that "[c]arbamates" contain the monovalent ion $NH_2COO^-$. (Doc. No. 71-1.)  Spectrum opposes said construction, arguing that carbamates can be either a salt of carbamic acid ($NH_2COO^-$) or an ester of carbamic acid ($NH_2COO-$).  (Doc. No. 73 at p. 5.)  To date, the Court has not held a claim

construction hearing or set a date for the hearing.  In its motion for summary judgment, Spectrum identifies "carbamic acid methyl ester" as the carbamate allegedly present in Dr. Greens' accused "Agent X" synthetic urine powder. However, Spectrum is silent as to how "carbamic acid methyl ester" is consistent with and covered by its proposed claim construction for the term "carbamates."

Moreover, the specification in the '776 patent for the term "carbamates" adds more uncertainty as to what is the proper construction of the disputed term. The specifications identify and describe carbamates as follows:

> Carbamates (such as a mix of sodium dimethyldithiocarbamate (DIBAM) and disodium ethylene bisdithiocarbamate (NIBAM), or single product, such as potassium n-hydroxymethyl-n-methyldithiocarbamate, an organo-sulfur group).

('776 patent, col. 5 ll. 5-9.)  Notably, "carbamic acid methyl ester"—the carbamate allegedly present in Dr. Greens' accused "Agent X" synthetic urine powder—is not listed in the above specification.  Spectrum offered no explanation as to why "carbamic acid methyl ester" is consistent with and covered by the specifications in the '776 patent for the term "carbamates."  The evidence is insufficient to establish that the term "carbamates" as used in the '776 patent should be construed to include the compound "carbamic acid methyl ester."

In addition, there is no reliable and meaningful evidence that Dr. Greens' accused "Agent X" synthetic urine powder *actually* contains a "carbamate," let alone the specific compound "carbamic acid methyl ester."  The only evidence offered by Spectrum to support its argument regarding the presence of a carbamate is the declaration of Mr. Thanedar (Doc. No. 101-3.)  However, the declaration opinion testimony of Mr. Thanedar should be excluded as unreliable under Rules 702 and 703 of the Federal Rules of Evidence for the multiple reasons outlined above.  Moreover, even if, for argument purposes, Mr. Thanedar's expert opinion testimony is considered by the Court, his testimony is inconsistent with the DSBR evidence presented through its discovery production.  (See Ex. 4 to Decl. Eastman)

Spectrum's argument of literal infringement is based on chemical testing of an alleged 2004 "Agent X" sample.  DSBR's entire inventory of ingredients for Dr. Greens' accused "Agent X" synthetic urine powder as of December 31, 2004 was limited to eight ingredients: (1) sodium chloride (NaCl); (2) potassium bicarbonate ($KHCO_3$); (3) monopotassium phosphate ($KH_2PO_4$); (4) ammonium sulfate (($NH_4)_2SO_4$); (5) Urea ($CH_4N_2O$); (6) Creatinine ($C_4H_7N_3O$); (7) FD&C Yellow #6 ($C_{16}H_{10}N_2Na_2O_7S_2$); and (8) Tartazine ($C_{16}H_9N_4Na_3O_9S_2$).  (*See* Doc. No. 101-13.)

Notably missing from the above DSBR list of ingredients is the compound "carbamic acid methyl ester."  Spectrum does not dispute the genuineness of the above DSBR list of ingredients for the accused "Agent X" product.  To the contrary, Spectrum relies on the above DSBR inventory list in support of its motion for summary judgment.  (Doc. No. 101-13 [Exhibit G to Decl. Cavanagh].) Critically, Spectrum makes no effort to reconcile the obvious and material disparity between the 2004 DSBR inventory of ingredients for Dr. Greens' accused "Agent X" synthetic urine powder and Mr. Thanedar's 2012 opinion that Dr. Greens' accused "Agent X" synthetic urine powder contains the compound "carbamic acid methyl ester."  The DSBR documents introduced by Spectrum in support of its motion for summary judgment (Doc. Nos. 101-11, 101-12, 101-13, and 101-14) are sufficient to establish that a genuine dispute exists as to whether Dr. Greens' accused "Agent X" synthetic urine powder contains "carbamic acid methyl ester."

## ii.  "dissolved within said water"

As discussed above, the synthetic urine product sold as "Agent X" in 2004 was available in ***powder*** form only, i.e. ***not*** premixed with water.  (Decl. Green at ¶¶ 4-8; see also, Exhibit 1 to Decl. Green; Ex. 1 to Decl. Eastman [Green Dep. at 193:5-6].)  In this case, Spectrum obtained a box of "Agent X" (i.e., a synthetic urine powder), ***not*** "Agent X Premixed" (i.e., a synthetic urine liquid solution).

(Decl. Green at ¶¶ 4-6; see also, Exhibit 1 to Decl. Green.)  Dr. Greens' accused "Agent X" product cannot literally infringe the '776 patent because, indisputably, the product at issue is sold as synthetic urine *powder* only—it does not contain "water."

### iii.    "to form a solution exhibiting a specific gravity"

Spectrum's reliance on the deposition of David Short from DSBR and his "formula sheets" to prove that the accused "Agent X" product has "*a specific gravity*" between 1.005 g/cm$^3$ and 1.0250 g/cm$^3$ is misplaced.  Mr. Short testified that Dr. Greens did not require DSBR to test, and DSBR did not test, the synthetic urine powder it supplied to Dr. Greens for a desired or acceptable density or gravity range.  (Doc. No. 101-9 [Short Dep. at 80:3-7].)  The fact that DSBR would periodically take "a small sample of a given batch, dilute it in water, and then measure the pH and *sometimes* the density" (Doc. No. 101-9 at 78:12-15 [Short Dep.] (emphasis added)), does not mean that the synthetic urine powder *actually* sold by Dr. Greens as "Agent X" has a specific gravity between 1.005 g/cm$^3$ and 1.0250 g/cm$^3$.  (*See*, *e.g.*, Decl. Green at ¶ 10.)  Notably, Avomeen did not test the gravity level of the alleged "Agent X" sample at issue here.

### iv.    "selected in relative concentrations to minimize sepsis"

Mr. Thanedar's declaration testimony that the alleged Dr. Greens' "Agent X" sample tested by Avomeen in 2012 "showed no signs of sepsis" (Doc. No. 101-3 at ¶ 7) is insufficient to prove that the sample contained a creatinine and a biocide "selected in relative concentration to minimize sepsis."  Similarly, Spectrum's reliance on the deposition testimony of Mr. Short from DSBR is equally unavailing.  Mr. Short testified that it was his "understanding" that there was a "concern" that creatinine mixed with water may create a problem of bacterial

growth or sepsis in the liquid solution.  (Doc. No. 101-9 at 58:3-8 [Short Dep.]
When asked if DSBR did anything to address that "concern" as of 2004, Mr. Short
responded, "[i]t's a problem that occurred later."  (*Id.* at 58:9-13.)   In other words,
as of 2004, DSBR did ***nothing*** to minimize sepsis in the synthetic urine powder it
supplied to Dr. Greens because, as of 2004, sepsis was not a problem.  Later, when
sepsis became a concern, there is no evidence that Dr. Greens' accused "Agent X"
synthetic urine powder *actually* contains a creatinine and a biocide "selected in
relative concentration to minimize sepsis."  (*See*, *e.g*., Decl. Green at ¶ at 18.)  The
only additive that was included was sodium benzoate, a preservative and not
covered by the closed Markush group of the '776 claims.

　　　　The evidence is insufficient to establish that Dr. Greens' accused "Agent X"
synthetic urine powder contains "creatinine and a biocide, said creatinine and
biocide dissolved within said water to form a solution exhibiting a specific gravity
and said creatinine and biocide selected in relative concentrations to minimize
sepsis."  ('776 patent col. 6 ll. 37-40.)  Therefore, Spectrum failed to show that Dr.
Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of
the '776 patent.

### C.　Limitation not met: dissociated ionic compound dissolved to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³

　　　　To prove literal infringement, Spectrum must prove that Agent X contains
"at least one dissociated ionic compound also dissolved within said solution to
adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³."
('776 patent col. 6 ll. 41-43.)  Spectrum has failed to offer evidence sufficient to
satisfy its burden.

　　　　Dr. Greens does not dispute that Agent X contains a dissociated ionic
compound.  The issue of whether said compound is "dissolved within the solution

to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm," however, is a disputed material fact that Spectrum has failed to prove. Notably, Avomeen did not test the density of the alleged Agent X sample Spectrum obtained in 2004.  Further, as discussed above, Dr. Greens did not set, and DSBR did not test for, a specific or "set range" of gravity.  (Doc. No. 101-9 at 78:12-15, 80:3-7 [Short Dep.].)  The fact that Mr. Short would periodically spot-check for consistency by taking "a small sample of a given batch, dilute it in water, and then measure the pH and **sometimes** the density" (*Id*. at 78:12-15), does not mean that the synthetic urine solution *actually* sold by Dr. Greens had/has a specific gravity.

The evidence is insufficient to establish that the accused "Agent X" synthetic urine solution obtained by Spectrum in 2004 contains "at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³." ('776 patent col. 6 ll. 41-43.)  Therefore, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of the '776 patent.

### D.    Limitation not met: Carbamates

To prove literal infringement, Spectrum must prove that Agent X contains:

[a biocide] selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(decylthio)ethanamine, guanides, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, terbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

('776 patent col. 6 ll. 44-54.)  Spectrum failed to satisfy its burden.

Spectrum contends that the alleged "Agent X" sample it obtained in 2004 tested positive in 2012 for carbamates, specifically, the compound "carbamic acid methyl ester."   The only evidence offered by Spectrum to support its argument regarding the presence of a carbamate is the declaration of Mr. Thanedar.  (Doc. No. 101-3.)  However, the declaration opinion testimony of Mr. Thanedar should be excluded as unreliable under Rules 702 and 703 of the Federal Rules of Evidence for the multiple reasons outlined above.

Moreover, as discussed above, the construction of the term "carbamate" is strongly disputed by the parties and the evidence offered by Spectrum is insufficient to establish that the proper construction of "carbamates" as used in the '776 patent includes the compound "carbamic acid methyl ester."   In addition, critically important to the Court's determination here is the fact that Mr. Thanedar's declaration opinion testimony is directly contracted by reliable—and undisputed—contemporaneous documentary evidence showing that Dr. Greens' accused "Agent X" synthetic urine powder **does not** contain "carbamic acid methyl ester." (*See*, *e.g.*, Doc. Nos. 101-11, 101-12, 101-13, and 101-14.)

Based on the above, the evidence is insufficient to establish that Dr. Greens' accused "Agent X" synthetic urine contains any "carbamates."  ('776 patent col. 6 ll. 44-54.)  Therefore, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of the '776 patent.

## II.   **Dr. Greens' does not literally infringe dependent claims 2 through 4 of the '776 patent.**

Dependent claim 2 requires: "The synthetic urine solution of claim 1, further including urea dissolved within said solution."  ('776 patent col. 6 ll. 55-56.)

Dependent claim 3 requires:  "The synthetic urine solution of claim 1, wherein said at least one ionic compound is selected from the group consisting of

carbonate salts, halide salts, hydroxide salts and bromides." ('776 patent col. 6 ll. 55-56.)

Dependent claim 4 requires: "The synthetic urine solution of claim 1, further including urea dissolved within said solution." ('776 patent col. 6 ll. 55-56.)

It is undisputed that claims 2 through 4 of the '776 patent depend on claim 1. As demonstrated above, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes independent claim 1 of the '776 patent.   Therefore, Spectrum cannot prove that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claims 2, 3, or 4 of the '776 patent.

## III.   Summary judgment should be denied under Rule 56(d) of the Federal Rules of Civil Procedure.

Spectrum's motion for summary judgment should be denied under Rule 56(d) of the Federal Rules of Civil Procedure.  The declaration of Gary L. Eastman filed concurrently herewith demonstrates that material facts of genuine dispute are unavailable to Dr. Greens at this juncture. Discovery in this case is still open.  Dr. Greens has not deposed Mr. Thanedar or Mr. Kusala, but surely intends do in light of their respective declaration testimony offered in support of Spectrum's summary judgment motion.  No expert discovery has occurred yet.  In fact, neither party has even designated their respective experts in this action.  Under these circumstances, it is impossible to conclude that the declaration of Mr. Thanedar and Mr. Kusala are sufficient to establish the absence of a genuine issue of material fact.  As recognized in U.S. v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970), summary judgment should not be granted "where a trial, with its opportunity for cross-examination and testing the credibility of witnesses, might disclose a picture substantially different from that given by the affidavits. (U.S. v. Perry, 431 F.2d at 1022.)  That is the exact situation here.

1
2

# VI.   CONCLUSION

3
4
5
6
7
8
9
10
11
12
13
14
15

In sum, the sole evidence in support of the claim element "carbamates" is a supposed test of an alleged 2004 sample of Agent X that was conducted late in 2012.  The custody of that sample is highly suspect, and adulteration is likely since it simply wasn't available from Dr. Greens in the form it was received by the lab.  Although the depositions of the persons most knowledgeable of the Dr. Greens' 2004 supplier DSBR was conducted, no testimony from that deposition was offered in support of the notion that the Agent X formula included carbamic acid methyl ester.  Similarly, none of the documents produced by DSBR were offered in evidence in support of the notion that the Agent X formula included carbamic acid methyl ester.  Spectrum Laboratories possess no documentary evidence that was created contemporaneously with the creation of the Agent X formula by DSBR that supports its contention that the Agent X formula included carbamic acid.  Indeed, formula sheets produced by DSBR show sodium benzoate, a well-known preservative, as an active ingredient used to control sepsis.

16
17
18
19
20
21
22
23
24
25
26

Further, the motion fails to provide this Court with guidance as to how long the allegedly infringing 2004 formula was utilized.  The documents produced by DSBR show that several different formulas for Agent X were utilized, none of which included carbamic acid methyl ester.  These contemporaneous DSBR documents establish a triable issue of fact as to whether or not the 2004 Agent X formula included carbamic acid methyl ester.  Moreover, there is no evidence in the record as to the chemical composition of Agent X from 2005 through 2014.  In the absence of such evidence, this Court cannot rule that Agent X infringed the '776 Patent through that period of time.  In 2005 Matt Green specifically discussed the need to control sepsis with Martin Short of DSBR.  Martin Short of DSBR informed Matt Green that sodium benzoate would be used as the active ingredient to control sepsis.  Further, it is well known that in 2011 Dr. Greens replaced DSBR

27
28

OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
11cv0638 JAH (KSC)

with a new supplier, who utilized an entirely different formula for Agent X. That new supplier utilized sodium azide to control sepsis.

Spectrum's motion for summary judgment against Dr. Greens for direct and literal infringement of the '776 patent must be denied because genuine disputes of material fact exist as to whether Dr. Greens' accused "Agent X" synthetic urine powder literally infringes independent claim 1 and dependent claims 2, 3, and 4 of the '776 patent.


Dated:  May 2, 2014              EASTMAN & MCCARTNEY LLP

                                By:  /s/  Gary L. Eastman
                                    Gary L. Eastman, Esq.

                                Attorneys for Plaintiff
                                DR. GREENS, INC.

## PROOF OF SERVICE

I, the undersigned certify and declare as follows:

      I am over the age of eighteen years and not a party to this action.  My business address is 401 West A Street, Suite 1785, San Diego, California, 92101, which is located in the county where the service described below took place.

      On May 2, 2014, at my place of business in San Diego, California, I served the following document:

### PLAINTIFF'S OPPOSITION TO SPECTRUM LABORATORIES, LLC'S MOTION FOR SUMMARY JUDGMENT


Via the CM/ECF FILING SYSTEM.  The undersigned hereby certifies that he caused a copy of the foregoing documents to be filed with the clerk of the U.S. District Court, Southern District of California, using the CM/ECF filing system, which caused a copy to be electronically mailed to the following CM/ECF Participant(s) noted below:

| | |
|---|---|
| David B. Cupar | J. Christopher Jaczko |
| Matthew J. Cavanagh | Jaczko Goddard LLP |
| McDonald Hopkins, LLP | 4401 Eastgate Mall |
| 600 Superior Avenue East | San Diego, CA 92121 |
| Cleveland, OH 44114 | |

      I certify and declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on May 2, 2014 in San Diego, California

                 By:   /s/ Gary L. Eastman
                     Gary L. Eastman