Gary L. Eastman (CSB #182518)
Matthew C. McCartney (CSB #226687)
EASTMAN & MCCARTNEY LLP
401 West "A" Street, Suite 1785
San Diego, CA 92101
Telephone: (619) 230-1144
Facsimile: (619) 230-1194

Attorneys for Plaintiff
DR. GREENS, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. GREENS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>JAMES MATTHEW STEPHENS, an individual, and SPECTRUM LABORATORIES, LLC, an Ohio limited liability company,<br><br>Defendants. | Case No. 11cv0638 JAH (KSC)<br><br>**DECLARATION OF GARY L. EASTMAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SPECTRUM LABORATORIES, LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>Date: December 15, 2014<br>Time: 2:30 p.m.<br>Judge: Hon. John A. Houston<br>Courtroom: 13(B) (Annex) |

I, Gary L. Eastman, declare and state as follows:

1. I have personal knowledge of the following, except where the text indicates otherwise, and if called to testify could and would competently testify to the facts as set forth herein below.

2. I am an attorney at law duly licensed to practice before the courts of the State of California and have been admitted to the United States District Court,

**1**

DECLARATION OF GARY L. EASTMAN IN SUPPORT OF OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT
11cv0638 JAH (KSC)

Southern District of California. I am an attorney of record for Plaintiff and Counterclaim-Defendant Dr. Greens, Inc. in this matter.

3. Attached hereto as Exhibit 1 is a true and correct copy of selected pages (with cited excerpts highlighted) from the transcript of the FRCP 30(b)(6) deposition Matthew Robert Green in this action, conducted on January 23, 2013. This deposition sets forth the specific content of the Agent X product, namely, a powdered form of synthetic urine sold in a black box. It also sets forth the specific content of the Agent X premixed product sold in a grey box.

4. Attached hereto as Exhibit 2 is a true and correct computer print-out from the University of Bristol website, http://www.bris.ac.uk/nerclsmsf/techniques/gcms.html, obtained on May 2, 2014, discussing the instrumental technique referred to as "Gas chromatography mass spectrometry," and stating in part:

> Gas chromatography mass spectrometry (GC/MS) is an instrumental technique, comprising a gas chromatograph (GC) coupled to a mass spectrometer (MS), by which complex mixtures of chemicals may be separated, identfied and quantified. This makes it ideal for the analysis of the hundreds of relatively low molecular weight compounds found in environmental materials. In order for a compound to be analysed by GC/MS it must be sufficiently volatile and thermally stable. In addition, functionalised compounds may require chemical modification (derivatization), prior to analysis, to eliminate undesirable adsorption effects that would otherwise affect the quality of the data obtained. Samples are usually analyzed as organic solutions consequently materials of interest (e.g. soils, sediments, tissues etc.) need to be solvent extracted and the extract subjected to various 'wet chemical' techniques before GC/MS analysis is possible.

5. Exhibit 3 is a collection of documentation that DSBR provided pursuant to discovery requests by Spectrum. Even a cursory review of these documents demonstrates that DSBR kept contemporaneous and clear records of the constituent components to the Agent X product, including all chemical components that were used.

**2**

DECLARATION OF GARY L. EASTMAN IN SUPPORT OF OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT
11cv0638 JAH (KSC)

6. DSBR's discovery responses confirm that no "carbamic acid" or other carbamate was ever included in the Agent X product sold by Dr. Greens.

7. Exhibit 4 is Spectrum's Responses to Dr. Greens' Interrogatories. Interrogatory No. 8 specifically requests the basis for the infringement allegations. Spectrum's response was objection and rhetoric; no substantive basis existed. If Spectrum had a sample, since 2004, of Agent X it believed to be infringing, then it should have identified the existence of such sample in response to Dr. Greens' discovery requests. Failure to do so deprived Dr. Greens an opportunity to request inspection and testing of the sample, and casts a cloud on the legitimacy of the sample allegedly tested by Spectrum in support of its Renewed Motion for Summary Judgment.

8. On November 19, 2014, I had an opportunity to depose Dr. Thanedar in connection with his expert report submitted in support of Spectrum's Renewed Motion for Summary Judgment.

9. The transcript from the expert deposition of Dr. Thanedar on November 19, 2014, is not yet available. However, a draft copy of the transcript has been provided to counsel for both parties. For the purpose of this Opposition to Spectrum's Motion for Summary Judgment, portions of Dr. Thanedar's draft deposition text have been cited. A copy of the relevant pages of the draft transcript is attached here to as Exhibit 5.

10. The few noteworthy excerpts from the deposition of Dr. Thanedar indicate that Dr. Thanedar cannot possible determine if the sample was tampered with (pg. 30, line 17 – pg. 32, line 8) . Dr. Thanedar performed no clinical testing to verify the presence of spoliation. (pg. 37, line 1-pg. 38, line 16). Dr. Thanedar performed one GC-MS test (pg. pg. 79, line 17 – pg. 80, line 4). That test included the dilution of the approximately 3 oz. specimen in a 10:1 ratio with methanol (pg. 46, line 12 – pg. 47, line 21); yielding approximately 30 oz. of solution. In that one test, Dr. Thanedar identified Carbamic Acid Methyl Ester as a biocide

contained in the sample.  The entire sample was used; there is none available for retest, or additional sampling.  (pg. 80, lines 2-4).

11. Following the commencement of this lawsuit, I asked Matthew Green (president of Dr. Greens) to provide my firm a sample of the accused Agent X product.  Mr. Green located a vial of Agent X (powder) in Dr. Greens' warehouse and personally delivered the vial to my office (the "Agent X Sample").  Upon receipt, I photographed and labeled the Agent X Sample, then placed it in a secure location at my office.  Below is a true and correct copy of the photograph I took showing the Agent X Sample.



12. The Agent X Sample has remained in the custody of my firm at all times following my receipt and relevant herein up to and until it was mailed via Federal Express to FAI Materials Testing Laboratory, Inc. for testing.

13. In connection with Dr. Greens' Opposition to Spectrum's Renewed Motion for Summary Judgment, my office mailed via Federal Express the Agent X

**4**

DECLARATION OF GARY L. EASTMAN IN SUPPORT OF OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT
11cv0638 JAH (KSC)

Sample to FAI Materials Testing Laboratory, Inc. ("FAI"), located at 825 Chance Road, Marietta, Georgia, 30066, for chemical testing.

14. On November 20, 2014, my office received the chemical analysis report for the Agent X Sample tested by FAI. FAI tested the Agent X Sample for the presence of biocides using gas chromatography coupled with mass spectrometry (GC-MS)—the same type of testing method used by Spectrum's expert, Dr. Shri Thanedar (see Doc. No. 130-3, ¶ 8.). FAI's test report (exhibit 7 to Dec. Stefanie Eick submitted herewith) confirms that the Agent X Sample does not contain carbamic acid methyl ester.

15. When comparing the testing procedure used by Dr. Thanedar's company Avomeen Analytical Services ("Avomeen") with the testing procedure used by FAI, a primary difference between the two is the compound used to dilute the sample. According to Mr. Thanedar, Avomeen personnel tested the sample after it was "**diluted 1:10 in methanol**." (Doc. No. 130-3, ¶ 8.) In contrast, FAI tested the Agent X Sample after it was "**diluted in acetone**."

16. Published literature indicates that dilution of urea in methanol results in the **formation** of carbamic acid methyl ester (See Exhibit 3 of Decl. Stefanie Eick submitted herewith). Accordingly, it appears that the specific dissolvent used has a material effect on the outcome of the test results. Consequently, the results of Dr. Thanedar cannot be relied upon.

17. It is widely known and clinically established that Avomeen's selection and use of methanol to test the alleged Agent X sample reacted with the urea present and caused the positive test result for carbamic acid, methyl ester.

18. Plaintiff Dr. Greens is still in the process of working with its chemistry expert for participation in this case, the Expert report is not due until November 28, 2014, and has not yet been completed. Consequently, it is likely that there will be additional expert opinions presented by Plaintiff Dr. Greens which will supplement the information provided in this Declaration.

5

DECLARATION OF GARY L. EASTMAN IN SUPPORT OF OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT
11cv0638 JAH (KSC)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed in San Diego, California.

Dated: November 24, 2014

By: /s/ Gary L. Eastman
Gary L. Eastman, Esq.

**6**

DECLARATION OF GARY L. EASTMAN IN SUPPORT OF OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT
11cv0638 JAH (KSC)

EXHIBIT 1

FILED UNDER SEAL

# EXHIBIT 2

 

**NERC LSMSF**
- Contacts
- Application Procedure
- Analytical Training
- Commercial Tenders
- Useful Links

**Instruments**
- TraceMS
- Turbomass Gold
- MAT95-XP Trap
- Delta S
- Delta plus XL
- Delta XP

**Techniques**
- GC/MS
- Py-GC/MS
- HPLC/MS
- GC/C/IRMS

**Project Examples**
- Microbial Community Structure
- Palaeoclimate Reconstruction
- Environmental Pollution
- Archaeological Investigations
- Elemental Cycling

## ◢ Gas Chromatography Mass Spectrometry (GC/MS)

Gas chromatography mass spectrometry (GC/MS) is an instrumental technique, comprising a gas chromatograph (GC) coupled to a mass spectrometer (MS), by which complex mixtures of chemicals may be separated, identfied and quantified. This makes it ideal for the analysis of the hundreds of relatively low molecular weight compounds found in environmental materials. In order for a compound to be analysed by GC/MS it must be sufficiently volatile and thermally stable. In addition, functionalised compounds may require chemical modification (derivatization), prior to analysis, to eliminate undesirable adsorption effects that would otherwise affect the quality of the data obtained. Samples are usually analyzed as organic solutions consequently materials of interest (e.g. soils, sediments, tissues etc.) need to be solvent extracted and the extract subjected to various 'wet chemical' techniques before GC/MS analysis is possible.

The sample solution is injected into the GC inlet where it is vaporized and swept onto a chromatographic column by the carrier gas (usually helium). The sample flows through the column and the compounds comprising the mixture of interest are separated by virtue of their relative interaction with the coating of the column (stationary phase) and the carrier gas (mobile phase). The latter part of the column passes through a heated transfer line and ends at the entrance to ion source (Fig. 1) where compounds eluting from the column are converted to ions.

Two potential methods exist for ion production. The most frequently used method is electron ionisation (EI) and the occasionally used alternative is chemical ionisation (CI). For EI a beam of electrons ionise the sample molecules resulting in the loss of one electron. A molecule with one electron missing is called the molecular ion and is represented by $M^{+\cdot}$ (a radical cation). When the resulting peak from this ion is seen in a mass spectrum, it gives the molecular weight of the compound. Due to the large amount of energy imparted to the molecular ion it usually fragments producing further smaller ions with characteristic relative abundances that provide a 'fingerprint' for that molecular structure. This information may be then used to identify compounds of interest and help elucidate the structure of unknown components of mixtures. CI begins with the ionisation of methane (or another suitable gas), creating a radical which in turn will ionise the sample molecule to produce $[M+H]^{+}$ molecular ions. CI is a less energetic way of ionising a molecule hence less fragmentation occurs with CI than with EI, hence CI yields less information about the detailed structure of the molecule, but does yield the molecular ion; sometimes the molecular ion

cannot be detected using EI, hence the two methods complement one another. Once ionised a small positive is used to repel the ions out of the ionisation chamber.

The next component is a mass analyser (filter), which separates the positively charged ions according to various mass related properties depending upon the analyser used. Several types of analyser exist: quadrupoles (Fig. 2), ion traps, magnetic sector, time-of-flight, radio frequency, cyclotron resonance and focusing to name a few. The most common are quadrupoles and ion traps. After the ions are separated they enter a detector the output from which is amplified to boost the signal. The detector sends information to a computer that records all of the data produced, converts the electrical impulses into visual displays and hard copy displays. In addtion, the computer also controls the operation of the mass spectrometer.



**Figure 1** A schematic of an ion source



**Figure 2** A schematic of a quadrupole analyser

Diagrams by Dr Paul Gates, School of Chemistry, University of Bristol

University home

about this site | terms and conditions | feedback

Organic Geochemistry Unit (OGU), Bristol Biogeochemistry Research Centre,
School of Chemistry, University of Bristol, Cantocks Close,
Bristol BS8 1TS, UK - Tel: +44 (0)117 9546967

© 2002-2014 University of Bristol
Updated 14/01/2008 by Dr Ian D Bull

EXHIBIT 3



FILED UNDER SEAL

EXHIBIT 4

FILED UNDER SEAL

EXHIBIT 5

FILED UNDER SEAL

**PROOF OF SERVICE**

I, the undersigned certify and declare as follows:

I am over the age of eighteen years and not a party to this action. My business address is 401 West A Street, Suite 1785, San Diego, California, 92101, which is located in the county where the service described below took place.

On November 24, 2014, at my place of business in San Diego, California, I served the following document:

**DECLARATION OF GARY L. EASTMAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SPECTRUM LABORATORIES, LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Via the CM/ECF FILING SYSTEM. The undersigned hereby certifies that he caused a copy of the foregoing documents to be filed with the clerk of the U.S. District Court, Southern District of California, using the CM/ECF filing system, which caused a copy to be electronically mailed to the following CM/ECF Participant(s) noted below:

| | |
|---|---|
| David B. Cupar | J. Christopher Jaczko |
| Matthew J. Cavanagh | Jaczko Goddard LLP |
| McDonald Hopkins, LLP | 4401 Eastgate Mall |
| 600 Superior Avenue East | San Diego, CA 92121 |
| Cleveland, OH 44114 | |

I certify and declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on November 24, 2014 in San Diego, California

By: /s/ Gary L. Eastman
Gary L. Eastman