J. Christopher Jaczko (Bar No. 149317)
PROCOPIO, CORY, HARGREAVES &
 SAVITCH LLP
12544 High Bluff Dr., Suite 300
San Diego, CA 92130
Telephone: 858.720.6300
Facsimile: 619.235.0398
Email: chris.jaczko@procopio.com

DAVID B. CUPAR (*Pro Hac Vice*)
MATTHEW J. CAVANAGH (*Pro Hac Vice*)
MCDONALD HOPKINS LLC
600 Superior Avenue East, Suite 2100
Cleveland, OH 44114
t: (216)348-5730 │ f: (216)348-5474
Email: dcupar@mcdonaldhopkins.com
 mcavanagh@mcdonaldhopkins.com

Attorneys for Defendant and Counterclaimant
SPECTRUM LABORATORIES, LLC and
Defendant JAMES MATTHEW STEPHENS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. GREENS, INC., a California corporation,<br><br>        Plaintiff,<br><br>v.<br><br>JAMES MATTHEW STEPHENS, an individual and SPECTRUM LABORATORIES, LLC, an Ohio limited liability company,<br><br>        Defendant.<br><br>AND RELATED CROSS ACTION | Case No. 11cv0638 JAH (KSC)<br><br>**SPECTRUM LABORATORIES, LLC'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT OF DIRECT INFRINGEMENT BY DR. GREENS, INC.**<br><br>Date:   December 15, 2014<br>Time:   2:30 p.m.<br>Courtroom:  13B (Annex)<br><br>Judge:  Hon. John A. Houston<br>Filed:   March 29, 2011<br>Trial:    None Set |

## I. WHETHER DR. THANEDAR TESTED "PREMIXED" OR "POWDER-ONLY" AGENT X IS NOT MATERIAL

Dr. Greens, Inc.'s ("Greens") opposition primarily rests on the fact that it offers a "premixed" and a "powder only" Agent X. (*See, e.g.*, Plaintiff's Opp. to

CASE NO. 11CV0638 JAH (KSC)
REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Renewed MSJ ("Opp.") at 2-3, ECF # 139.) Greens argues that a genuine dispute exists over which version Dr. Thanedar tested. However, whether Dr. Thanedar tested "premixed" or "powder only" Agent X is not "material" to this motion, and any dispute over the issue cannot preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.")

The reason is simple: it is undisputed that the powder that Greens mixed with water to create "premixed" Agent X is identical to the powder sold with the "powder only" Agent X, which end users mixed with water. (*See* Green Dep. 193:5-194:13, attached as Exhibit A to the Cavanagh Declaration, filed concurrently herewith.) The resulting liquid products are the same; the *only* difference is who adds the water. Thus, Dr. Thanedar's testing confirms that both versions of Agent X contain carbamate, regardless of whether they are premixed or powder-only, and regardless of who adds the water – Greens or the end user.

Spectrum's motion seeks summary judgment of direct infringement only as to *premixed* Agent X. Consequently, Greens' argument that it cannot directly infringe because its *powder-only* Agent X does not meet the "water" limitation of each asserted patent claim is a red herring that the Court should ignore.

## II. ATTORNEY SPECULATION ABOUT "TAMPERING" DOES NOT CREATE A GENUINE DISPUTE

In May of this year, Greens opposed Spectrum's original summary judgment motion by claiming that it needed time to depose Fran Kusala of Spectrum, who submitted a declaration explaining that Spectrum obtained the tested sample of Agent X in 2004 and had maintained custody of the sample until he sent it directly to Dr. Thanedar in 2012. (Greens Opp. to Original Mot. ("Original Opp.") at 21, ECF # 108.) Spectrum made Mr. Kusala available for deposition, but Greens declined to depose him. Instead, Greens chose merely to speculate–based solely on inadmissible

attorney argument from its counsel–that the Agent X that Mr. Kusala forwarded to Dr. Thanedar must have been "tampered" with. (Opp. at 7.) If, as Greens' attorney argues, the Agent X that Dr. Thanedar tested was originally a "powder only" product, whether someone added water–which is exactly what Greens instructs and expects its customers to do with the powder-only version of the product[1]–is neither evidence of tampering nor sufficient to create a genuine issue of material fact with respect to Dr. Thanedar's findings and opinion.

### III. GREENS' EVIDENTIARY OBJECTIONS DO NOT CREATE A GENUINE ISSUE OF MATERIAL FACT

#### A. There is no evidence of a broken chain of custody.

Greens claims that Mr. Kusala, who provided a declaration showing that Spectrum acquired and securely stored the tested sample of Agent X, "cannot possibly establish a proper chain of custody" because he was not a regular employee of Spectrum between December 31, 2004 and January 1, 2008. (Opp. at 5.)[2] Greens conveniently ignores two crucial facts.

First, Mr. Kusala was with Spectrum at the relevant times; namely, the point at which Spectrum initially acquired, inspected, and stored the Agent X sample in 2004 and the point at which the sample was sent to Dr. Thanedar for testing in 2012. (*See* Kusala Decl., ¶¶ 13-16, 18-20, ECF # 130-2.) Mr. Kusala was also with Spectrum when it relocated to a new office in March 2008. (*See id.* ¶ 17.) Mr. Kusala provided uncontroverted testimony that the sample was stored securely at all times. (*See id.* ¶¶ 12, 17, 20.)

Second, Mr. Kusala describes not only his role, but also Spectrum's regular business practice concerning the acquisition and storage of samples of competitors'

---

[1] (*See* Green Decl. ¶ 12, ECF # 139-2 (noting that powder-only product "requires the addition of water").)

[2] Greens erroneously states that this is a four-year period. In fact, it is a three-year period. In any event, the length of time is beside the point because, as explained above, Mr. Kusala was employed by Spectrum *at all relevant times*.

products. (*See id.* ¶¶ 11-12.). Mere attorney speculation by Greens does not and cannot counter the evidence that Spectrum established and followed a business practice—a practice of which Mr. Kusala had personal knowledge—that ensured the integrity of the sample provided to Dr. Thanedar.

Mr. Kusala's testimony, together with the declaration of Dr. Thanedar, authenticate the tested sample as a genuine and unadulterated sample of Agent X. Greens does not cite any authority that requires more from Spectrum to authenticate the sample under Fed. R. Evid. 901. And Greens offers no admissible evidence to refute Mr. Kusala's and Dr. Thanedar's declarations. In fact, Greens mostly concedes the tested sample is genuine Agent X, but relies on speculation that somehow the possible adding of water would be tantamount to tampering (even though Greens' instructs that water be added). Greens has failed to demonstrate the existence of a genuine issue of material fact sufficient to overcome Spectrum's motion.

### B. Dr. Thanedar's testimony clearly satisfies Fed.R.Evid 702 and 703.

#### 1. The Agent X sample is reliable.

Greens argues Dr. Thanedar's testimony should be stricken by, again, speculating that the Agent X sample he tested must have been tampered with. As an initial matter, this claim is another red herring because the testing relates only to one part of the infringement analysis; namely, the presence of carbamates in Agent X (and it is undisputed that Dr. Thanedar found carbamate in the product). Greens submits a declaration of its president Matt Green to address this issue, but Mr. Green <u>does not deny</u> that the product contains carbamates. Instead, he merely says, "I never instructed DSBR to include any specific preservative or biocide in any synthetic urine product." (Green Decl. ¶ 18, ECF #139-2.) Mr. Green does <u>not</u> state, however, that he instructed his supplier DSBR <u>not</u> to include any biocide at all, but only that he did not instruct it to include any "<u>specific</u>" biocide. Moreover, Mr. Green does <u>not</u> state that Greens' products did not include carbamates when they were sold. He merely claims that carbamates did not appear in any "<u>formulation</u>" provided by

DSBR. For purposes of direct infringement, it makes no difference what instructions were given or whether the biocide was added by a supplier or by Greens itself because direct infringement is a strict liability tort. *See* 35 U.S.C. § 271(a). Thus, Mr. Green's statement, even if true, fails to raise any issue of material fact to avoid liability for direct infringement.

Greens further claims that "[t]here is a strong likelihood" that spoliation would have occurred because of the age of the Agent X sample . (Opp. at 8.) According to Mr. Green, synthetic urine products have a two-year "shelf life." (*See* Green Decl. ¶ 14.) But Mr. Green neither has, nor purports to have, any expertise in chemistry. Moreover, Mr. Green does not say what, if anything, would have occurred after the "shelf life" expired or, more to the point, how this would have resulted in the presence of carbamic acid methyl ester where none existed before.

Mr. Greens' testimony does nothing to counter Dr. Thanedar's observation that the sample he tested showed no signs of spoliation. (*See* Thanedar Decl. ¶ 7, ECF #130-3.) Indeed, even had spoliation occurred, it would not have resulted in the introduction of carbamic acid methyl ester into the sample. (Supplemental Decl. of Dr. Thanedar ("Supp. Thanedar Decl.") ¶ 6, filed concurrently herewith.) As Dr. Thanedar states, "because biocides such as carbamic acid methyl ester are consumed as part of the spoliation process, ***any spoliation would have resulted in the decrease or elimination, not the increase or introduction, of carbamic acid methyl ester in the sample over time***." (*Id.* (emphasis added).) Neither Mr. Green's ambiguous, uninformed testimony about "shelf life" nor the inadmissible speculation of Greens' counsel creates any issue of material fact regarding the presence of a carbamate in the sample tested by Dr. Thanedar.

### 2. Greens has Abandoned Prior Attacks on Dr. Thanedar

In its opposition to Spectrum's original summary judgment motion last May, Greens attacked Dr. Thanedar as lacking "specialized knowledge," attacked Dr. Thanedar's method as unreliable, and attacked Dr. Thanedar's "library" as

speculative. (*See* Original Opp. at 8-10.) In response to those arguments, Dr. Thanedar submitted a supplemental declaration, which Spectrum filed with its reply brief last May. In his deposition taken on November 19, 2014, Dr. Thanedar testified in detail about these issues, and Greens' opposition to this renewed motion did not make these three challenges, which means they have been abandoned or waived.

## IV. GREENS FAILS DEMONSTRATE THE EXISTENCE OF A GENUINE DISPUTE REGARDING DIRECT INFRINGEMENT

### A. Greens directly infringes claim 1 of the '776 patent.

#### 1. Agent X comprises water having a pH between 3 and 10.

Again, it is undisputed that Greens' premixed products – which are the only products subject to Spectrum's motion – all are sold by Greens with "water."

As to the pH level of the premixed solution, Spectrum proved through the repeated pH testing by Greens' own supplier – DSBR – that Agent X always had a pH level between 3 and 10, as recited by the patent claims. (*See* Memo ISO MSJ ("MPA"), at 8, ECF # 130-1.) Greens offers <u>no evidence</u> to the contrary. Furthermore, Greens' claim that DSBR was merely testing batches for "consistency" and not aiming for any pH range is incorrect. Short was testing for consistency with the pH of human urine, and admitted that he was trying to ensure that the solution had a pH level between 3 and 10. (*See id.*) Even if he was testing for "consistency," his testing confirmed that the consistent range was always between 3 and 10. (*See id.*) To dispute that evidence, Greens needed to proffer facts showing that the pH was outside those ranges, which it has failed to do.

#### 2. Agent X comprises creatinine and a biocide dissolved to exhibit a specific gravity and selected in concentrations to minimize sepsis.

Greens concedes that Agent X contains creatinine.

Regarding the presence of a biocide, Greens makes the puzzling claim that the presence of carbamic acid methyl ester is somehow "inconsistent" with the

ingredient list provided by DSBR. (*Id.* at 15-16.) But this is another red herring. Spectrum does not claim that carbamic acid methyl ester is mentioned on the list provided by Greens' supplier; it contends that the compound *is in* the Agent X products sold by Greens. Indeed, if the compound *were* on the ingredient list provided by the supplier, Spectrum would not have been forced to incur the expense and effort of performing chemical testing on the sample. Whether added by Greens, DSBR, or an upstream supplier, the testing demonstrates that carbamic acid methyl ester *is in* the product. Whether it was added by Greens or someone upstream goes to the willfulness that will be litigated at trial, not to the strict liability infringement issue involved in Spectrum's motion. In short, that DSBR's powder recipe list may not admit the presence of the carbamate is not evidence that it is not actually found in the solution.

### 3. Agent X comprises a dissociated ionic compound resulting in a specific gravity between 1.005 g/cm$^3$ and 1.025 g/cm$^3$.

Greens concedes that Agent X comprises a dissociated ionic compound.

Regarding specific gravity, Greens makes the same mistake that it makes in connection with the pH level of the solution. DSBR tested the specific gravity of multiple samples of Agent X, and in each case the density was within the range recited in claim 1. Again, Greens cannot create a genuine issue of material fact simply by speculating (without any evidence whatsoever) that an unknown batch of the product might theoretically have fallen outside the prescribed range.

### 4. Agent X comprises carbamates.

Greens' contention that Agent X does not comprise carbamates depends almost entirely on its frivolous and improper claim construction argument. The only point that Green adds with respect to this limitation is that several exhibits cited in Spectrum's Memorandum allegedly "contradict" the finding of carbamic acid methyl ester in the product. However, the exhibits in question are the ingredient lists discussed above, *i.e.* the DSBR formula. Obviously, the fact that carbamates do not

appear on these lists does not "contradict" the lists. It merely shows that they were not in the written formula that has been produced in this case. However, the testing by Dr. Thanedar clearly demonstrates the presence of a biocide, whether or not the ingredient appeared on any list.

### B. Greens directly infringes claims 2 through 4 of the '776 patent.

Greens does not dispute that Agent X meets the additional limitations that dependent claims 2 through 4 add to independent claim 1. Therefore, if the product infringes claim 1, it also infringes these claims.

## V. GREENS' CLAIM THAT DR. THANEDAR'S TEST CREATED THE CARBAMATE IS INSUFFICIENT TO CREATE A GENUINE DISPUTE

Dr. Greens tries to create a fact issue regarding the presence of carbamates by claiming that Dr. Thanedar's testing method somehow introduced carbamic acid methyl ester into the sample of Agent X that he tested. (*See* Opposition at 17-18.) However, all of the alleged "evidence" offered in support of this claim—namely, the assertions made in the declaration of a "post-bar law clerk" employed by Greens' counsel Eastman & McCartney, LLP, and several documents the law clerk claims to have obtained from the internet—is clearly inadmissible.[3]

As explained in Spectrum's accompanying Evidentiary Objections and Motion to Strike Re Declaration of Stefanie Eick in Support of Plaintiff's Opposition to Renewed Motion for Summary Judgment ("Motion to Strike"), Ms. Eick's Declaration, and the exhibits thereto, must be stricken because they constitute inadmissible hearsay. (*See* Motion to Strike at 4-5.) Ms. Eick offers the exhibits,

---

[3] To be sure, Dr. Greens also includes a meritless argument regarding chain of custody, which was addressed above, and also claims that test results showed that a different sample of Agent X did not contain carbamates, which will be discussed below. Nevertheless, the declaration and internet exhibits are the only evidence offered in support of the theory that the Agent X sample tested by Dr. Thanedar had not previously contained carbamates. (*See* Opposition at 17-18.)

1 which are mostly articles she found online, to prove the truth of the matters asserted
2 within those documents. And her declaration, which repeats and describes those
3 hearsay statements, constitutes hearsay as well. (*See id.* at 5-7.)

Remarkably, Dr. Greens relies exclusively on the declaration and the articles. The Ninth Circuit has held that "[a] trial court **may only consider admissible evidence** in ruling on a motion for summary judgment." *Ballen v. City of Redmond*, 466 F.3d 736, 745 (9th Cir. 2006) (emphasis added); *see also, e.g., Scosche Industries, Inc. v. Visor Gear Inc.*, 121 F.3d 675, 681 (Fed. Cir. 1997) (holding that statement in declaration was hearsay and "therefore does not satisfy the requirement" under Rule 56 that evidence opposing summary judgment must be admissible in evidence) (citations omitted)).

Separate and apart from the inadmissibility of this evidence, Greens' attorney misreads the publications on which he relies and ignored certain details about Dr. Thanedar's testing. Indeed, as Dr. Thanedar explains in his supplemental declaration, to the extent these publications describe the formation of a carbamate in a solution, that alleged formation is described as occurring under conditions that are materially different from the testing that Dr. Thanedar conducted. Consistent with that, and contrary to the speculation of Greens' attorneys, Dr. Thanedar states that it is not scientifically possible for his testing to have introduced into the Agent X formula the carbamate he detected. (Thanedar Decl. ¶¶ 8-13.)

Accordingly, because Greens has failed to rebut Spectrum's evidence that carbamates were present in the sample of Agent X tested by Dr. Thanedar, Spectrum is entitled to summary judgment. *See* FED. R. CIV. P. 56(e) (stating that where opposing party fails to cite admissible evidence, Court may grant summary judgment provided that motion and supporting materials show that movant is entitled to it); *see also Buckman v. MCI World Com, Inc.*, 374 Fed. Appx. 719, 721 (9th Cir. 2010) (holding that properly authenticated documents are required to survive summary judgment); *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990)

(holding that evidence "that is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine issue of material fact sufficient to withstand summary judgment." (citation omitted)).

Finally, the alleged independent testing of a separate sample of Agent X—which allegedly "reveal[ed] no carbamate is present in the Agent X powder," which Greens refers to its brief, Opposition at 19—misses the mark. First, that report is hearsay and cannot be considered. Second, even if a sample of Agent X were shown not to contain carbamates, this would establish nothing about the sample that Dr. Thanedar tested. Importantly, Spectrum's Motion for Summary Judgment does not claim that every sample of Agent X ever sold contains carbamates. This may be true, but this is not what the motion claims. Rather, it claims that at least one sample of Agent X made, used, sold, offered for sale, or imported by Greens at any time contained carbamates. If this point is established on summary judgment—and Greens has failed to offer any admissible evidence that could refute the results of Dr. Thanedar's testing—then, because the other claim limitations are met, Greens is liable for direct infringement of at least claim 1 of the '776 patent. The extent to which other samples of Agent X also contain carbamates goes to the <u>extent</u> of the infringement and is thus nothing more than a damages issue (*i.e.*, how many infringing Agent X products Greens sold).[4]

## VI. <u>CONCLUSION</u>

For all the foregoing reasons, Spectrum respectfully requests that the Court find that Greens has directly infringed claims 1 through 4 of the '776 patent and enter summary judgment accordingly.

---

[4] Moreover, while the law clerk may have believed that the testing laboratory possessed "the requisite skill set and experience" and that the methodology it used was "appropriate," Eick Decl. ¶¶ 12, 14, she was in no position to make such a statement, and her declaration should be stricken and excluded from the Court's consideration for the reasons set forth in the Motion to Strike.

| | | |
|---|---|---|
| DATED: December 3, 2014 | | PROCOPIO, CORY, HARGREAVES & SAVITCH LLP |
| | By: | /s/ J. Christopher Jaczko |
| | | J. Christopher Jaczko |
| | | Attorneys for James Matthew Stephens, an Individual and Spectrum Laboratories, LLC |