1   Gary L. Eastman (CSB #182518)
    Matthew C. McCartney (CSB #226687)
2   EASTMAN & MCCARTNEY LLP
    401 West "A" Street, Suite 1785
3   San Diego, CA 92101
    Telephone:   (619) 230-1144
4   Facsimile:   (619) 230-1194

5   Attorneys for Plaintiff
    DR. GREENS, INC.
6

7                   UNITED STATES DISTRICT COURT

8                 SOUTHERN DISTRICT OF CALIFORNIA

9

10  DR. GREENS, INC., a California          Case No. 11cv0638 JAH (KSC)
    corporation,
11                                          **PLAINTIFF'S OPPOSITION TO**
    Plaintiff,                              **SPECTRUM LABORATORIES,**
12                                          **LLC'S RENEWED MOTION FOR**
             v.                             **SUMMARY JUDGMENT**
13
    JAMES MATTHEW STEPHENS, an              Date: February 17, 2015
14  individual, and SPECTRUM                Time: 2:30 p.m.
    LABORATORIES, LLC, an Ohio limited      Judge: Hon. John A. Houston
15  liability company,                      Courtroom: 13(B) (Annex)

16  Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

I.  STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT                          2

II.  LEGAL STANDARD FOR SUMMARY JUDGMENT                                    3

III.  EVIDENTIARY OBJECTIONS                                                4

    A.  Broken Chain of Custody                                         4

    B.  Failure to meet the requirements of Rules 702 and 703 of the    5
Federal Rules of Evidence

    i.  Unreliable sample                                               5

    ii.  Unreliable testing method                                     10

IV.  ARGUMENT                                                               13

    I.  Dr. Greens' does not literally infringe independent claim 1
of the '776 patent.                                                        13

    A.  Limitation not met: Water having a pH between 3 and 10         14

    B.  Limitation not met: Creatinine and a biocide dissolved to exhibit
specific gravity and selected in relative concentrations to minimize
sepsis                                                                     15

        i.  "contain a creatine and a biocide"                     15

        ii.  "dissolved within said water"                        17

        iii.  "to form a solution exhibiting a specific gravity"  17

        iv.  "selected in relative concentrations to minimize sepsis"  18

    C.  Limitation not met: dissociated ionic compound dissolved to
adjust the specific gravity of the solution to between 1.005 g/cm³
and 1.025 g/cm³                                                            19

    D.  Limitation not met: Carbamates                                19

    II.  Dr. Thanedar's Testing Actually Introduced Carbamic Acid Methyl Ester
into the Agent X Test.                                                      21

V.  CONCLUSION                                                              22

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)     3, 4

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)     4

Markman v. Westview Instruments, Inc., 517 U.S. 370, 372–74 (1996).)     13

Mas–Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed.Cir.1998)     13

Read Corp. v. Portec, Inc., 970 F.2d 816, 821 (Fed.Cir.1992)     13

Fed.R.Civ.P. 56(c)     3,4

Fed. R. Evid. 702     4,5,6,9,10,16, 20

Fed. R. Evid. 703     4,5,16, 20

Dr. Greens, Inc. ("Dr. Greens") hereby submits its response in opposition to Spectrum Laboratories, LLC's ("Spectrum") renewed motion for summary judgment for direct and literal infringement of United States Patent No. 7,192,776, entitled, "Synthetic Urine and Method of Manufacturing Same" ("the '776 patent"). Additionally, Dr. Greens specifically includes by this reference its Opposition to Dr. Green's original Motion for Summary Judgment, Doc. No. 108 and supporting declarations. Spectrum's renewed motion must be denied because genuine disputes of material fact exist as to whether Dr. Greens' synthetic urine powder sold as "Agent X" infringes the '776 patent.

## I. STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

Beginning in late 2003/early 2004, Dr. Greens began selling its own synthetic urine products. (Doc. No 139-2, at ¶ 2.) In early 2004, Dr. Greens hired DSBR as the supplier for its synthetic urine products. (Doc. No 139-2, at ¶ 3; see also, Doc. No. 130-8 at 17:9-12 [excerpts from Transcript of Deposition of David A. Short ("Short Dep.")].) From early 2004 through early 2011, DSBR was the exclusive supplier for Dr. Greens' synthetic urine products. (Doc. No 139-2, at ¶ 3; see also, Short Dep. at 21:22-25.) All of the synthetic urine product DSBR supplied to Dr. Greens from 2004 through 2011 was in ***powder*** form only, i.e., not premixed with water. (Doc. No 139-2, at ¶ 3; see also, Short Dep. at 26:19-23.)

Back in 2004, when Dr. Greens first started selling its synthetic urine products, the only product offered was Dr. Greens' "Agent X." (Doc. No 139-2, at ¶ 4; see also, Ex. 1 to Decl. Eastman at 195:12-13 [excerpts from Transcript of 30(b)(6) Deposition of Matthew R. Green ("Green Dep.")].) The synthetic urine product sold as "Agent X" comes in ***powder*** form only, i.e. ***not*** premixed with water. (Doc. No 139-2, at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 193:5-6].) Overtime, Dr. Greens learned that some customers disliked the fact that "Agent X" did not come premixed with water. (Doc. No 139-2, at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 195:15-22].) As a result of popular

demand in 2005, Dr. Greens began offering for sale a new synthetic urine product, "Agent X Premixed," allowing customers to choose between a synthetic urine product in powder form versus a liquid form. (Doc. No 139-2, at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 195:15-25].) To help customers distinguish between the two different products, "Agent X" is sold in a black box, whereas "Agent X Premixed" is sold in a grey box with the term "Premixed" clearly labeled on the front. (Doc. No 139-2, at ¶ 4; see also, Ex. 1 to Decl. Eastman [Green. Dep. at 193:16-18].)

For purposes of Spectrum's summary judgment motion, however, **only** "Agent X" is at issue—i.e., the **powder** form. Specifically, Spectrum contends that Dr. Greens' synthetic urine powder called "Agent X" literally infringes upon independent claim 1 and dependent claims 2 through 4 of the '776 patent. Spectrum alleges that it obtained a box of Dr. Greens' "Agent X" product—as opposed to "Agent X Premixed"— back in 2004, and eight years later, in 2012, Spectrum sent the "Agent X" box to Avomeen Analytical Services ("Avomeen") for chemical testing. (*See* Doc. No. 101-2 at ¶ 13 [Decl. Kusala].) The alleged "Agent X" product tested by Avomeen in 2012 cannot be a true and correct representation of Dr. Greens' accused "Agent X" product because Dr. Greens' accused "Agent X" product comes in **powder** form only. As admitted by Spectrum, the alleged "Agent X" product tested and relied on by Spectrum here was a liquid, not a powder.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Fed.R.Civ.P. 56(c).) Material facts are those which may affect the outcome of the proceedings. (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).) The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.

(*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).)  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  (*Id.* at 325.)

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."  (Fed.R.Civ.P. 56(e).)  The court may not make credibility determinations and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion.  (*Anderson, supra*, 477 U.S. at 249.)

Spectrum's renewed motion for summary judgment must be denied because genuine disputes of material fact exist as to whether Dr. Greens' synthetic urine powder sold as "Agent X" literally infringes the '776 patent.

## III.   <u>EVIDENTIARY OBJECTIONS</u>

Spectrum relies on the declaration of Dr. Shri Thanedar to introduce purported expert opinion testimony that Greens' "Agent X" synthetic urine powder contains a biocide.  Mr. Thanedar's declaration testimony should be excluded as unreliable because (1) Spectrum failed to establish proper authentication and chain of custody for the alleged 2004 "Agent X" sample at issue, and (2) his purported expert testimony does not meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

### A.      **Broken Chain of Custody**

Spectrum relies on the declaration of Fran Kusala to establish a chain of custody for the alleged "Agent X" product tested by Avomeen.  Mr. Kusala's attempt to trace the whereabouts of the "Agent X" box from the date on which it was obtained by Spectrum in 2004 to the date on which Spectrum sent the box to Avomeen for chemical testing in 2012 is ineffective and improper.

Critically, Mr. Kusala testified that he left his job with Spectrum on December 31, 2004 "to pursue outside interests."  (Doc. No. 130-2 at ¶ 4.)  He

testified that he was rehired by Spectrum on January 1, 2008. (Doc. No. 130-2 at ¶ 4.) Thus, Mr. Kusala cannot possibly establish a proper chain of custody for the subject "Agent X" box because he has no personal knowledge of what happened to the box between December 31, 2004 and January 1, 2008. ***Over three years*** of the chain of custody analysis are entirely unaccounted for by Spectrum. Moreover, during the deposition of Dr. Thanedar, Dr. Thanedar admitted that the alleged Agent X sample was received from Spectrum's counsel, not Spectrum (and labeled with the initials of Spectrum's counsel). (Exhibit 4 to Decl. Eastman, at pg. 35, ll. 8-25 through p. 36, ll. 1-5.) Yet Spectrum made no effort to account for this transfer of possession or otherwise explain how and when it occurred.

The facts before the Court provide more questions than answers, leaving the Court guessing as to the authenticity of the alleged "Agent X" sample. Mr. Kusala's declaration testimony fails to answer numerous important questions, including, for example, who from Spectrum obtained the alleged "Agent X" box in 2004, where did the box come from, who first opened the box, who had access to the box after it was opened, who first inspected the contents of the box, where was the box stored from 2004 to 2008, who had access to the box from 2004 to 2008, etc. Consequently, the evidence before the Court is insufficient to determine that no genuine issue of material fact remains as to whether the alleged "Agent X" sample relied on by Spectrum here is a true and correct representation of the accused product sold by Dr. Greens in 2004. To the contrary, as demonstrated herein, there is overwhelming evidence to suggest that the alleged "Agent X" sample relied on by Spectrum was indeed altered and manipulated in such a way as to render it, and the corresponding test results, unreliable and untrustworthy.

**B.    Failure to meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence**

**i.    Unreliable sample**

Mr. Thanedar's expert opinion testimony that the alleged "Agent X" synthetic urine product obtained by Spectrum in 2004 contains a biocide should be

excluded as unreliable under Rule 702 of the Federal Rules of Evidence because his expert opinion is based on the unfounded, uncorroborated, and unduly speculative assumption that the (1) the "Agent X" product was not tampered with prior to testing, and (2) that the eight-year delay in testing the "Agent X" product did not materially affect and/or alter the structural and compositional integrity of the product.

As mentioned above, Dr. Greens sells both "Agent X" (i.e., synthetic urine powder) and "Agent X Premixed" (i.e., synthetic urine liquid). "Agent X" is sold in a black box, whereas "Agent X Premixed" is sold in a grey box with the term "Premixed" clearly labeled on the front:

 

(Doc. No 139-2, at ¶ 5-6; see also, Ex. 1 to Decl. Green)  The declaration of Mr. Thanedar includes a photograph of the "Agent X" box obtained by Spectrum in 2004 that Spectrum sent to Avomeen in 2012, specifically:



According to the declaration of Mr. Kusala, the "Agent X" box obtained by Spectrum in 2004 contained "a capped plastic bottle holding a liquid." (Doc. No. 130-2 at ¶ 15.)  Mr. Kusala's testimony cannot be accurate because, as discussed above, the synthetic urine product sold as "Agent X" comes in *powder* form only, i.e. *not* premixed with water.  (Doc. No 139-2, at ¶ 6; see also, Ex. 1 to Doc. No 139-2; and Ex. 1 to Decl. Eastman [Green Dep. at 193:5-6].)  Therefore, if Mr. Kusala's testimony is true—that the "Agent X" box obtained by Spectrum in 2004 contained a liquid solution—then one of two things had to have occurred: (1) prior to Spectrum's receipt of the "Agent X" box, the box was opened and water was added to the synthetic urine powder by an unknown third-party, or (2) after Spectrum's receipt of the "Agent X" box, the box was opened and water was added to the synthetic urine powder by Spectrum personnel—either way, the "Agent X" product at issue was materially tampered with.  (*Id.*)  On this basis alone, Mr. Thanedar's expert opinion should be excluded as unreliable.

The likelihood that Dr. Greens' "Agent X" product was in fact tampered with prior to Avomeen's testing is underscored by the vague and ambiguous declaration of Mr. Kusala.  Notably absent from Mr. Kusala's declaration is any description of where Spectrum obtained the "Agent X" box, how it was obtained, who it was obtained from, or when in 2004 it was obtained.  Mr. Kusala's use of the term "obtained," rather than the term "purchased," suggests that Spectrum itself did not purchase the "Agent X" box from Dr. Greens or any other reliable source. Spectrum failed to produce any contemporaneous documentary evidence to corroborate Mr. Kusala's testimony, such as an invoice, purchase order, receipt, shipping confirmation, etc. for the subject "Agent X" box.  As demonstrated above, there is no question that *somebody* opened the "Agent X" box, took out the synthetic urine powder inside the box, and mixed the powder with water to create a liquid solution.

The doubt surrounding the genuineness of the "Agent X" product at issue here is strengthened by the fact that Mr. Kusala does not identify who from

"*Spectrum personnel*" first received the "Agent X" box back in 2004. Mr. does not identify the specific "*Spectrum personnel*" that first opened the "Agent X" box. Mr. Kusala does not identify the specific "*Spectrum personnel*" that participated in the 2004 inspection of the "Agent X" box. Mr. Kusala does not provide any description of the specific location within Spectrum's offices at which the "Agent X" box was stored, who had access to said location, or the types of security procedures implemented by Spectrum to keep the location secure from unwanted intrusion. Mr. Kusala has no personal knowledge of whether "*Spectrum Personnel*" tampered with and materially altered Dr. Greens' "Agent X" synthetic urine product during his **three-plus year** departure from Spectrum, i.e., December 31, 2004 to January 1, 2008.

Moreover, during the deposition of Dr. Thanedar, Dr. Thanedar admitted that the liquid bottle containing the alleged Agent X sample he received from Spectrum was not sealed in any way. (Exhibit 4 to Decl. Eastman, at pg. 32, ll. 19-25 through p. 33, ll. 1-4.) Dr. Greens' expert explained that "[w]hen a seal does not exist on a sample, the sample is subject to tampering, as well as chemical degradation depending on the composition of the sample and the exposure to air, other chemicals, etc." (Decl. Chatfield, at ¶ 4.) Additionally, the deposition transcript of Dr. Thanedar makes clear that there is no legitimate basis from which to conclude that in his opinion, the alleged Agent X sample was not tampered with. For example, Dr. Thanedar admitted that he does not remember whether any items were in the Agent X box he received from Spectrum's counsel other than a bottle of liquid. (Exhibit 4 to Decl. Eastman, at pg. 36, ll. 6-25 through pg. 38, ll. 1-9.) Further, Dr. Thanedar admitted that he tested the alleged Agent X sample without any knowledge as to where the sample came from originally, how it was obtained, when it was obtained, how it was stored, where it was stored, who mixed the sample with liquid, what kind of liquid was the sample mixed with, was anything other than liquid added to the sample, etc. (Exhibit 4 to Decl. Eastman, at pg. 35-38.) Answers to these questions are pertinent to determining whether the alleged

Agent X sample was authentic and capable of producing reliable test results. Dr. Greens' expert explained that "[a]s an analytical chemist, [he] would not feel comfortable concluding that the alleged sample of Agent X comprised any compound, biocide or otherwise, due to the lack of details surrounding the above factual inquiries." (Decl. Chatfield, at ¶ 4.)

In addition, a serious issue exists here as to whether the structural and compositional integrity of the "Agent X" product was materially affected by the *eight-year* delay in chemical testing. Mr. Kusala testified that the date on the instruction sheet for the "Agent X" states "June 2004." (Doc. No. 130-2 at ¶ 15.) Avomeen did not test the "Agent X" product until "October 9th, 2012." (Doc. No. 130-3 ¶ 7.) There is a strong likelihood that this eight-year lapse in time would result in the spoliation of the accused "Agent X" product. Indeed, the shelf-life of Dr. Greens' accused "Agent X" product is only two years. (Doc. No 139-2, at ¶ 14; see also, Ex. 2 to Doc. No 139-2.) This 2-year shelf life is standard in the synthetic urine industry. (*Id*.) For example, Spectrum's synthetic urine product sold as "Quick Fix" also has a 2-year shelf life. (Doc. No 139-2, at ¶ 14; see also, Ex. 3 to Doc. No 139-2.)

Based on the totality of circumstances, Spectrum failed to establish the reliability of the "Agent X" test results procured by Avomeen in 2012. In all cases where expert testimony is offered, the trial judge must find that the testimony is "properly grounded, well-reasoned and not speculative before it can be admitted." (See FRE 702, Adv. Comm. Notes (2000).) As demonstrated above, Dr. Thanedar's expert opinion is highly speculative because a genuine dispute exists as to whether the alleged "Agent X" product tested by Avomeen is a true and correct representation of Dr. Greens' accused "Agent X" synthetic urine powder. Therefore, Mr. Thanedar's opinion testimony that Dr. Greens' "Agent X" contains a biocide should be excluded as unreliable.

### ii. Unreliable testing method

Mr. Thanedar's expert opinion testimony that the alleged "Agent X" synthetic urine product obtained by Spectrum in 2004 contains a biocide should be excluded as unreliable under Rule 702 of the Federal Rules of Evidence because his expert opinion is based on the unreliable testing method and uncorroborated test results.

Dr. Thanedar admitted that he performed no clinical testing to verify the presence of spoliation. (Exhibit 4 to Decl. Eastman, at pg. 40, ll. 4-21; pg. 41, ll. 12-16.) This is improper. When assessing whether a sample has undergone sepsis, the proper assessment typically involves growing the culture on a Petri dish and examining the contents under a microscope. (Decl. Chatfield, at ¶ 5.)

Dr. Thanedar admitted that he has no data to show that he ran a blank prior to testing the alleged Agent X sample. (Exhibit 4 to Decl. Eastman, at pg. 42, ll. 23-25 through pg. 43, ll. 1-15.) This is improper. It is also common practice to produce the data for the blank in order to subsequently analyze the integrity of the test performed and Dr. Thanedar's failure to produce the data for the blank test severely undermines the ability to corroborate the reliability of his testing method and subsequent opinion. (Decl. Chatfield, at ¶ 10.)

Dr. Thanedar admitted that he did not used any spiked samples subsequent to testing the alleged Agent X sample. This is improper. Spiked samples or standard samples should be used when providing defensible data and should be performed after testing an unknown. Positive identification should be based on two (2) criteria. (Decl. Chatfield, at ¶ 11.) First, the chemist must show a mass spectrum that matches the NIST library or other valid library. (*Id*.) This requires a chemist to run a valid sample (spiked sample or standard sample) to show that the mass spectrum matches the unknown, as used in that particular machine. (*Id*.) Second, multiple compounds can have similar spectrums. (*Id*.) Therefore, the retention time of the unknown peaks must match that of a valid standard or spiked sample under identical operating conditions. (*Id*.) When comparing spectra, the

NIST program offers a variety of possible identities of the unknown and each possibility is given a match number out of 999. (*Id.*) The individual retention times of each possible match should be analyzed in comparison to the retention times of the spike or standard sample and the unknown. (*Id.*) Dr. Thanedar failed to do this.

Dr. Thanedar admitted that he has no data to confirm that the testing machine was properly calibrated prior to his testing of the alleged Agent X sample. (Exhibit 4 to Decl. Eastman, at pg. 47, ll. 20-25 through pg. 48, ll. 1-25.) This is improper. The calibration of the GC-MS can affect the outcome of the experiment, leading to false positives when the data reported by the GC-MS is compared to the NIST database. (Decl. Chatfield, at ¶ 9.) Thus, to minimize the likelihood of inaccurate data, calibration should occur immediately prior to running the unknown sample and the data from the calibration should be available for examination to show the machine was calibrated and the results of the calibration. (*Id.*) Dr. Thanedar failed to do this.

Dr. Thanedar admitted that he diluted the alleged Agent X sample 10:1 ratio with methanol and that methanol was the only solvent used despite the fact that other solvents were available and could have been used. (Exhibit 4 to Decl. Eastman, at pg. 49, ll. 14-25 through pg. 50, ll. 1-18.) This is improper. When an unknown sample is received and a chemist is asked to test for a wide range of compounds ("biocides" is a considerably large class of compounds), a chemist should undergo preliminary research into current literature to determine what procedures are recommended, any issues that may occur during testing, optimal conditions, etc. (Decl. Chatfield, at ¶ 7.) Choosing a solvent is an extremely important step in the process. (*Id.*) For example, while a solvent like methanol is typically used for aqueous solutions, methanol is still very reactive with some chemicals. (*Id.*) For example, it is well known that methyl carbamate and ethyl carbamate can be prepared readily by the reaction of urea with methanol. (Exhibits 2, 8, and 9 to Decl. Chatfield.) Even a cursory investigation into biocides and

more specifically into carbamates, should have alerted Dr. Thanedar to the possibility that the use of ethanol or methanol as a solvent could potentially result in a false positive test for a carbamate. (Decl. Chatfield, at ¶ 13.) Because carbamic acid methyl ester is produced from the reaction of urea and methanol, Dr. Thanedar should have performed tests using other solvents in order to show that the results were not a product of the solvent used. (*Id.*)

Moreover, and perhaps most importantly, Dr. Thanedar admitted that he used the entire alleged Agent X sample in one test. (Exhibit 4 to Decl. Eastman, pg. 82, ll. 18-25 through pg. 83, l. 1.) This is improper for several reasons. For starters, before dilution, Dr. Thanedar had enough sample to perform approximately 88,721 tests (1 µl= 0.000034 fluid ounces.). (Decl. Chatfield, at ¶ 12.) If Dr. Thanedar diluted the sample 1:10 in methanol, the number of tests Dr. Thanedar could have performed would increase exponentially. (*Id.*) Curiously, however, Dr. Thanedar performed one test only. It makes no logical or scientific sense for Dr. Thanedar to have used all three ounces of the alleged Agent X sample in a single test. (*Id.*)

Dr. Thanedar's failure to perform differential testing on the alleged Agent X sample also casts serious doubt on the reliability of his testing method and subsequent opinion. (Decl. Chatfield, at ¶ 13.) Furthermore, Dr. Thanedar's use of the entire alleged Agent X sample improperly precludes Plaintiff's expert from performing his own test to evaluate the merit of Dr. Thanedar's opinion. Dr. Thanedar's unjustified use of the entire sample is not only inconsistent with reliable scientific principles, but it is tantamount to the spoliation of material evidence as well. For this reason alone Spectrum's renewed motion should be denied with prejudice. Spectrum should not be able to rely on evidence to prove infringement where such evidence was deliberately concealed or otherwise destroyed for no reason other than to preclude third party analysis or independent testing of the same.

# IV.   ARGUMENT

A patent infringement analysis involves two steps.  First, the court determines the scope and meaning of the asserted claims.  (*See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372–74 (1996).)  Second, the properly construed claims are compared to the allegedly infringing device.  (*See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821 (Fed.Cir.1992).)

In this case, Spectrum contends Dr. Greens' synthetic urine powder sold as "Agent X" literally infringes independent claim 1 and dependent claims 2 through 4 of the '776 patent.  To prove literal infringement, Spectrum must prove that Dr. Greens' "Agent X" powder contains each limitation of the disputed claims.  (*See Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed.Cir.1998).)  If any claim limitation is absent from Agent X, there is no literal infringement as a matter of law.   (*See id.*)

## I.   Dr. Greens' does not literally infringe independent claim 1 of the '776 patent.

Independent claim 1 requires:
A synthetic urine solution comprising:
> water having a pH between 3 and 10;
> creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis;
> at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³; and
> wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(decylthio)ethanamine, guanides, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, terbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate,

Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

## A.    Limitation not met: Water having a pH between 3 and 10

To prove literal infringement, Spectrum must prove that Dr. Greens' accused "Agent X" synthetic urine powder contains "water having a pH between 3 and 10." ('776 patent col. 6 l. 36.)  Spectrum failed to satisfy its burden.

As discussed above, the synthetic urine product sold as "Agent X" comes in *powder* form only, i.e. *not* premixed with water.   (Doc. No 139-2, at ¶¶ 4-6; see also, Exhibit 1 to Doc. No 139-2; Ex. 1 to Decl. Eastman [Green Dep. at 193:5-6].) In this case, Spectrum obtained a box of "Agent X" (i.e., a synthetic urine powder), *not* "Agent X Premixed" (i.e., a synthetic urine liquid solution).  (Doc. No 139-2, at ¶¶ 4-6; see also, Exhibit 1 to Doc. No 139-2.)  This fact is confirmed by Mr. Thanedar's declaration, which includes a photograph of the "Agent X" box Avomeen received from Spectrum.  (See Doc. No. 130-3 at ¶ 6.)  Dr. Greens' accused "Agent X" product cannot literally infringe the '776 patent because, indisputably, the product at issue is sold as synthetic urine *powder* only—it does not contain "water."  (Doc. No 139-2, at ¶¶ 4-6; see also, Exhibit 1 to Doc. No 139-2.)

In addition, the evidence offered by Spectrum is insufficient to establish that Dr. Greens' accused "Agent X" synthetic urine powder has "*a pH between 3 and 10*."  Notably, Avomeen did not test the pH level of the alleged "Agent X" sample Spectrum obtained in 2004.  Further, Spectrum's reliance on the deposition of David Short from DSBR and his "formula sheets" to prove that the accused "Agent X" product has "*a pH between 3 and 10*" is misplaced.

Mr. Short testified that Dr. Greens did not require DSBR to test, and DSBR did not test, the synthetic urine powder it supplied to Dr. Greens for a desired or acceptable pH level.  (Doc. No 139-2, at ¶ 8; see also, Doc. No. 130-8 [Short Dep. at 80:3-7].)  Rather, DSBR would periodically spot-check the synthetic urine

powder sold as "Agent X" for consistency by taking "a sample of one of the batches and dissolve a small portion in water to test the pH of the resultant solution." (Doc. No. 101-9 [Short Dep. at 60:25 -61:2].) DSBR would perform these pH spot-checks "to ensure that it was reasonably consistent with what [they] observed in previous batches." (Doc. No. 130-8 [Short Dep. at 80:3-7].) It was consistency, not a specific pH level, that DSBR was aiming for. (Doc. No. 130-8 [Short Dep. at (61:6-9, 61:17-23, 80:3-7.) DSBR never rejected a sample batch of Agent X as having an unacceptable pH level. (*Id*.) The fact that DSBR periodically tested the pH level of random batches of synthetic urine solution does not mean that the synthetic urine powder *actually* sold by Dr. Greens as "Agent X" has "a pH between 3 and 10."

The evidence is insufficient to establish that Dr. Greens' accused "Agent X" synthetic urine powder contains "water having a pH between 3 and 10." ('776 patent col. 6 l. 36.) Therefore, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of the '776 patent.

**B.     Limitation not met: Creatinine and a biocide dissolved to exhibit specific gravity and selected in relative concentrations to minimize sepsis**

To prove literal infringement, Spectrum must prove that Dr. Greens' accused "Agent X" synthetic urine powder contains "creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis." ('776 patent col. 6 ll. 37-40.) Spectrum failed to satisfy its burden.

**i.     "contain a creatine and a biocide"**

Dr. Greens does not dispute that "Agent X" contains a creatinine. However, the issue of whether Agent X contains a biocide, specifically, a carbamate, is a disputed material fact that Spectrum failed to prove.

Per the Court's Claim Construction Order (Doc. No. 126), the disputed claim term "carbamates" is construed as "organic compounds derived from carbamic acid." In its renewed motion for summary judgment, Spectrum identifies "carbamic acid methyl ester" as the carbamate allegedly present in Dr. Greens' accused "Agent X" synthetic urine powder. Spectrum's renewed motion must fail because there is no reliable and meaningful evidence that Dr. Greens' accused "Agent X" synthetic urine powder *actually* contains a "carbamate," let alone the specific compound "carbamic acid methyl ester." The only evidence offered by Spectrum to support its argument regarding the presence of a carbamate is the declaration of Mr. Thanedar (Doc. No. 130-3.) However, the declaration opinion testimony of Mr. Thanedar should be excluded as unreliable under Rules 702 and 703 of the Federal Rules of Evidence for the multiple reasons outlined above. Moreover, even if, for argument purposes, Mr. Thanedar's expert opinion testimony is considered by the Court, his testimony is inconsistent with the DSBR evidence presented through its discovery production. (See Ex. 4 to Decl. Eastman)

Spectrum's argument of literal infringement is based on chemical testing of an alleged 2004 "Agent X" sample. DSBR's entire inventory of ingredients for Dr. Greens' accused "Agent X" synthetic urine powder as of December 31, 2004 was limited to eight ingredients: (1) sodium chloride (NaCl); (2) potassium bicarbonate ($KHCO_3$); (3) monopotassium phosphate ($KH_2PO_4$); (4) ammonium sulfate (($NH_4$)$_2SO_4$); (5) Urea ($CH_4N_2O$); (6) Creatinine ($C_4H_7N_3O$); (7) FD&C Yellow #6 ($C_{16}H_{10}N_2Na_2O_7S_2$); and (8) Tartazine ($C_{16}H_9N_4Na_3O_9S_{2}$). (*See* Doc. No. 130-12 [Exhibit G to Decl. Cavanagh].)

Notably missing from the above DSBR list of ingredients is the compound "carbamic acid methyl ester." Spectrum does not dispute the genuineness of the above DSBR list of ingredients for the accused "Agent X" product. To the contrary, Spectrum relies on the above DSBR inventory list in support of its renewed motion for summary judgment. (Doc. No. 130-12 [Exhibit G to Decl. Cavanagh].) Critically, Spectrum makes no effort to reconcile the obvious and

material disparity between the 2004 DSBR inventory of ingredients for Dr. Greens' accused "Agent X" synthetic urine powder and Mr. Thanedar's 2012 opinion that Dr. Greens' accused "Agent X" synthetic urine powder contains the compound "carbamic acid methyl ester." The DSBR documents introduced by Spectrum in support of its motion for summary judgment (Doc. Nos. 130-10, 130-11, 130-12, and 130-13) are sufficient to establish that a genuine dispute exists as to whether Dr. Greens' accused "Agent X" synthetic urine powder contains "carbamic acid methyl ester."

### ii. "dissolved within said water"

As discussed above, the synthetic urine product sold as "Agent X" in 2004 was available in **powder** form only, i.e. **not** premixed with water. (Doc. No 139-2, at ¶¶ 4-8; see also, Exhibit 1 to Doc. No 139-2; Ex. 1 to Decl. Eastman [Green Dep. at 193:5-6].) In this case, Spectrum obtained a box of "Agent X" (i.e., a synthetic urine powder), **not** "Agent X Premixed" (i.e., a synthetic urine liquid solution). (Doc. No 139-2, at ¶¶ 4-6; see also, Exhibit 1 to Doc. No 139-2.) Dr. Greens' accused "Agent X" product cannot literally infringe the '776 patent because, indisputably, the product at issue is sold as synthetic urine **powder** only— it does not contain "water."

### iii. "to form a solution exhibiting a specific gravity"

Spectrum's reliance on the deposition of David Short from DSBR and his "formula sheets" to prove that the accused "Agent X" product has "**a specific gravity**" between 1.005 $g/cm^3$ and 1.0250 $g/cm^3$ is misplaced. Mr. Short testified that Dr. Greens did not require DSBR to test, and DSBR did not test, the synthetic urine powder it supplied to Dr. Greens for a desired or acceptable density or gravity range. (Doc. No. 130-8 [Short Dep. at 80:3-7].) The fact that DSBR would periodically take "a small sample of a given batch, dilute it in water, and then measure the pH and **sometimes** the density" (Doc. No. 130-8 at 78:12-15 [Short Dep.] (emphasis added)), does not mean that the synthetic urine powder *actually* sold by Dr. Greens as "Agent X" has a specific gravity between 1.005

g/cm$^3$ and 1.0250 g/cm$^3$. (*See*, *e.g.*, Decl. Green at ¶ 10.) Notably, Avomeen did not test the gravity level of the alleged "Agent X" sample at issue here.

### iv. "selected in relative concentrations to minimize sepsis"

Mr. Thanedar's declaration testimony that the alleged Dr. Greens' "Agent X" sample tested by Avomeen in 2012 "showed no signs of sepsis" (Doc. No. 130-3 at ¶ 7) is insufficient to prove that the sample contained a creatinine and a biocide "selected in relative concentration to minimize sepsis." Similarly, Spectrum's reliance on the deposition testimony of Mr. Short from DSBR is equally unavailing. Mr. Short testified that it was his "understanding" that there was a "concern" that creatinine mixed with water may create a problem of bacterial growth or sepsis in the liquid solution. (Doc. No. 130-8 at 58:3-8 [Short Dep.] When asked if DSBR did anything to address that "concern" as of 2004, Mr. Short responded, "[i]t's a problem that occurred later." (*Id*. at 58:9-13.) In other words, as of 2004, DSBR did ***nothing*** to minimize sepsis in the synthetic urine powder it supplied to Dr. Greens because, as of 2004, sepsis was not a problem. Later, when sepsis became a concern, there is no evidence that Dr. Greens' accused "Agent X" synthetic urine powder *actually* contains a creatinine and a biocide "selected in relative concentration to minimize sepsis." (*See*, *e.g.*, Doc. No 139-2, at ¶ at 18.) The only additive that was included was sodium benzoate, a preservative and not covered by the closed Markush group of the '776 claims.

The evidence is insufficient to establish that Dr. Greens' accused "Agent X" synthetic urine powder contains "creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis." ('776 patent col. 6 ll. 37-40.) Therefore, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of the '776 patent.

### C. Limitation not met: dissociated ionic compound dissolved to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³

To prove literal infringement, Spectrum must prove that Agent X contains "at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³." ('776 patent col. 6 ll. 41-43.) Spectrum has failed to offer evidence sufficient to satisfy its burden.

Dr. Greens does not dispute that Agent X contains a dissociated ionic compound. The issue of whether said compound is "dissolved within the solution to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm," however, is a disputed material fact that Spectrum has failed to prove. Notably, Avomeen did not test the density of the alleged Agent X sample Spectrum obtained in 2004. Further, as discussed above, Dr. Greens did not set, and DSBR did not test for, a specific or "set range" of gravity. (Doc. No. 130-8 at 78:12-15, 80:3-7 [Short Dep.].) The fact that Mr. Short would periodically spot-check for consistency by taking "a small sample of a given batch, dilute it in water, and then measure the pH and *sometimes* the density" (*Id*. at 78:12-15), does not mean that the synthetic urine solution *actually* sold by Dr. Greens had/has a specific gravity.

The evidence is insufficient to establish that the accused "Agent X" synthetic urine solution obtained by Spectrum in 2004 contains "at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm³ and 1.025 g/cm³." ('776 patent col. 6 ll. 41-43.) Therefore, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of the '776 patent.

### D. Limitation not met: Carbamates

To prove literal infringement, Spectrum must prove that Agent X contains:

> [a biocide] selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(decylthio)ethanamine, guanides, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, terbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

('776 patent col. 6 ll. 44-54.)  Spectrum failed to satisfy its burden.

Spectrum contends that the alleged "Agent X" sample it obtained in 2004 tested positive in 2012 for carbamates, specifically, the compound "carbamic acid methyl ester."   The only evidence offered by Spectrum to support its argument regarding the presence of a carbamate is the declaration of Dr. Thanedar.  (Doc. No. 130-3.)  However, the declaration opinion testimony of Dr. Thanedar should be excluded as unreliable under Rules 702 and 703 of the Federal Rules of Evidence for the multiple reasons outlined above.

Moreover, as discussed above, the construction of the term "carbamate" is strongly disputed by the parties and the evidence offered by Spectrum is insufficient to establish that the proper construction of "carbamates" as used in the '776 patent includes the compound "carbamic acid methyl ester."   In addition, critically important to the Court's determination here is the fact that Dr. Thanedar's declaration opinion testimony is directly contracted by reliable—and undisputed—contemporaneous documentary evidence showing that Dr. Greens' accused "Agent X" synthetic urine powder **does not** contain "carbamic acid methyl ester."  (*See, e.g.*, Doc. Nos. 130-10, 130-11, 130-12, and 130-13.)

Based on the above, the evidence is insufficient to establish that Dr. Greens' accused "Agent X" synthetic urine contains any "carbamates."  ('776 patent col. 6 ll. 44-54.)  Therefore, Spectrum failed to show that Dr. Greens' accused "Agent X" synthetic urine powder literally infringes claim 1 of the '776 patent.

Supplemental opposition to defendant's Renewed motion
for summary judgment
11cv0638 JAH (KSC)

## II. Dr. Thanedar's Testing Actually Introduced Carbamic Acid Methyl Ester into the Agent X Test.

As demonstrated by the declaration of Dale Chatfield, submitted herewith, there is good reason to believe that the testing methods selected and implemented by Spectrum's expert, Dr. Thanedar, caused the introduction of carbamic acid methyl ester, a carbamate, into the alleged Agent X sample.

Dr. Thanedar used methanol as the solvent to dilute the Agent X sample at a ratio of 10:1.

Methanol combines with urea to create carbamic acid methyl ester (also known as methyl carbamate). (*see* Chatfield Dec., *e.g.* ¶24)  This means that the carbamic acid methyl ester detected by Dr. Thanedar could be the result of the use of methanol as the testing solvent.

The use of methanol on a GS-MS test of a urea solution (such as synthetic urine) results in the formation of methyl esters of carbamic acid. (*see* Chatfield Dec., *e.g.* ¶22, 23, 24 ).  This means that the carbamic acid methyl ester detected by Dr. Thanedar could be the result of the use of methanol in a GC-MS test on a solution containing urea (which synthetic urine must contain).

The use of GC-MS on pheylurea combined with methanol results in the formation of esters. (*See* Decl. Chatfield, ¶ 22, exhibit 7).  In fact, the subject of the article referred to by Dr. Chatfield is the problem with using methanol as a solvent when analyzing complex ureas with gas chromatography. *Id*.

Moreover, the natural fermentation process results in the formation of ethyl carbamate and methyl carbamate. (*See* Decl. Chatfield, ¶20-21, exhibit 6).

It is well known in the industry that "methyl carbamate and ethyl carbamate can be prepared readily by the reaction of urea with methanol and ethanol." (*See* Decl. Chatfield ¶24, reference to exhibit 9, US Pat. No. 5,534,649 issued 1996 – long prior to filing of '776 patent at issue in this case).  This means that combining urea with methanol, as was done in Dr. Thanedar's test, can result in the formation of carbamic acid methyl ester.

Any one of the sources of carbamic acid methyl ester may be present in the sample tested by Dr. Thanedar.  As a result, it is impossible for this court to determine from Dr. Thanedar's testimony and testing methods that there was ever any of the accused biocide in the Agent X sample.

Also, Dr. Thanedar cannot accurately opine on the absence of tampering. Indeed, he can only attest to what occurred with the sample after his receipt (*See* Decl. Eastman, ¶7, Exhibit 4, pg. 30, line 17 – pg. 32, line 8).  The sample was contained in a screw-top bottle; anyone during the eight-plus years since its creation could have added carbamic acid methyl ester.  Dr. Thanedar cannot assure this court that the solution he was provided was in any way confirmed to be a product provided by Dr. Greens.  Indeed, he received a solution in a box which should have contained a powder.

According to Dr. Thanedar, despite performing only a single test, there is no remaining Agent X from his 30 ounces of diluted solution.  (*See* Decl. Eastman, ¶8, Exhibit 4, page 82, lines 18-25 through pg. 83, 1ine 1).  As a result, Dr. Greens cannot test the same solution used by Dr. Thanedar, thus rendering his test results unreliable.

## V.    CONCLUSION

In sum, the sole evidence in support of the claim element "carbamates" is a test of an adulterated 2004 sample of Agent X that was conducted late in 2012. The custody of that sample is highly suspect given that over three years of the chain of custody is entirely unaccounted for by Spectrum.  Further, adulteration of the alleged sample certain given that the sample tested by Dr. Thanedar was a liquid solution, yet the accused product was available in powder form only. Moreover, there is no evidence from Dr. Greens' 2004 supplier DSBR that the Agent X formula included carbamic acid methyl ester.  In addition, there is compelling reliable evidence that Dr. Thanedar himself created the presence of

Supplemental opposition to defendant's Renewed motion
for summary judgment
11cv0638 JAH (KSC)

carbamic acid methyl ester in the alleged Agent X sample due to his dilution of the sample in 1:10 methanol.

  Lastly, Dr. Thanedar's unjustified use of the entire sample is tantamount to the spoliation of material evidence and reveals a deliberate attempt by Spectrum to conceal and destroy evidence in this case. If the alleged sample really did contain a carbamic acid methyl ester, as argued by Spectrum, then the logical thing to do would be to preserve the sample around and encourage independent testing by Dr. Greens' expert. Typically parties do not waste or destroy evidence that helps prove their case. Here, there was no reason for Spectrum to destroy the alleged sample other than to cover its tracks and obfuscate the fact that either Spectrum, or somebody at the direction of Spectrum, tampered with the alleged 2004 Agent X sample prior to it being tested by Dr. Thanedar in 2012. Since the facts must be viewed in the light most favorable to Dr. Greens, Spectrum's renewed motion for summary judgment for direct and literal infringement of the '776 patent must be denied because genuine disputes of material fact exist as to whether Dr. Greens' accused "Agent X" synthetic urine powder literally infringes independent claim 1 and dependent claims 2, 3, and 4 of the '776 patent.


Dated: January 26, 2015   EASTMAN & MCCARTNEY LLP


        By: /s/ Gary L. Eastman
         Gary L. Eastman, Esq.

        Attorneys for Plaintiff
        DR. GREENS, INC.

23

Supplemental opposition to defendant's Renewed motion
for summary judgment
11cv0638 JAH (KSC)

**PROOF OF SERVICE**

I, the undersigned certify and declare as follows:

      I am over the age of eighteen years and not a party to this action. My business address is 401 West A Street, Suite 1785, San Diego, California, 92101, which is located in the county where the service described below took place.

      On January 26, 2015, at my place of business in San Diego, California, I served the following document:

**PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO SPECTRUM LABORATORIES, LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Via the CM/ECF FILING SYSTEM. The undersigned hereby certifies that he caused a copy of the foregoing documents to be filed with the clerk of the U.S. District Court, Southern District of California, using the CM/ECF filing system, which caused a copy to be electronically mailed to the following CM/ECF Participant(s) noted below:

| | |
|---|---|
| David B. Cupar | J. Christopher Jaczko |
| Matthew J. Cavanagh | Jaczko Goddard LLP |
| McDonald Hopkins, LLP | 4401 Eastgate Mall |
| 600 Superior Avenue East | San Diego, CA 92121 |
| Cleveland, OH 44114 | |

      I certify and declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on January 26, 2015 in San Diego, California

                     By:   /s/ Gary L. Eastman
                           Gary L. Eastman