# Exhibit
# F

# UNITED STATES DISTRICT COURT

## SOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. GREENS, INC., a California corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>JAMES MATTHEW STEPHENS, an individual, and SPECTRUM LABORATORIES, LLC, an Ohio limited liability company,<br><br>    Defendant. | Case No.:  11cv0638 JAH (KSC) |


## EXPERT REPORT OF DALE CHATFIELD, Ph.D.


## A REPORT RE: INVALIDITY OF U.S. PATENT NO. 7,192,776

# **TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | SUMMARY OF OPINIONS | 1 |
| III. | QUALIFICATIONS | 2 |
| IV. | INFORMATION CONSIDERED IN FORMING OPINION | 3 |
| V. | COMPENSATION | 3 |
| VI. | BACKGROUND OF THE TECHNOLOGY | 4 |
| VII. | THE '776 PATENT | 5 |
| VIII. | LEGAL STANDARD | 7 |
| IX. | PERSON OF ORDINARY SKILL IN THE ART | 9 |
| X. | CLAIM CONSTRUCTION | 10 |
| XI. | OPINIONS AND REASONS THEREFORE | 11 |

    A. Invalidity based on Obviousness — 11

        i. "water having a pH between 3 and 10" — 11

        ii. "creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis" — 12

        iii. "at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between $1.005 \text{ g/cm}^3$ and $1.025 \text{ g/cm}^3$" — 13

        iv. "wherein said biocide is selected from the group consisting of…" — 13

    B. Invalidity based on failure to disclose material information — 14

# I.     INTRODUCTION

1.      I have been retained by Plaintiff, Dr. Greens, Inc., a California Corporation, through its counsel to provide analysis and expert opinion in this case on non-infringement of U.S.  Patent No. 7,192,776, titled Synthetic Urine and Method of Manufacturing Same, based on invalidity due to obviousness and due to a failure to disclose material and relevant information.

2.      My opinions, which are summarized in Section II of this report, are based on data and information available to me at this time.  I reserve the right to update, supplement or revise the opinions contained in this report if and when additional information or data becomes available for my review, including any issues raised by the Defendants' experts or resulting from depositions that have yet to be taken or documents or other information to be produced, or based upon construction of any claim term by the court or other relevant ruling the court may issue.

# II.    SUMMARY OF OPINIONS

3.      It is my opinion that Plaintiff cannot be liable for patent infringement because the invention claimed in the '776 Patent would have been obvious to a person of ordinary skill in the art at the time the invention was made and therefore, the '776 Patent is invalid as obvious under 35 U.S.C. § 103.

4.      It is also my opinion that Plaintiff cannot be liable for patent infringement because there was willful fraud on the United States Patent and Trademark Office by failing to disclose information that was material and relevant because text from the '776 Patent was plagiarized from third party publications, which constitute undisclosed prior art in violation of 37 C.F.R. 156.

### III. QUALIFICATIONS

4.      I earned my Bachelor of Science and Master of Science Degrees in Chemistry from Oakland University in Rochester, Michigan.  I also earned a Ph.D. in Analytical Chemistry from the University of North Carolina in Chapel Hill, North Carolina.

5.      I served as the Senior Scientist and President of PCR technologies in San Diego, California.

6.      From 1998-2003, I served as Department Chair for the Department of Chemistry at San Diego State University.

7.      I was an Associate Professor of Chemistry at San Diego State University from 1983- 2013, and now hold the position as Professor Emeritus.  I routinely teach introductory chemistry (Chemistry 200, SDSU) to science students. I have knowledge and experience teaching the following topics: Chromatography (Chemistry 751, SDSU) (This course covers all aspects of chromatography theory and applications, including gas chromatography (GC). I have taught this class to graduate students at SDSU at least one dozen times.); Mass Spectrometry (Chemistry 753, SDSU) (I have taught this class at least 15 times in my career at SDSU. It covers the theory and applications of mass spectrometry, including the type of MS used in this work.); Analytical Chemistry Laboratory (Chem 457, SDSU) (This is a hands-on class in operation of various analytical laboratory instruments used for chemical analysis, including GC and MS techniques. I have taught this course more than 30 times to the Chemistry majors at SDSU.) Introduction to Analytical Chemistry (Chem 251, SDSU) (This class covers basic analytical techniques used for chemical analysis.) In addition, I have been an invited speaker by

Agilent Technologies, a major manufacturer of GC-MS instruments, to conduct workshops in GC-MS theory and applications.

8.      I currently serve as Professor Emeritus and San Diego State University, where I teach part-time and perform research.

9.      As a result of my education, work experience, teaching experience, and research experience, I have extensive experience in the field of Chemistry, specifically Analytical Chemistry.

10.      Attached, as Exhibit A, is a copy of my Curriculum Vitae, including a list of my twenty (20) publications and research support.

## IV.      INFORMATION CONSIDERED IN FORMING OPINIONS

11.      In forming my opinions, I reviewed the '776 Patent. In addition, attached as Exhibit B is a list of all documents and other materials I considered in forming my opinions.

## V.      COMPENSATION

12.      I am being compensated at my customary rate of $300.00 per hour for courtroom testimony, deposition testimony, and all other consultant hours and will be reimbursed for any expenses directly attributable to this matter. My compensation does not depend upon the outcome of this litigation.

## VI.    BACKGROUND OF THE TECHNOLOGY

13.    Various solutions of synthetic urines have been developed for many purposes, including assurance that instrumentation used to analyze human urine is working properly. [1] Many formulations of synthetic urine exist and many include the use of a preservative or biocide, as evidenced by the following prior art.

14.    United States Patent Application Publication No. US 2004/0077106, filed June 27, 2003, entitled, "Synthetic Urine and Method of Making the Same" by Haddad, teaches a synthetic urine and a method for manufacturing that synthetic urine. [2]  The synthetic urine in Haddad has a specific gravity between about 1.00 and 1.035 g/cm³, a pH between about 4-10, creatinine, urea, water, an optional buffer, and other ions typically found in human urine. [3] The synthetic urine of Haddad also teaches the use of a suitable preservative in the synthetic urine. [4]

15.    United States Patent No. 5,651,778, filed May 19, 1995, entitled, "Formed Incontinence Article and Method of Manufacture" by Melius et al., teaches a synthetic urine composition comprising various compounds including urea, water, sodium chloride, and Germall 115 preservative. [5]

16.    United States Patent No. 6,716,632, filed August 2, 1999, entitled, "System for Stabilizing Samples" by Dorn, teaches a composition for preserving and transporting bodily fluids such as urine samples. [6] Because urine is sometimes transported before urinalysis, a means

---

[1] U.S. Patent Application Publication No. 2004/0077106, paragraph [0001]
[2] U.S. Patent Application Publication No. 2004/0077106, paragraph [0001]
[3] U.S. Patent Application Publication No. 2004/0077106, paragraph [0016]
[4] U.S. Patent Application Publication No. 2004/0077106, paragraph [0020]
[5] The '778 Patent, 6: 12-28
[6] The '632 patent, 2:32-48

of preserving the urine sample and preventing bacterial growth was needed.[7] The '632 Patent proceeds to discuss the various deficiencies associated with the use of commercial preservatives.[8] The '623 Patent includes a system for preserving the sample that may develop sepsis, through the use of biguanide and other antimicrobial agents with the composition being cidal to microorganisms.[9]

17.    Urine is an aqueous solution because it contains water.  The synthetic urine of the '776 Patent includes "three basic components: water with a pH between 3 and 10, creatinine; and some means for controlling or eliminating the unwanted sepsis of the creatinine."[10]  Biocides are commonly used to prevent sepsis in the treatment of water and a book by Colin Frayne entitled *Cooling Water Treatment- Principles and Practice*, which was published in 1999, outlines a list of potential biocides that may be used to prevent sepsis in the treatment of aqueous solutions.[11] Frayne also converted this list into a spring of 2001 article for professionals to use to receive continuing education credits.[12] The article is excerpted from Chapter 6 of Frayne's book.[13]

## VII.    THE '776 PATENT

---

[7] The '632 patent, 2:32-48
[8] The '632 Patent, 2:49-3:16
[9] The '632 Patent, 4:25-5:31
[10] The '776 Patent, 3:24-29
[11] Frayne, Colin. *Cooling Water Treatment- Principles and Practice.* 1999, Chemical Publishing Company, New York, New York. Pp. 213-224
[12] Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. pp. 2-10
[13] Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. p. 11.

18.     The '776 Patent discloses a synthetic urine solution and its method of manufacture.[14]  Specifically, the '776 Patent includes a solution including water having a pH between 3-10; creatinine; a specific gravity from 1.005 g/cm³ to 1.025 g/cm³; and a means of controlling or eliminating sepsis.[15] The '776 states that the object of the invention is to provide a synthetic urine and its method for manufacture, which is capable of retaining viability and utility for extended periods of time through the prevention of sepsis.[16]

19.     I understand that Defendants allege that Plaintiff infringes Claims 1-4 of the '776 Patent.

Claim 1 states:

1. A synthetic urine solution comprising:

water having a pH between 3 and 10;

creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis;

at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm$^3$ and 1.025 g/cm$^3$; and

wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride,

---

[14] The '776 Patent, Abstract
[15] The '776 Patent, Abstract
[16] The '766 Patent, 2:48-51

sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

Claim 2 states:

2. The synthetic urine solution of claim 1, further including urea dissolved within said solution.

Claim 3 states:

3. The synthetic urine solution of claim 1, wherein said at least one ionic compound is selected from the group consisting of carbonate salts, halide salts, hydroxide salts and bromides.

Claim 4 states:

4. The synthetic urine solution of claim 3, further including urea dissolved within said solution.

## VIII.  LEGAL STANDARD

20.     I understand that an affirmative defense to patent infringement is patent invalidity and that an issued patent enjoys a presumption of validity.

21.     I understand that not all innovations are patentable.  I understand that a patent claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in

the field at the time the claimed invention was made.[17]  I understand that this means that even if all of the requirements of the claim cannot be found in a single prior art reference, subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.[18]

22.     I understand that the ultimate conclusion of whether a claim is obvious is based upon the determination of at least four underlying factual issues: (1) the level of ordinary skill in the prior art; (2) the scope and content of the prior art; (3) differences between the prior art and the claims at issue; and (4) evaluation of any relevant secondary considerations, including for example, commercial success of a product due to the merits of the claimed invention, a long felt need for the solution provided by the claimed invention, etc.[19]

23.     In addition, I understand that when applying for a patent, each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the United States Patent and Trademark Office.[20] I understand that the duty of candor and good faith includes a duty to disclose all information known to be material to patentability and that there is a fraud committed on the United States Patent and Trademark Office if the duty of disclosure is violated through bad faith or intentional misconduct.[21]

24.     I understand that finding of fraud or violation of the duty of disclosure with respect to any claim in an application or patent renders the claims invalid. [22]

---

[17] KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398 (2007)
[18] KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398 (2007)
[19] KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398 (2007)
[20] 37 C.F.R. 1.56   Duty to disclose information material to patentability
[21] 37 C.F.R. 1.56   Duty to disclose information material to patentability
[22] 37 C.F.R. 1.56   Duty to disclose information material to patentability

25.     I understand that information is material to patentability when it is not cumulative to information already disclosed or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or (2) refutes, or is inconsistent with, a position the applicant takes in opposing an argument of unpatentability relied on by the Office, or asserting an argument of patentability.[23]

## IX.     PERSON OF ORDINARY SKILL IN THE ART

26.     In preparation for this expert report, I was asked to consider who the person of ordinary skill in the art at the time the invention was made would be.  I understand that the person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention.[24]  Factors that may be considered in determining the level of ordinary skill in the art may include type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.[25]

27.     The field of the invention of the '776 Patent is a synthetic urine solution and method of its manufacture.[26]  Synthetic urine is an aqueous solution containing water. The synthetic urine of the '776 Patent includes "three basic components: water with a pH between 3

---

[23] 37 C.F.R. 1.56   Duty to disclose information material to patentability
[24] *In re GPAC,* 57 F.3d 1573, 1579, 35 USPQ2d 1116, 1121 (Fed. Cir. 1995).
[25] *In re GPAC,* 57 F.3d 1573, 1579, 35 USPQ2d 1116, 1121 (Fed. Cir. 1995).
[26] The '776 Patent, Abstract

and 10, creatinine; and some means for controlling or eliminating the unwanted sepsis of the creatinine."[27]

28.    In my opinion, a person of ordinary skill in the art at the time the invention was made would be a person having familiarity with preventing sepsis in aqueous solutions.

## X.    CLAIM CONSTRUCTION

29.    I understand that on August 13, 2014, the parties appeared before the Court for a Markman Hearing.[28]  I understand that a Markman Hearing is a pre-trial hearing during which a judge examines evidence from both parties in order to assign meaning of relevant words used in a patent claim.  I understand that the parties asked the court to construe two terms found in Claim 1 of the '776 Patent: 1) "a biocide" and 2) "carbamates." [29]

Claim 1 of the asserted '776 Patent reads:

1. A synthetic urine solution comprising:

water having a pH between 3 and 10;

creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis;

at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm$^3$ and 1.025 g/cm$^3$; and

---

[27] The '776 Patent, 3:24-29
[28] Claim Construction Order, p. 4
[29] Claim Construction Order, p. 5

wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

30.     I understand that on August 21, 2014, the Court issued an opinion and order resolving the contested phrases and terms "a biocide" and "carbamates." [30]  A table containing the claims as construed by the court is presented below: [31]

| CLAIM TERM | CONSTRUCTION OF CLAIM TERM |
|---|---|
| "a biocide" | "one or more biocides" |
| "carbamates" | "organic compounds derived from carbamic acid" |

## XI.     OPINIONS AND REASONS THEREFORE

### A. Invalidity Based on Obviousness

31.     Based on my understanding of the legal standards set forth in section VII for invalidity based on obviousness, Claims 1-4 of the '776 Patent are invalid because the differences between the subject matter sought to be patented and the prior art are such that the

---

[30] Claim Construction Order, p. 1
[31] Claim Construction Order, p. 10

subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

32.     Specifically, Claim 1 of the '776 Patent is obvious in light of the combination of Haddad, Melius et al., Dorn, and the book, *Cooling Water Treatment- Principles and Practice,* by Colin Frayne and a corresponding article, "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems", also by Colin Frayne. The patents, book, and article were available prior to the filing date of the '776 Patent and thus qualify as prior art. Haddad, Melius et al. and Dorn were cited by the examiner during the prosecution process.[32]

33.     I have reviewed Claim 1 in light of the prior art mentioned above and the following is my analysis.

### i. "water having a pH between 3 and 10"

34.     Haddad teaches synthetic urine having a pH between 4-10.[33] Haddad teaches the adjustment of the pH of synthetic urine using buffers.[34] It would have been obvious to one of ordinary skill in the art to adjust the pH of a synthetic urine to mimic the pH of human urine as Haddad taught.[35]

### ii. "creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis"

---

[32] The '776 patent, References cited.
[33] U.S. Patent Application Publication No. 2004/0077106, paragraph [0016].
[34] U.S. Patent Application Publication No. 2004/0077106, paragraph [0024].
[35] U.S. Patent Application Publication No. 2004/0077106, paragraph [0024].

35.     Haddad teaches a synthetic urine comprising creatinine.[36] In addition, while Haddad does not specifically teach a biocide and instead teaches a preservative, Dorn teaches the preservation of urine samples using a formulation that includes biguanide,[37] which is one of the listed biocides in the '776 Patent specifications and originally included in Claim 1, but was removed from the Claim 1 during prosecution of the '776 Patent.[38] It would have been obvious to one skilled in the art to include a biocide to prevent sepsis in a synthetic urine when biocides are used to preserve and prevent sepsis in human urine that the synthetic urine is attempting to mimic.

In addition, because synthetic urines are aqueous solutions, it would have been obvious to one skilled in the art to prevent sepsis in a synthetic urine by using biocides typically used in water treatment. Aqueous solutions are solutions containing water. The book, *Cooling Water Treatment- Principles and Practice* by Colin Frayne, specifically lists biocides used in water treatment, including all the biocides listed in the specification and Claim 1.[39]

**iii. "at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 g/cm$^3$ and 1.025 g/cm$^3$"**

---

[36] U.S. Patent Application Publication No. 2004/0077106, paragraph [0016].
[37] The '632 Patent, 2:25-30
[38] Applicant Arguments/Remarks Made in an Amendment, August 18, 2006
[39] Frayne, Colin. *Cooling Water Treatment: Principles and Practice.* 1999, Chemical Publishing Company, New York, New York. Pp. 213-224.

36.     Haddad and Melius et al. disclose at least one dissociated ionic compound, specifically sodium chloride.[40]

**iv. "wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides."**

37.     Both Frayne's book, *Cooling Water Treatment- Principles and Practice*, and Frayne's corresponding article, "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems", list all the biocides listed in this element of Claim 1.[41] I believe it would have been obvious for one skilled in the art to access Frayne's book and article to find a means of preventing sepsis in synthetic urine because it is an aqueous solution. Because there were sepsis issues in the prior art and solved by prior patents, it would have been obvious to a person of ordinary skill in the art to use a biocide to prolong shelf life.[42]

---

[40] U.S. Patent Application Publication No. 2004/0077106, paragraph [0015-17] ; The '778 Patent, 6: 12-28.
[41] Frayne, Colin. *Cooling Water Treatment: Principles and Practice.* 1999, Chemical Publishing Company, New York, New York. Pp. 213-224; Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. pp. 1-10
[42] The '776 Patent, 2:34-39

38.     Therefore, I believe Claims 1-4 of the '776 Patent are invalid because the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  It would have been obvious for a person of ordinary skill in the art to create a synthetic urine solution including water having a pH between 3-10; creatinine; a dissociated ionic compound; a specific gravity from 1.005 g/cm³ to 1.025 g/cm³; and a means of controlling or eliminating sepsis.[43]

**B.      Invalidity based on failure to disclose material information**

39.     Based on my understanding of the legal standards set forth in section VII for invalidity based on a fraud of the United States Patent and Trademark Offices by willfully failing to disclose a source of material information, Claims 1-4 of the '776 Patent are invalid because the '776 Patent plagiarizes Frayne's article and yet, was not disclosed by those involved in the '776 Patent.[44]

40.     The '776 Patent states:

> "Specific examples of various biocides contemplated above include: BHAP (such as 2-Bromo-4-hydroxyacetophenone, an organo-bromine group); Bronopol (such as 2-Bromo-2-nitropropane-1,3 diol, an organo-bromine group); Carbamates (such as a mix of sodium dimethyldithiocarbamate (DIBAM) and disodium ethylene bisdithiocarbamate (NIBAM), or single product, such as potassium n-hydroxymethyl-n-methyldithiocarbamate, an organo-sulfur group); Chlorothioether (such as 2,2 Dihydroxy-5,5-dichlorodiphenyl monosulfide, a chlorinated phenolic thioether); DBNPA (such as 2-2-Dibromo-3-nitrilopropionamide, an organo-bromine group); DTEA, DTEA II (such as 2-(Decylthio)ethanamine, an alkylthioamine group); Guanides

---

[43] The '776 Patent, 2:34-39
[44] The '776 Patent, References Cited and Persecution History

(including Guanidine and Biguanides) (such as dodecylguanidine hydrochloride and acetate, also polyhexamethylene biguanide hydrochloride, and tetradecylguanidine, all aliphatic guanadines); Glutaraldehyde (such as Pentane-1,5-dial., an aldehyde group); Isothiazolines (such as Alkyl isothiazolin-3-ones, an organo-sulfur group); MBT (such as Methylene bis(thiocyanate), an organo-sulfur group); Polyquat (such as broad-spectrum, cationic polymers of low molecular weight); Quats (ADBACs) (such as Alkyldimethylbenzylammonium chloride (also known as alkylbenzyldimethyl ammonium chloride or benzalkonium chloride), a quaternary ammonium compound group); Sulfone (such as Bis(trichloromethyl)sulfone, an organo-sulfur group); TBTO (such as Bis(tributyltin)oxide, an organo-tin group); TBZ (Tertbuthylazine) (such as 2-(tert-butylamino)-4-chloro-6-(ethylamino)-s-triazine, a Triazine group); TCCBN (such as Tetrachloro-2,4,6-cyano-3-benzonitrile, TCCBN functions similarly to the chlorophenols); TCMTB (such as 2(thiocyanomethylthio)benzothiazole); Thione (such as Tetrahydro-3,5,dimethyl-2H-1,3,5-thiadiazine-2-thione, an organo-sulfur group); THPS (TKHPS) (such as Tetrakis(hydroxymethyl)phosphonium sulfate, an alkyl phosphonium group); and TTPC (such as Tributyltetradecylphosphonium chloride, an alkylphosphonium group)." [45]

This excerpt from the '776 Patent is almost verbatim the first two sentences of every biocide listed in the article by Colin Frayne and in the same particular order. [46]

41.    In addition, the article itself states that "[t]his article was excerpted from Chapter 6 of Colin Frayne's book 'Cooling Water Treatment - Principles and Practices.' Some of the nonoxidizing biocides discussed in Chapter 6 have not been included in this article due to space limitation. Mr. Frayne's book may be purchased in its entirety from the AWT bookstore." [47]  At

---

[45] The '776 Patent, 5:1-49.

[46] Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. pp. 1-10.

[47] Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. p. 11.

some point during the translation of chapter 6 from the book to the article there were some errors in nomenclature. Specifically, Frayne's article has three distinct typographical errors in nomenclature that do not appear in the book. All three errors from the article occur in the '776 patent.

42.     First, Frayne's books lists the correct spelling of Tetrakis(hydroxymethyl)phosphonium sulfate.[48] However, in Frayne's article, the spelling was incorrect and read "Tetrakis(hydroxymethyl)phosphonium sulfate."[49] (Error underlined.) The same mistake occurs in the '776 patent.[50]

43.     Second, Frayne's book lists the correct abbreviation for disodium ethylene bisdithiocarbamate (NABAM).[51] However, in Frayne's article, the abbreviation for disodium ethylene bisdithiocarbamate is incorrectly written as "NIBAM".[52] (Error underlined.) The same mistake occurs in the '776 Patent.[53] In fact, when I attempted to find another reference that has the same mistake, I was unable to do so. Specifically, when I used "bisdithiocarbamate (NIBAM)" to search for a reference in the Google Search Engine, the only two results with that misspelling were the '776 patent and Frayne's article (as well as references to the article). A print out of the Google search results is attached as Exhibit C.

---

[48] Frayne, Colin. *Cooling Water Treatment: Principles and Practice.* 1999, Chemical Publishing Company, New York, New York. p. 222.
[49] Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. p. 9.
[50] The '776 patent, 5:36.
[51] Frayne, Colin. *Cooling Water Treatment: Principles and Practice.* 1999, Chemical Publishing Company, New York, New York. p. 215.
[52] Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. p. 4.
[53] The '776 Patent, 5:7.

44.     Lastly and most significantly, Frayne's book lists the correct spelling of aliphatic guanidines. [54]  However, in Frayne's article, the spelling was incorrect and read, "aliphatic guan<u>a</u>dines." [55]  (Error underlined.) The same mistake occurs in the '776 patent. [56]  In fact, when I attempted to find another reference that has the same mistake, I was unable to do so. Specifically, when I used "aliphatic guanadines" to search for a reference in the Google Search Engine, the only two results with that misspelling were the '776 patent and Frayne's article. A print out of the Google search results is attached as Exhibit D.

45.     Due to the glaring similarities of the listed biocides to the list of biocides in Frayne's article and the uncanny misspellings represented in both the article and the '776 Patent, I believe the author of the '776 Patent application plagiarized the list of biocides from Frayne's book.  I could not find any evidence to support that the list of biocides in the '776 Patent was independently produced.

46.     Based on my understanding of the legal standards set forth in section VII for invalidity based on a fraud of the United States Patent and Trademark Offices, willfully failing to disclose a source of material information renders Claims 1-4 of the '776 Patent invalid because the '776 Patent plagiarizes Frayne's article and yet, Frayne's article was not disclosed to the

---

[54] Frayne, Colin. *Cooling Water Treatment: Principles and Practice.* 1999, Chemical Publishing Company, New York, New York. p.  217.
[55] Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001. p. 5.
[56] The '776 patent, 5:18.

Expert Report of Dale Chatfield

patent examiner by those involved in the preparation or prosecution of the patent application that ultimately issued as the '776 Patent.

Respectfully Submitted,

Dale Chatfield, Ph.D.

Professor Emeritus at San Diego State University

# EXHIBIT  A

BIOGRAPHICAL SKETCH

| NAME | POSITION TITLE |
|------|----------------|
| Chatfield, Dale, Alton | Professor Emeritus |
| | San Diego State University |

| INSTITUTION AND LOCATION | DEGREE *(if applicable)* | YEAR (s) | FIELD OF STUDY |
|--------------------------|--------------------------|----------|----------------|
| Oakland University, Rochester, MI. | B.S. | 1968 | Chemistry |
| Oakland University, Rochester, MI. | M.S. | 1968 | Chemistry |
| University of North Carolina, Chapel Hill, NC. | Ph.D. | 1975 | Analytical Chemistry |

| | |
|---|---|
| 1968-70 | Chemist, General Motors Corporation, Pontiac Motor Div., Pontiac, MI. |
| 1974-77 | Postdoctoral Fellow, Chemistry Department and Materials Science & Engineering Department, University of Utah, Salt Lake City, UT. |
| 1977 | High Country Tech, North Cascades National Park, Marblemount, WA. |
| 1977-78 | Assistant Research Professor, Materials Science and Engineering Department, University of Utah, Salt Lake City, UT. |
| 1981 | Inhalation Toxicology Research Institute (ITRI), Visiting Faculty Member, Albuquerque, NM. |
| 1981 | Jet Propulsion Laboratory (JPL), Pasadena, CA. Visiting Faculty Member. |
| 1978-83 | Assistant Professor of Chemistry, San Diego State University, San Diego, CA. |
| 1983-pres | Associate Professor of Chemistry, San Diego State University, San Diego, CA. |
| 1990-1993 | Senior Scientist and President, PCR Technologies, San Diego, CA. |
| 1998-2003 | Chair, Department of Chemistry, San Diego State University, San Diego, CA. |
| 2012 | Professor Emeritus, teaching part-time and performing research |

Honors

Fellow, American Chemical Society, Division of Analytical Chemistry, sponsored by the Society for Analytical Chemists of Pittsburgh (1972); Graduate Research Fellowship, University of North Carolina (1973); Faculty Fellow, U.S. Dept. of Energy (1979, 1980); Outstanding Faculty Award, San Diego State University (1980); Outstanding Faculty Contribution to the University, Alumni and Associates, San Diego State University (1981); Faculty Fellow, National Aeronautics and Space Administration (1981). Outstanding Faculty Award, SDSU, 2005.

## A. Publications

Identification of Sphingolipid Metabolites That Induce Obesity via Misregulation of Appetite, Caloric Intake and Fat Storage in *Drosophila*, Stanley M. Walls Jr, Steve J. Attle, Gregory B. Brulte, Marlena L. Walls, Kim D. Finley, Dale A. Chatfield, Deron R. Herr, Greg L. Harris, Published: December 05, 2013, DOI: 10.1371/journal.pgen.100397

Hoh, Eunha; Hunt, Richard; Quintana, Penelope; Zakarian, Joy; Chatfield, Dale; Wittry, Beth; Rodriguez, Edgar; Matt, Georg, Environmental Tobacco Smoke as a Source of Polycyclic Aromatic Hydrocarbons in Settled Household Dust, Environmental Science & Technology, 46 (April 3, 2012), pp. 4174 – 4183 DOI: 10.1021/es300267g.

Schmitz KE, Hovell MF, Wong CA, Kelley NJ, Nilsen D, Blumberg EJ, Hill LL, Sipan CL, Kolody B,  Chatfield DA. The reliability and practicality of the Arkansas Method assay of Isoniazid adherence. _Clin Nurs Res._ 2010 May:19:131-143.

Matt, G.E., Romero, R., Ma, D.S., Quintana, P.J.E., Hovell, M.F., Salem, S., Aguilar, M., Boland, J., Cullimore, J., Crane, M., Junker, J., Tassinario, P., Timmermann, V., Wong, K., & Chatfield, D. Tobacco use and asking prices of used cars:  prevalence, costs, and new opportunities for changing smoking behavior.  Tobacco Induced Diseases. 4:2(31Jul2008).

Georg E. Matt, P J E Quintana, Melbourne F. Hovell, Dale Chatfield, Debbie Ma, Romina Romero, Anna Uribe, MS #1734, "Residual Tobacco Smoke Pollution in Used Cars for Sale: Air, Dust, and Surfaces," in Nicotine & Tobacco Research.(submitted 10-3-07)

A F. Hofmann, V. Loening-Baucke, J. E. Lavine, L. R. Hagey, J. H. Steinbach, C. A. Packard, T. L. Griffin, and D. A. Chatfield, Altered bile acid metabolism in childhood functional constipation:  inactivation of secretory bile acids by sulfation in a subset of patients, J. Pediatric Gastroenterol. Nutrition, J Pediatr Gastroenterol Nutr 2008:47:598-606.

Hamilton JP, Xie G, Raufman JP, Hogan S, Griffin TL, Packard CA, Chatfield DA, Hagey LR, Steinbach JH, Hofmann AF.. Bile acids of human cecal contents: concentration and spectrum, Am J Physiol Gastrointest Liver Physiol. 2007 Jul;293(1):G256-63. Epub 2007 Apr 5.

Chatfield, D. A., Fourier Transform Time of Flight Mass Spectrometry, in Advances in Time of Flight Mass Spectrometry, R. J. Cotter, ed., 1992.

Chatfield, D. A., Improved Resolution in Fourier Transform Time of Flight Mass Spectrometry ", Invited Paper, Fall Workshop on Time of Flight Mass Analysis, Amer. Soc. Mass Spectrom., November, 1986.

Chatfield, D.A., and Ajami, M., improved detection limits for a time of flight mass spectrometer with a surface ionization source, Int. J. Mass Spectrom., Ion Processes, 77, 241, 1987.

Knorr, F.J., Ajami, M. and Chatfield, D. A., Fourier transform time-of-flight mass spectrometry, Anal. Chem., 54, 690, 1986.

Chatfield, D.A., the pyrolysis and nonflaming oxidative degradation of poly-(vinylfluoride), J. Polym. Sci., 21, 1681, 1983.

Chatfield, D.A., Einhorn, I.N., and Mickelson, R.W., Analysis of the Products of Thermal Decomposition of an Aromatic Polyamide Fabric, J. Polym. Sci., 17, 1367, 1979.

Chatfield, D.A., Einhorn, I.N., and Mickelson, R.W., Thermal decomposition products of a chlorinated aromatic polyimide, J. Polym. Sci., 17, 1353, 1979.

Mumford, N.A., Chatfield, D.A., and Einhorn, I.N., The analysis of rigid polyurethanes by chemical ionization mass spectrometry, J. Appl. Polym. Chem., 23, 2099, 1979.

Chatfield, D.A., and Einhorn I.N., Stepwise thermal degradation of a polybenzimidazole foam, J. Poly. Sci., 19, 601, 1981.

Mumford, N. A., Chatfield, D.A., and Einhorn, I.N., Component analysis of rigid urethane foams, Fire Research, 2, 107, 1978.

Einhorn, I.N., Chatfield, D.A., Voorhees, K.J., Hileman, F.D., Mickelson, R.W., Israel, S.C., Futrell, J.H., and Ryan, P.W., A strategy for analysis of thermal decomposition of polymeric materials, Fire Research, 1, 41, 1977.

Brimfield, A.A., Street, J.C., Futrell, J.H, and Chatfield, D.A., Identification of products arising from the metabolism of cis and trans-chlordane in rat liver microsomes in vitro: outline of possible metabolic pathway, Pest. Biochem. and Physiol., 9, 84, 1978.

Chatfield, D.A., Hileman, F.D., Voorhees, K.J., Einhorn, I.N., and Futrell, J.H., Characterization of polymer decomposition by electron impact and chemical ionization mass spectrometry, in Application of Polymer Spectroscopy, E.G. Brame, Jr., Ed., Academic Press, Chapter 15, 1978.

Chatfield, D.A., Voorhees, K.J., Hileman, F.D., Futrell, J.H.,and Einhorn, I.N., Production and analysis of thermal  decomposition products from polymeric materials, in Experimental Diagnostics in Combustion of Solids,M.  Summerfield, Ed., Amer. Inst. Aeronautics and Astronautics, Vol. 63, Chapter 1, 1978.

Pitt, C.G., Bursey, M.M., and Chatfield, D.A., The relative gas-phase proton affinities and polarizabilities of alkyl and silyl ethers, J. Chem. Soc., Perkin Transactions II, 434, 1976.

Chatfield, D.A., and Bursey, M. M., Rates of gaseous ionic acetylation of some alkylbezenes by acetyl cations formed from acetone and 2,3-butanedione, J. Chem. Soc., Faraday Trans. I, 72, 417, 1976.

Chatfield, D.A., and Bursey, M. M., The acetylation of aromatic compounds containing nitrogen substituents using gaseious ions derived from acetone and 2,3-butanedione, J. Amer. Chem. Soc., 20, 101, 1976.

Chatfield, D.A., and. Bursey, M. M.,  gaseous ionic acetylation of some substituted anisoles. evidence for an intermediate pi-complex, J. Amer. Chem. Soc., 98, 6492, 1976.

Chatfield, D.A., and Bursey, M. M, The acetylation of some mono-substituted oxygen- and halogen-containing aromatic  compounds by gaseous ions derived from acetone and 2,3-butanedione, Int. J. Mass Spectrom. Ion Phys., 18, 239, 1975.

Pitt, C.G., Bursey, M. M., Chatfield, D.A., and Greenberg, R.S., Some gas phase reactions of silicenium ions derived from syn-tetramethyldisiloxane, Inorg. Chem., 90, 269, 1975.

Chatfield, D.A., and Bursey, M.M., Gaseous ionic acetylation of cresols.  J. Amer. Chem. Soc., 97, 3600, 1975.

## C. Research Support (2001-present)

NIH HL103684-01 Hovell (PI), $5.3M , 8/11-4/16, Innovation for Smoke-Free Homes: Real-Time Feedback.Study will investigate innovative methods to monitor smoking activity with inexpensive real-time monitoring. Role: Co-Investigator

21RT-0142, Matt (PI) 07/01/12–06/30/15, Certifying Smoke-Free Used Cars: Effects on Value and Consumer Behavior, This study establishes a program to certify used as smoke-free and investigate the impact on consumer behavior and the value of used cars. Role: Co-Investigator

19CA-0164 TRDRP, Matt (PI), 06/01/10–05/31/13, Thirdhand Smoke Pollution and Exposure in Ex-Smokers' Homes, This study will investigate the presence, distribution, and time course of thirdhand smoke pollutants in ex-smokers' homes and the exposure to these pollutants among nonsmokers living in these homes. Role: Co-Investigator

RSG-09-098-01-CNE Kassem (PI) ,$200K/yr, 1/9- 12/13, Hookah Tobacco Use: Carcinogenic Metabolites. Monitoring Hooka smokers levels of nicotine and nicotine metabolites, Role: co-Investigator

CRDRP ,Matt/Quintana (PI), 01/09- 01/11, Smoking Policies and Secondhand Smoke in Hotels. Study will (1) document existing smoking policies of local hotels (2) examine how these policies are implemented and enforced, (3) investigate whether hotels are contaminated with significant SHS, and (4) determine whether existing smoking policies reduce the level of contamination. Role: co-Investigator

15RT-0160 TRDRP Matt/Quintana (PI) 07/01/06-06/30/09, Smoking Policies and Secondhand Smoke in Rental Cars. The proposed study will (1) document existing smoking policies of national and local car rental companies, (2) examine how these policies are implemented and enforced, (3) investigate whether rental cars are contaminated with SHS, and (4) determine whether existing smoking policies reduce the level of contamination. Role: co-Investigator

52364 FAMRI YCSA Kassem (PI) 07/01/06 – 06/30/09, Hookah Use and Second Hand Smoke
The purpose of this proposal is to investigate the prevalence and determinants of hookah tobacco use, and secondhand hookah tobacco smoke exposure among college students frequenting hookah lounges. Role: co-Investigator

13RT- 0161 TRDRP  Matt (PI), 07/01/04–06/30/07 *Exposing Children to Secondhand Smoke through Contaminated Homes (Healthy Homes 2,* This study examines (1) the ETS contamination of homes currently occupied by smokers and nonsmokers, (2) the extent to which young children are exposed to ETS at home from contaminated air, dust, and surfaces, (3) the ETS contamination of homes after nonsmokers move into smoker homes, and (4) whether nonsmokers moving into smoker homes are exposed to secondhand smoke through contaminated home environments. Role: co-Investigator

R01 HL066307 NIH/NHLBI  Hovell (PI), 02/01/03–01/31/08, *ETS Reduction in High-risk Preteens: A Controlled Trial (Project SIROCCO),* To determine whether counseling plus cotinine feedback and incentives reduces ETS exposure more than counseling and cotinine feedback (without incentives) and whether these two conditions reduce ETS exposure more than usual tobacco control education. Role: co-Investigator

U.S. Navy Subcontract, U.S. Naval Medical Center   Carney (PI) 01/07-01/08, Antibiotic Bone Study Collaboration, This is a study of the leachability of nine anitibiotics from implantation materials used in bone reconstruction. Components of the antibiotics, antibiotic breakdown products, and components of the polymethylmethacrylate monomer and impurities will be determined in saline solutions. Role: co-PI

#15RT-0160 (Matt/Quintana), 07/01/06-06/30/09,TRDRP, *Smoking Policies and Secondhand Smoke in Rental Cars.* The proposed study will (1) document existing smoking policies of national and local car rental companies, (2) examine how these policies are implemented and enforced, (3) investigate whether rental cars are contaminated with SHS, and (4) determine whether existing smoking policies reduce the level of contamination.

#52364 (Kassem), 07/01/06 – 06/30/09, FAMRI YCSA , Hookah Use and Second Hand Smoke
The purpose of this proposal is to investigate the prevalence and determinants of hookah tobacco use, and secondhand hookah tobacco smoke exposure among college students frequenting hookah lounges. Role: co-PI

13RT- 0161 (Matt), 07/01/04–06/30/07, TRDRP, Exposing Children to Secondhand Smoke through Contaminated Homes (Healthy Homes 2), This study examines (1) the ETS contamination of homes currently occupied by smokers and nonsmokers, (2) the extent to which young children are exposed to ETS at home from contaminated air, dust, and surfaces, (3) the ETS contamination of homes after nonsmokers move into smoker homes, and (4) whether nonsmokers moving into smoker homes are exposed to secondhand smoke through contaminated home environments. Role: Co-Investigator

R03 DK064891-01A1 (Hofmann), 8/15/04 – 7/31/06, NIH, Defective bile acid synthesis in childhood constipation, Role: Co-investigator

0116758 (Chatfield), 07/01/00 – 06/30/04, National Science Foundation, Acquisition of a Liquid Chromatograph-Mass Spectrometer System for Chemistry and Biology, Purchase of a Liquid Chromatograph-Mass Spectrometer for chemical analysis, Role: Principal Investigator

SDSUF 900302  (Chatfield), 01/01/02 – 01/01/03, CSUPERB, Upgrading a MALDI Mass Spectrometer for Teaching and Research, Uploading of a mass spectrometer for research investigations, Role: Principal Investigator

C02427 (Chatfield), 01/01/01 – 01/01/03, Agilent Technologies, The Science Associated Program, High-tech mentoring of high school students for scientific discovery in the laboratory, Role: PI.

# EXHIBIT  B

## Court Documents

1. Declaration of Shri Thanedar, Ph.D., MBA, in Support of Spectrum Laboratories, LLC's Motion for Summary Judgment of Direct Infringement by Dr. Greens, Inc.
2. Supplemental Declaration of Shri Thanedar, Ph.D., MBA, in Support of Spectrum Laboratories, LLC's Motion for Summary Judgment of Direct Infringement by Dr. Greens, Inc.
3. Declaration of Shri Thanedar, Ph.D., MBA, in Support of Spectrum Laboratories, LLC's Renewed Motion for Summary Judgment of Direct Infringement by Dr. Greens, Inc.
4. Claim Construction Order.
5. Declaration of Dale Chatfield, Ph.D., in Support of Supplemental Opposition to Spectrum Laboratories, LLC's Renewed Motion for Summary Judgment.
6. Spectrum Laboratories, LLC's Memorandum of Points and Authorities in Support of Renewed Motion for Summary Judgment of Direct Infringement By Dr. Greens, Inc.
7. Declaration of Kusala in Support of Spectrum Laboratories, LLC's Renewed Motion for Summary Judgment.

## Patents/Patent Applications/Prosecution History

8. Stephens, James Matthew. Synthetic Urine and Method of Manufacturing Same. US Patent No. 7,192,776.
9. Haddad, Laith. Synthetic Urine and Method of Making Same. Pub. No. US 2004/0077106
10. Melius, Mark Kevin; Sherrod, Earle Harry; LeMahieu, Lynn Kirkpatrick. Formed Incontinence Article and Method of Manufacture. US Patent No. 5,651,778.
11. Dorn, Gordon L. System for Stabilizing Samples. US Patent No. 6,716,632.
12. Ranade et al. Synthesis of Methyl Carbamate and Dimethyl Carbonate (DCM) in the Presence of Stripping with Inert Gas or Superheated Vapours and a Reactor for the Same. WO2014/072803 A1.
13. Cho et al. Process for preparing Dialkyl Carbonates. US Patent No. 5,534,649.
14. Applicant ArgumentsRemarks Made in an Amendment. August 18, 2006. Image File Wrapper.

## Other Sources

15. Berrada, H.; Font, G.; Moltó, J.C. Influence of the Solvent on the Gas Chromatographic Behaviour of Urea Herbicides. *Chromatographia.*
16. Sun, Jianjun; Yang, Bolun; Lin, Hongye. A Semicontinuous Process for the Synthesis of Methyl Carbamate from Urea and Methanol. *Chemical Engineering and Technology.*
17. Eiceman, G.A.; Leasure, C.S. Quantitative Investigation of Rapid Injector Port Derivatization of Amphetamine Using TriFluoroacetic Anhydride with Packed Capillary Column GC and GC/MS Methods. *Journal of Chromatographic Science.*

18. Docherty, Kennth S.; Ziemann, Paul J. On-line, inlet-based derivatization for Gas Chromatography of mono- and dicarboxylic acids. *Journal of Chromatography A.*

19. Shin, Ho-Sang; Yang, Eun-Young. The Simultaneous Determination of Methylcarbamate and Ethylcarbamate in Fermented Foods and Beverages by Derivatization and GC-MS Analysis. *Chemistry Central Journal.*

20. Tamiri, Tsippy; Zitrin, Shmuel. Gas Chromotography Mass Spectometry of Some Thermally Labile Urea Pesticides. *Biomedical and Environmental Mass Spectrometry.*

21. Frayne, Colin. *Cooling Water Treatment- Principles and Practice.* 1999, Chemical Publishing Company, New York, New York.

22. Frayne, Colin. "The Selection and Application of Nonoxidizing Biocides for Cooling Water Systems". Spring 2001.

23. 37 C.F.R. 1.56   Duty to disclose information material to patentability

24. Deposition of Shri Thanedar

# EXHIBIT C

Google

"bisdithiocarbamate (NIBAM)"

Sign in

Web    Maps    Shopping    Images    Videos    More ▾    Search tools

5 results (0.19 seconds)

**Patent US20050164395 - Synthetic urine and method of ...**
www.google.com.ar/patents/US20050164395 ▾ Google
Jul 28, 2005 - ... a mix of sodium dimethyldithiocarbamate (DIBAM) and disodium
ethylene **bisdithiocarbamate (NIBAM)**, or single product, such as potassium ...

[PDF] **The Selection and Application of Nonoxidizing Biocides fo...**
https://www.awt.org/pub/015401ED-F59F-BB61-2DDD-B8D82CDF58A8 ▾
**bisdithiocarbamate (NIBAM)**, or single product, such as potassium n-hydroxymethyl-n-
methyldithiocarbamate. Organo-sulfur group. Often two carbamates are ...

**Patent US7192776 - mixture of water, creatinine, biocides ...**
www.google.com/patents/US7192776 ▾ Google
Mar 20, 2007 - ... a mix of sodium dimethyldithiocarbamate (DIBAM) and disodium
ethylene **bisdithiocarbamate (NIBAM)**, or single product, such as potassium ...

[PDF] **Optimal Tech News**
www.optimal.co.th/.../Water%20Treatment%20News... ▾ Translate this page
**bisdithiocarbamate (NIBAM)**, or single product. Organo-sulfur group. Often two
carbamates are blended together, typically in 15% DIBAM + 15% NABAM, or 4.5% ...

**ethylene diamine - ChemIndustry.com**
www.chemindustry.com/searches/E/ethylene_diamine.html/590/59/ ▾
... Spring Biocides Quiz.doc ... DIBAM) and disodium ethylene **bisdithiocarbamate**
**(NIBAM)**, or single product ... URL: http://www.awt.org/certification/quiz5.pdf ...

*In order to show you the most relevant results, we have omitted some
entries very similar to the 5 already displayed.*
*If you like, you can repeat the search with the omitted results included.*

○ San Diego, CA - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms

# EXHIBIT D

Google

"aliphatic guanadines"

Sign in

Web    Shopping    Images    News    Videos    More ▾    Search tools

2 results (0.14 seconds)

Patent US7192776 - mixture of water, creatinine, biocides ...
www.google.com/patents/US7192776 ▾ Google ⌄
Mar 20, 2007 - ... polyhexamethylene biguanide hydrochloride, and tetradecylguanidine,
all **aliphatic guanadines**); Glutaraldehyde (such as Pentane-1,5-dial., ...

[PDF] The Selection and Application of Nonoxidizing Biocides fo...
https://www.awt.org/pub/015401ED-F59F-BB61-2DDD-B8D82CDF58A8 ▾
The **aliphatic guanadines** are good, general-purpose algaecides, bactericides and
fungicides. These biocides are cationic surfactants with good dispersing ...

In order to show you the most relevant results, we have omitted some
entries very similar to the 2 already displayed.
If you like, you can repeat the search with the omitted results included.

○ San Diego, CA - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms