J. CHRISTOPHER JACZKO (CSB #149317)
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
12544 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone:   (619) 906-5748
Facsimile:   (619) 744-5418
chris.jaczko@procopio.com

DAVID B. CUPAR (admitted *Pro Hac Vice*)
MATTHEW J. CAVANAGH (admitted *Pro Hac Vice*)
McDONALD HOPKINS LLC
600 Superior Avenue East, Suite 2100
Cleveland, OH 44114
Telephone:   (216) 348-5730
Facsimile:   (216) 348-5474
dcupar@mcdonaldhopkins.com
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendant and Counterclaimant Spectrum Laboratories, LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DR. GREENS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SPECTRUM LABORATORIES, LLC, <br><br> Defendant. <br><br> AND RELATED CROSS-ACTION | Case No. 11cv0638 JAH (KSC) <br><br> **SPECTRUM LABORATORIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ENHANCED DAMAGES, ATTORNEYS' FEES, AND PREJUDGMENT INTEREST** <br><br> Date:        July 2, 2018 <br> Time:       2:30 p.m. <br> Courtroom: 13B (Annex) <br><br> Judge:      Hon. John A. Houston <br> Filed:       March 29, 2011 <br> Trial:        held February 13, 2018 |

The jury, after having heard all of the evidence at trial, found that both Matt Green and Dr. Greens, Inc. (collectively, "Greens") willfully infringed claim 1 of Spectrum's '776 patent. (Special Verdict Form, ECF #326.) Spectrum now seeks

enhanced damages of three times the jury's compensatory award, attorneys' fees, and prejudgment interest.

## I. Spectrum Is Entitled to Enhanced Damages to Compensate It for Greens' Willful Infringement

### A. Law on Enhanced Damages

Patent infringement is a tort. *3D Systems, Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998). The jury assesses compensatory damages. *See* 35 U.S.C. § 284. And the court, in its sole discretion, "may increase the damages up to three times the amount found or assessed." *Id.*

Typically, damages are enhanced upon a finding of willfulness. *See Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S.Ct. 1923, 1928 (2016) (enhanced damages are appropriate when defendant acts wantonly and not in good faith). A finding of willfulness is akin to a finding of an intentional tort warranting punitive damages. *See id.* ("vindictive or exemplary damages" may be awarded to "punish the defendant"). The key is Greens' subjective willfulness at the time the '776 patent issued in 2007—*i.e.*, the time the infringement began and Greens knew of the patent. *Id.* at 1933.

Factors to consider include: (1) whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or not infringed; (2) the infringer's behavior as a party to the litigation; (3) the infringer's size and financial condition; (4) closeness of the case; (5) duration of the infringer's misconduct; (6) remedial action by the infringer; (7) the infringer's motivation for harm; and (8) whether the infringer attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).[1]

---

[1] Spectrum does not address the copying factor because it is not relevant to the analysis. Spectrum stated the same to the jury during closing argument, and the jury nonetheless determined that

Because the jury has concluded that Greens acted willfully (Special Verdict Form (ECF #326)), and the *Read* factors weigh strongly in favor of awarding enhanced damages, enhanced damages are appropriate.

**B.     The relevant factors favor an award of enhanced damages here.**

   *1.     Greens' failure to investigate patent scope or form*
           <u>*a good-faith non-infringement belief favors enhanced damages*</u>

The recent *Apple v. Samsung* case is instructive to this factor. There, the Court found that defendant Samsung failed to adequately investigate the patent. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 258 F.Supp. 3d 1013, 1031 (N.D. Cal. 2017); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 09-cv-05235-MMC, 2017 WL 130236 at *4 (N.D. Cal. Jan. 13, 2017) (lack of adequate investigation and good faith belief factor weigh in favor of enhancement).

Despite the aggressive act of suing Spectrum twice for infringement, Greens behind the scenes failed to investigate Spectrum's '776 patent to form a good-faith non-infringement belief. Greens knew about the '776 patent since it issued on March 20, 2007. (ECF #313 at 236-8 (Green testimony).) Greens never asserted advice of counsel that its Agent X product did not infringe and never obtained a non-infringement legal opinion. (ECF #320 at 793-6 (Green).) Greens never performed any independent chemical testing for its Agent X product to determine whether it included one of the infringing biocides. (ECF #318 at 269-72 (Green).) Greens never obtained the formula from its supplier and never raised Spectrum's '776 patent to its supplier. (*Id.*) Similarly, Greens' former supplier admitted it did not test its own formula for existence of biocides. (*Id.* at 299-300 (Short testimony).)

Indeed, in 2009, Greens raised only an invalidity defense—and no non-infringement defense—incorrectly claiming that Spectrum sold its Quick Fix with

---

Greens willfully infringed. (ECF #325, Spectrum Closing Argument.) Therefore, that copying factor is not relevant.

the biocide formulation more than one year prior to the '776 patent filing date. (ECF #320 at 793-6 (Green).) At trial, Spectrum readily established that it created the new Quick Fix formulation in the Summer of 2003, just a few months before it filed for its '776 patent. (ECF #312 at 31-2 (Stephens).) Most importantly, Greens knew about Spectrum's new formulations because Greens was Spectrum's largest distributor and knew about the "floaty" problem that the new formula fixed at that time. (ECF #318 at 264 (Green).)

Finally, Greens switched out formulas and suppliers just before filing its second lawsuit, but then hid those facts from both the Court and Spectrum until it sold off the old Agent X. (ECF #318 at 278-81 (Green).) Greens also failed to keep any sample of old Agent X despite its legal obligation to do so. (*Id.* at 281.) Greens' hiding of its old Agent X and failure to keep any sample despite suing Spectrum strongly highlights its lack of forming a good-faith belief of non-infringement. Therefore, this factor weighs very strongly in favor of enhanced damages.

### 2. *Greens' egregious litigation behavior favors enhanced damages*

Courts also award enhanced damages when the infringer has engaged in overly aggressive litigation tactics. *SRI Intern'l, Inc. v. Cisco Sys., Inc.*, 254 F.Supp. 3d 680, 722 (D. Del. 2017) (on appeal) ("[t]here can be no doubt from even a cursory review of the record that Cisco pursued litigation about as aggressively as the court has seen in its judicial experience. While defending a client aggressively is understandable, if not laudable, in the case at bar, Cisco crossed the line in several regards.").

Greens needlessly increased litigation costs in every phase of this trial, including the following non-exhaustive examples:

(1) *Pleadings* Greens twice initiated lawsuits claiming non-infringement without, as set forth above, any basis for doing so. Greens also improperly raised numerous baseless claims against Mr. Stephens personally and Spectrum (*e.g.*, tortious interference) with no evidence or basis to do so. These vexatious and

baseless claims against Mr. Stephens and Spectrum from day one needlessly increased litigation costs.

(2) *Discovery* Greens refused to provide its supplier's name despite filing this suit and obviously being relevant to this case. This improper tactic allowed Greens to secretly sell off its old Agent X from its prior supplier without the Court or Spectrum knowing that. The Court granted Spectrum's motion to compel on the same. (ECF #110.) Greens then served *167* document requests to Mr. Stephens and another *199* document requests to Spectrum. Greens used questionable backdating of documents to justify new defenses raised in its expert's reports and claimed to serve updated contentions (that were never received) by regular mail when all other documents up to that point were served by email. (ECF #158, 163, 179.) Greens also failed to provide a timely expert report and provided conflicting explanations: claiming his secretary didn't docket the deadline and then, in the same brief, admitting he knowingly missed the deadline because he didn't think Spectrum would really submit an expert report. (Greens Opp. at pp. 2, 6, ECF #166.) These non-exhaustive examples show how Greens needlessly caused litigation costs to increase and lengthen this litigation.

(3) *Sanctions Motions* Greens filed multiple sanctions motions, including a motion for sanctions incorrectly claiming that Spectrum's technical expert knowingly spoliated evidence by using all Agent X. (*See* ECF #207, 208.) Spectrum raised the obvious point that: (a) Greens was the maker of Agent X; and (b) had the responsibility of maintaining old Agent X when it filed suit but did no such thing. The Court denied Greens' motion. *SRI, 254* F.Supp. 3d at 721-723 (denial of sanctions motions supports egregious litigation behavior).

(4) *Claim Construction* In claim construction briefing, Greens sought construction of every biocide without tying it into any infringement or invalidity theory. (*See* ECF #71 (Greens needlessly raising dozens of claim terms for

construction).) This again caused Spectrum to address an improper position raised by Greens and needlessly increase litigation costs.

(5) *Settlement* Greens did not take settlement conferences seriously. Greens' initial position was for Spectrum to pay millions of dollars. Because the parties were not close to settlement, Spectrum proposed a conference by telephone to reduce costs. Greens opposed Spectrum's request, falsely claimed to the Court that the parties were "close," when its real motivation was to force Spectrum to run up legal and travel costs. After creating all of these needless issues for both the Court and Spectrum, Matthew Green then did not show up to the settlement conference. (*See* ECF #193, 194, 196; *see also* Cavanagh 3/10/17 Decl. ¶¶ 8-16, ECF #216.)

(6) *Summary Judgment* Greens filed *five* summary-judgment related motions with over 80 pages of briefing and hundreds of pages of exhibits. (*See* ECF #205-214.) Substantively, Greens' pleadings asserted numerous claims, specious invalidity defenses, and baseless arguments, forcing Spectrum to seek and obtain summary judgment from the Court. *SRI,* 254 F.Supp.3d at 722-723 (Cisco maintained numerous invalidity theories throughout litigation, increasing litigation costs). The Court denied *all* of Greens' numerous defenses and arguments except for infringement, which the jury ultimately determined was willful. (ECF #280, 285.) *SRI,* 254 F.Supp.3d at 722-723 (Cisco "asserted many more defenses through the summary judgment exercise, causing SRI to expend its resources on responding to such motions, all of which were denied.").

Moreover, Greens' March 10, 2017 motion bombardment was an improper attempt to overwhelm Spectrum by burying it in paperwork. Despite Local Rule 7.1(h) requiring no more than 25 pages of total briefing for all motions "noticed for the same motion day," Greens obtained a hearing date of April 24, 2017, with briefing on five motions totaling 81 pages. (ECF #205-214.) This required Spectrum to respond to five motions and hundreds of pages of material (briefing and exhibits)

by April 10. When Spectrum requested that Greens stipulate to consolidate all motions for the May 15 date on which Spectrum's motions were noticed, Greens refused and tried to hold Spectrum's feet to the fire. This required an ex parte motion by Spectrum to obtain simple relief that Greens should have stipulated to. By not stipulating, Greens showed its true intent was to overwhelm Spectrum in hopes that one or more of its baseless claims or defenses would slip by Spectrum. (*See* ECF #220, 222.)

(7) *Trial* At trial, Greens used more than the allotted 12 hours of testimony time the Court provided the parties. And Greens tried to introduce previously excluded and inadmissible evidence that the Court repeatedly sustained. *SRI, 254 F.Supp.3d at 722-723* (Cisco attempted to introduce previously excluded evidence at trial). While improper on its own, this also caused numerous side bars and a further waste of time and money. For example, Greens' tactics forced Spectrum to spend additional fees and costs on attorneys, and to pay its financial and technical experts to stay several extra nights in San Diego based on Greens' dilatory tactics.

This factor is not a close call, and strongly favors enhanced damages.

### 3. *Greens' size and financial condition favors enhanced damages*

Greens' size and financial condition supports a finding of enhanced damages. Greens has been "a significant player in this market" with over $5 million in revenues during the infringing period alone. (ECF#319 at 605 (Haas).) Even with the jury's $865,000 damages verdict in compensatory damages, Greens "would still have over $1 million of gross margin in their pocket, even after paying this royalty." (*Id.* at 609 (Haas).) Greens has seven full-time employees and continues to sell Agent X and Spectrum's Quick Fix to this day. (ECF#320 at 778 (Green).) Also, Greens makes millions of dollars each year in revenue and has a sizable profit of about 18% for selling Spectrum's product and about 71% for selling Agent X. (ECF #320 at 815-6 (Green).) Further, Greens' sharp litigation tactics in initiating this lawsuit and

spending at least hundreds of thousands if not more than a million dollars further shows Greens' strong financial position and credit-worthiness. This factor weighs strongly in favor of enhanced damages

### 4. *This case was not a close call, which favors enhanced damages*

This litigation was not a close call. Greens, despite fighting hard every step of the way, lost on all of its defenses.[2] Greens raised baseless claims against Mr. Stephens personally that the Court also dismissed. And the jury determined that Greens willfully infringed Spectrum's '776 patent. Indeed, Greens' improper litigation tactics identified above, if anything, is evidence that Greens and its counsel knew how weak its own case was. This factor strongly weighs in favor of enhanced damages.

### 5. *Greens' four year duration of its misconduct favors enhanced damages*

Greens willfully infringed for about four years from the '776 patent issue date in March 2007 until it secretly changed suppliers in early 2011. This willful infringement also includes the first time Greens sued Spectrum in 2009 wrongly claiming to the Court that it did not infringe in the hopes that Spectrum would go away. The jury heard this evidence in finding that Greens willfully infringed. Therefore, Greens' lengthy four year willful infringement favors enhanced damages.

### 6. *Greens' failure to perform remedial action favors enhanced damages*

Greens failed to perform any remedial action for its willful infringement. In fact, Greens did the opposite: Greens tried to covered up its infringing activity by changing suppliers, switching out formulations and destroy the old infringing Agent X from the Court and Spectrum until it was able to sell off that product. Greens'

---

[2] Spectrum understands the Greens will move for judgment on a remaining "unclean hands" defense. This baseless defense is weaker than all of Greens' prior defenses that the Court dismissed at summary judgment. Greens' refusal to drop this baseless defense is further evidence of the one-sidedness of this suit and Greens' improper behavior of litigating every issue regardless of its actual merit.

failure to keep a sample. If Greens believed that the old Agent X did not infringe, it obviously would have kept samples (besides the obvious fact that it had a legal obligation to do so when it filed this suit). Greens did no such thing. Because Greens took no remedial action whatsoever, this factor weighs strongly in favor of enhanced damages.

### 7. *Greens' motivation for harm favors enhanced damages*

The evidence before the jury at trial strongly shows Greens' improper motivation for harm against Spectrum. Greens was a former distributor of Spectrum and made excellent profits selling Spectrum's patented Quick Fix product. (ECF #313 at 225 (Green).) Wanting greater profits, Greens ended its relationship with Spectrum and began selling its infringing Agent X in direct competition with Spectrum. (ECF #320 at 812 (Green).) Greens knew all about Spectrum's '776 patent since the day that it issued in 2007. (ECF #313 at 236-8 (Green).) Profits skyrocketed by Greens' willfully infringing sales of its Agent X product.

Also, Greens' trial argument that it could have easily switched out its infringing formula for a non-infringing alternative is actually evidence of motivation for harm and *not* evidence of good faith. *See Apple,* 258 F.Supp.3d at 1035-36 (motivation for harm factor met when Samsung had non-infringing alternative available to implement quickly but did not do so against direct competitor Apple). The problem for Greens is that it continued selling the old Agent X for four years instead of going to a non-infringing alternative, much like Samsung. Therefore, this factor strongly weight in favor of enhanced damages.

### 8. *Greens' concealment of its misconduct favors enhanced damages*

A significant amount of evidence introduced at trial supports Greens' concealment of its misconduct. Greens failed to keep a single sample of its old Agent X despite its legal obligation to do so. (ECF #318 at 278-81 (Green).) Obviously, if Greens believed that old Agent X did not infringed, it would have kept it as part of

its defense. Instead, Greens demonstrated its guilty mind by disposing of the incriminating evidence and not preserving it.

Then, through using objections and motion practice to stall, Greens hid those facts for nearly the first year of the litigation, claiming that they somehow were not discoverable. (ECF #110.) Through this tactic, Greens sold off the remaining old Agent X without Spectrum or the Court knowing about the switching of suppliers and formulas. This hiding and ultimate disposal of evidence of evidence strongly supports enhanced damages.

For all of these reasons, the Court should award three times the enhanced damages to Spectrum as allowed by law. 35 U.S.C. § 284 (proper measure of enhanced damages is an increase of "up to three times the amount found or assessed" by the jury). Thus, in this case, where compensatory damages were assessed at $865,173, an award of enhanced damages should bring the total award up to $2,595,519.

## II.  Spectrum is Entitled to its Reasonable Attorneys' Fees

The Patent Act provides that the Court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1756 (2014).

This case is exceptional for the same reasons that support enhanced damages above. There can be no doubt that Greens would have kept multiple samples of old Agent X around if it did not infringe. Greens' changing suppliers and then selling off old Agent X highlights its willful infringement and why attorneys' fees are

appropriate. Greens never actually performed a non-infringement analysis nor had a good faith non-infringement basis – despite twice suing Spectrum and representing to the Court that it did not infringe. Greens and counsel's tactics leading up to litigation strongly weighs in favor of finding this exceptional and awarding attorneys' fees.

Further, Greens and its counsel also crossed the line by litigating this case in a frivolous and unreasonable manner. As the *SRI* court stated that it: "understands the need for flexibility in terms of allowing attorneys to vigorously pursue the best interests of their clients[.] However, Cisco's litigation strategies in the case at bar created a substantial amount of work for both SRI and the court, much of which work was needlessly repetitive or irrelevant or frivolous." *SRI*, 254 F.Supp. 3d at 723

Finally, the jury's willful infringement verdict also weighs in favor of find this case exceptional and awarding attorneys' fees. *Id.* ("Of course, the fact that the jury found that Cisco's infringement was willful is yet another factor to be considered."). For these reasons, the Court should find this case exceptional and exercise its discretion pursuant to § 285 to award Spectrum its attorney fees and costs.[3]

### III. The Court should award prejudgment interest if $326,728.

Prejudgment interest is available pursuant to 35 U.S.C. § 284 (patentee shall be awarded damages "together with interest and costs as fixed by the court"). The purpose of prejudgment interest is to put the patent owner "in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983). Prejudgment interest should ordinarily be awarded to a victorious patentee. *Id.* at 655-56; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1263 (Fed. Cir. 2014).

---

[3] Upon completion of this briefing as well as any potential motion for judgment on unclean hands that Greens stated it would raise as its sole post-trial motion, Spectrum will provide its fees and costs for this litigation.

The Southern District of California and other jurisdictions commonly use prime interest rate, compounded quarterly, in awarding prejudgment interest. *See Thermolife International, LLC, et al. v. Mycogenix Corp.*, No. 13-CV-651 JLS (MDD) (S.D. Cal. Jan. 8, 2018). *See also Ill. Tool Works, Inc. v. MOC Prod. Co.*, No. 9-CV-1887 JLS (MDD) (S.D. Cal. Oct. 25, 2013) (applying the prime rate), *Idenix Pharm. LLC v. Gilead Sci., Inc.*, No. 14-846-LPS, 2017 WL 4216993, at *9 (D. Del. Sept. 22, 2017) (same), *Akamai Technologies, Inc., et al. v. Limelight Networks, Inc.*, No. 1-06-CV-11109-RWZ (MAD) (D. Mass. June 24, 2016) (same).

Using prime interest rates reported by JPMorgan Chase, Mr. David Haas determined the average prime interest rate for each quarter during the 2007-2018 time period, weighted by the number of days at each rate during quarters in which the rate changed. (Haas Declaration at ¶ 7.) Mr. Haas then split the jury's damages award into quarterly amounts, weighted by the number of days in the respective quarters. (*Id.*) Mr. Haas computed prejudgment interest to amount to $326,728 through May 22, 2018. (*Id.*)

Therefore, Spectrum asks the Court for a prejudgment interest in the amount of $326,728.

Dated: May 22, 2018                                   Respectfully submitted,

McDONALD HOPKINS LLC

by:  s/ *David B. Cupar*
David B. Cupar

*Attorneys for*
Defendant and Counterclaimant
SPECTRUM LABORATORIES, LLC