1 | SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
2 | Robert P. Allenby, SBN 156926
*allenby@sullivanhill.com*
3 | Rebecca M. O'Grady, SBN 273761
*ogrady@sullivanhill.com*
4 | 600 B Street, 17th Floor
San Diego, California 92101
5 | Telephone:  (619) 233-4100
Fax Number: (619) 231-4372
6 | Our File No.:  2028-18078

7 | Attorneys for Respondent GARY L. EASTMAN

8 | **UNITED STATES DISTRICT COURT**

9 | **SOUTHERN DISTRICT OF CALIFORNIA**

10 | DR. GREENS, INC., a California
corporation,

11 |                Plaintiff,

12 | v.

13 | JAMES MATHEW STEPHENS, an
individual, and SPECTRUM

14 | LABORATORIES, LLC, an Ohio limited
liability company,

15 |

16 |                Defendants.

17 | AND RELATED CROSS ACTION

18 |

Case No. 3:'11-cv-00638-JAH-KSC

RESPONDENT GARY L. EASTMAN'S
RESPONSE TO ORDER TO SHOW
CAUSE

District Judge:  Hon. John A. Houston
Mag. Judge:    Hon. Karen S. Crawford

Case No. 3:'11-cv-00638-JAH-KSC

# TABLE OF CONTENTS

PAGE

TABLE CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ................................................................... ii

I.    INTRODUCTION .......................................................................... 1

II.   STATEMENT OF FACTS .............................................................. 1

III.  DISCUSSION ............................................................................... 13

    A.    There Has Been No Transfer of "Money" or "Funds" ...................... 13

        1.   Any Transfer of "Assets" by the Green Parties Predated the Order ................................................................................ 14

        2.   The Perfection of the Security Interest Was Not a Transfer of Money ...................................................... 16

        3.   The Assignment; the Collection Action; the Foreclosure Sale; and the Move to Washington Were Not Transfers of Money ......................................................................... 17

    B.    The Order Was Invalid and Has Expired .............................................. 18

        1.   The Order Was Void *Ab Initio* and Transparently Invalid ............................................................................... 19

            a.   The Order Was Void *Ab Initio* Per California Attachment Law ..................................................... 19

            b.   Any Temporary Protective Order Has Long Expired ............................................................... 21

        2.   The Order Is Not Salvageable Under Rule 65 ...................... 22

    C.    Spectrum's Proposed Remedies Are Frivolous ................................... 24

IV.   CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

CASES                                                                          PAGE

Aggregates Assoc., Inc. v. Packwood,
    58 Cal. 2d 580 (1962)......................................................................... 15

Arnold v. Hadgis,
    102 Cal. App. 2d 88 (1951).............................................................. 16

Beeman v. Anthem Prescription Mgmt., LLC,
    689 F.3d 1002 (9th Cir. 2012)......................................................... 24

In re Berry,
    68 Cal. 2d 137 (1968)...................................................................... 18

Brun v. Evans,
    197 Cal. 439 (1925).......................................................................... 20

Chemoil Corp. v. Cunningham Holdings, Inc.,
    No. E068157,
    2018 Cal. App. Unpub. LEXIS 8653 (Cal. Ct. App. Dec. 20, 2018)........... 24

City of San Diego v. Pac. Beach Recreation Council, Inc.,
    No. D041232,
    2003 Cal. App. Unpub. LEXIS 11796 (Cal. Ct. App. Dec. 17, 2003)......... 24

CHoPP Computer Corp. v. United States,
    5 F.3d 1344 (9th Cir. 1993)............................................................. 24

Davidson v. Superior Court,
    70 Cal. App. 4th 514 (1999)............................................................ 18

Deckert v. Independence Shares Corp.,
    311 U.S. 282 (1940) ........................................................................ 23

Doyka v. Superior Court,
    233 Cal. App. 3d 1134 (1991).................................................... 20, 24

Economy Ref. & Serv. Co. v. Royal Nat'l Bank,
    20 Cal. App. 3d 434 (1971)............................................................. 15

Emp'rs Ins. of Wausau v. Granite State Ins. Co.,
    330 F.3d 1214 (9th Cir. 2003)......................................................... 24

Fletcher v. Davis,
    33 Cal. 4th 61 (2004).................................................................... 2

Freeman v. Lasky, Haas & Kohler,
    410 F.3d 1180 (9th Cir. 2005)...................................................... 17

FTC v. Am. Nat'l Cellular,
    868 F.2d 315 (1989)...................................................................... 18

Gates v. Shinn,
    98 F.3d 463 (9th Cir. 1996)..................................................... 13, 14

Grupo Mexicano De Desarrollo v. Alliance Bond Fund,
    527 U.S. 308 (1999) ............................................................... 22, 23

GTE Sylvania, Inc. v. Consumer's Union of United States, Inc.,
    445 U.S. 375 (1980) ..................................................................... 18

Harris v. City of Phila.,
    47 F.3d 1342 (3rd Cir. 1995)....................................................... 13

Int'l Longshoremen's Ass'n. v. Phila. Marine Trade Ass'n,
    389 U.S. 64 (1967) ....................................................................... 13

Irwin v. Mascott,
    370 F.3d 924 (9th Cir. 2004)....................................................... 18

Johannes v. Johannes,
    No. 15-CV-2598-AJB-BGS,
    2017 U.S. Dist. LEXIS 62110 (S.D. Cal. Apr. 21, 2017) ............ 24

JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.,
    295 F. Supp. 2d 366 (S.D.N.Y. 2003)......................................... 23

Klett v. Pim,
    965 F.2d 587 (8th Cir. 1992)....................................................... 19

Lenard v. Edmonds,
    151 Cal. App. 2d 764 (1957)........................................................ 24

Loftis v. Almager,
    704 F.3d 645 (9th Cir. 2012)....................................................... 24

*Melendres v. Arpaio,*
  154 F. Supp. 3d 845 (D. Ariz. 2016)............................................................... 22

*MGM Grand Hotel, Inc. v. Imperial Glass Co.,*
  533 F.2d 486 (9th Cir. 1976).......................................................................... 24

*N. Cntys. Bank v. Earl Himovitz & Sons Livestock Co.,*
  216 Cal. App. 2d 849 (1963).......................................................................... 17

*People v. Gonzalez,*
  12 Cal. 4th 804 (1996)................................................................................... 18

*People v. Green,*
  125 Cal. App. 4th 360 (2004)................................................................... 2, 17

*People v. Gruber,*
  No. F047525,
  2006 Cal. App. Unpub. LEXIS 8448 (Cal. Ct. App. Sep. 22, 2006)........... 25

*Pos-A-Traction, Inc. v. Kelly-Springfield Tire Co.,*
  112 F. Supp. 2d 1178 (C.D. Cal. 2000)......................................................... 20

*Raleigh Indus. of Am., Inc. v. Tassone,*
  74 Cal. App. 3d 692 (1977)............................................................................ 15

*Randone v. Appellate Dep't of Superior Court,*
  5 Cal. 3d 536 (1971)...................................................................................... 19

*Rusheen v. Cohen,*
  37 Cal. 4th 1048 (2006)................................................................................. 17

*Sniadach v. Family Finance Corp.,*
  395 U.S. 337 (1969) ...................................................................................... 19

*Scott & Fetzer Co. v. Dile,*
  643 F.2d 670 (9th Cir. 1981).......................................................................... 19

*Sosa v. DIRECTV, Inc.,*
  437 F.3d 923 (9th Cir. 2006).......................................................................... 17

*Thomas, Head & Greisen Emps. Trust v. Buster,*
  95 F.3d 1449 (9th Cir. 1996).......................................................................... 18

United States v. Armour & Co.,
      402 U.S. 673 (1971) .......................................................................... 14

United States v. Cazares,
      788 F.3d 956 (9th Cir. 2015) ........................................................... 24

United States Fid. & Guar. Co. v. Postel,
      64 Cal. App. 2d 567 (1944) .............................................................. 16

United States ex rel. Rahman v. Oncology Assocs.,
      198 F.3d 489 (9th Cir. 1999) ........................................................... 23

Vershbow v. Reiner,
      231 Cal. App. 3d 879 (1991) ............................................................ 21

Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.,
      689 F.2d 885 (9th Cir. 1982) ........................................................... 13

VFS Fin., Inc. v. CHF Express, LLC,
      620 F. Supp. 2d 1092 (C.D. Cal. 2009) ........................................... 20

Walker v. City of Birmingham,
      388 U.S. 307 (1967) .......................................................................... 18

Waltrip v. Kimberlin,
      164 Cal. App. 4th 517 (2008) ............................................................. 2

West Coast Constr. Co. v. Oceano Sanitary Dist.,
      17 Cal. App. 3d 693 (1971) .............................................................. 24

Whittaker Corp. v. Execuair Corp.,
      953 F.2d 510 (9th Cir. 1992) ........................................................... 22

Zal v. Steppe,
      968 F.2d 924 (9th Cir. 1992) ........................................................... 18

Zapon v. United States Dep't of Justice,
      53 F.3d 283 (9th Cir. 1995) ............................................................. 18

Zhenhua Logistics (H.K.) Co. v. Metamining, Inc.,
      No. C-13-2658 EMC,
      2013 U.S. Dist. LEXIS 87089 (N.D. Cal. June 20, 2013) ............... 23

STATUTES

Cal. Civ. Code § 47(b) ........................................................................ 17

Cal. Civ. Code §§ 3420-3424 ............................................................. 22

Cal. Civ. Code § 3432 ......................................................................... 16

Cal. Civ. Proc. Code §§ 481.010 - 493.060 ....................................... 20

Cal. Civ. Proc. Code § 484.080 .......................................................... 21

Cal. Civ. Proc. Code § 485.010 .......................................................... 20

Cal. Civ. Proc. Code § 486.020 .......................................................... 20

Cal. Civ. Proc. Code § 486.090(a) ...................................................... 21

Cal. Civ. Proc. Code § 489.210 .......................................................... 21

Cal. Civ. Proc. Code § 525 ................................................................. 22

Cal. Civ. Proc. Code § 526 ................................................................. 22

Cal. Civ. Proc. Code § 529 ................................................................. 22

Cal. Civ. Proc. Code § 532 ................................................................. 22

Cal. Civ. Proc. Code § 533 ................................................................. 22

Cal. Civ. Proc. Code §§ 995.010 - 996.560 ....................................... 20

Cal. Comm. Code § 1201(b)(35) ........................................................ 15

Cal. Comm. Code § 9102(a)(7) ........................................................... 15

Cal. Comm. Code § 9102(a)(74) ......................................................... 15

Cal. Comm. Code § 9203(a) ................................................................ 15

Cal. Comm. Code § 9203(b)(1) ........................................................... 15

Cal. Comm. Code § 9203(b)(2) ........................................................... 15

Cal. Comm. Code § 9203(b)(3) ........................................................... 15

Cal. Comm. Code § 9203(b)(3)(A) ...................................................... 15

Cal. Comm. Code § 9312(b)(1) ........................................................... 17

Cal. Comm. Code § 9312(b)(3) ........................................................... 17

Cal. Comm. Code §§ 9312-9313 ......................................................... 18

Cal. Health & Safety Code § 24135 .................................................... 18

CALIFORNIA RULES OF PROFESSIONAL CONDUCT

Cal. R. Prof'l Cond. 3-300 ........................................................... 7

Cal. R. Prof'l Cond. 1.8.1 ............................................................ 7

CALIFORNIA RULES OF COURT

Cal. R. Ct. 3.1150 ........................................................................ 22

FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. Proc. 64 ................................................................... 19

Fed. R. Civ. Proc. 65(a)(1) .......................................................... 22

Fed. R. Civ. Proc. 65(b) ............................................................... 22

Fed. R. Civ. Proc. 65(c) ............................................................... 22

Fed. R. Civ. P. 65(d) ............................................................... 13, 22

LOCAL RULES

CivLR 5.1(e) ................................................................................. 2

ECF Admin. Policies & Procs. Manual § 2(k) ............................. 2

SECONDARY AUTHORITIES

Alan M. Ahart, California Practice Guide: Enforcing Judgments and
   Debts ¶¶ [4:299]-[4:376] (2019) ........................................... 20

Alan M. Ahart, California Practice Guide: Enforcing Judgments and
   Debts ¶¶ [4:543] (2019).......................................................... 20

Lee Smalley Edmon & Curtis E.A. Karnoa, California Practice Guide:
   Civil Procedure Before Trial ¶¶ [9:560]-[9:670] (2019)............. 22

Ellen A. Friedman, Secured Transactions in California Commercial
   Law Practice § 3.2 (CEB 2d Ed. 2020)........................................ 15

/ / /

Ellen A. Friedman, Secured Transactions in California Commercial
    Law Practice § 3.6 (CEB 2d Ed. 2020) ........................................................ 16

13 Moore's Federal Practice - Civil § 64.12 (2019) ................................................. 19

13 Moore's Federal Practice - Civil § 64.14 (2019) ................................................. 19

4 B.E. Witkin, et al., Summary of California Law,
    Secured Transactions in Personal Property §§ 34-103 (11th Ed. 2018) ...... 15

## I.    INTRODUCTION

Predicated on half-truths; unsubstantiated speculation; outright falsehoods; and arguments without substantive reasoning, without citation to authority, or contrary to established authority, SPECTRUM LABORATORIES, LLC's ("Spectrum") attempt to charge MATHEW M. GREEN ("Mr. Green") and DR. GREENS, INC. ("Dr. Greens") (collectively the "Green Parties") and their attorney of record with contempt of this Court's order issued on February 23, 2018 (the "Order") is nothing more than unbounded overzealousness run amuck.  The simple facts remain that this Court only enjoined the Green Parties from transferring "money" or "funds" outside the ordinary course of business, and that no such transfer ever took place.  While Mr. Eastman created, attached, perfected, and foreclosed upon a valid security interest in the Green Parties' assets—acts which no order of this Court ever enjoined—the undisputable evidence establishes that he, his assigns, and their attorney assiduously avoided taking any money or funds of the Green Parties.  To the extent that Spectrum would claim some implication in the Order enjoining Mr. Eastman from collecting his accounts receivable or foreclosing upon his valid security interest, no such order would be valid or enforceable by contempt.  For these reasons, the Court should find that Mr. Eastman and his clients have shown good cause why they should not be found in contempt of the Order.

## II.    STATEMENT OF FACTS

The attorney-client relationship between Mr. Eastman and the Green Parties predates this action by several years. (Eastman Decl. ¶ 5 at 2-3.)  With respect to their dispute with Spectrum, the Green Parties, as "Client," executed a formal "Attorney - Client Agreement" with Mr. Eastman—acting through his professional law corporation, Gary L. Eastman, A Professional Law Corporation ("Eastman APLC") as "the Firm"—on October 20, 2008. (Id. ¶¶ 4 & 5 at 2-3 & Ex. A.)  Therein, the Green Parties expressly acknowledged that Eastman APLC "shall have a lien to the extent of its outstanding billings on any Patent, Trademark or Copyright Application filed by the

1  Firm for the Client, the proceeds of any litigation, *and assets of the Client*." (Id. Ex. A

2  at 3 (italics added).) [1]

3   Mr. Green, represented by Mr. Eastman through Eastman APLC, filed this

4  action on March 29, 2011. (Eastman Decl. ¶ 6 at 3 & Ex. B; Req. Jud. Not. 1(a); Doc.

5  # 1.)[2] On January 3, 2013, Mr. Eastman formed and, through Eastman APLC joined,

6  the law firm of Eastman & McCartney, LLP ("Eastman McCartney"). (Eastman Decl.

7  ¶ 7 at 3 & Ex. C; Req. Jud. Not. 3(a).)[3] Mr. Eastman and Eastman McCartney became,

8  and remain, the attorneys of record for the Green Parties in this action. (Id.)  On

9  January 10, 2013, Eastman McCartney, as the "Firm," executed a new Attorney -

10 Client Agreement with the Green Parties, as the "Client." (Id. ¶ 8 at 3 & Ex. D.)

11 Therein, the Green Parties again expressly acknowledged that "the Firm shall have a

12 lien to the extent of its outstanding billings on any Patent, Trademark or Copyright

13 Application filed by the Firm for the Client, the proceeds of any litigation, *and the*

14 *assets of the Client*." (Id. Ex. D at 54 (italics added).)[4]

---

15   [1] Exhibit page citations are to the consecutive page numbers prescribed by
16  local rule. See CivLR 5.1(e); ECF Admin. Policies & Procs. Manual § 2(k).

17   [2] Citations to "Doc. #" are to the Civil Docket in this action.

18   [3] Eastman McCartney subsequently changed its name to "Eastman
   McCartney Dallmann, LLP." (See Eastman Decl. ¶ 7 at 3 & Ex. C; Req. Jud. Not.
19  3(a).)

20   [4] California has long recognized attorney liens. See Waltrip v. Kimberlin,
   164 Cal. App. 4th 517, 525 (2008)(attorney's lien is a "secret lien" with priority over
21  later encumbrances and is effective upon execution of fee agreement); Fletcher v.
   Davis, 33 Cal. 4th 61 (2004)("An attorney's charging lien is a "*security* interest" in the
22  proceeds of the litigation.")(italics original); see also Fletcher, 33 Cal. 4th at 71
   (attorney's lien must comply with former Rule of Professional Conduct 3-300 (now
23  Rule 1.8.1)); see Note 6 infra at 7.)  To the extent an attorney's retainer agreement
24  creates a security interest beyond the proceeds of litigation, its attachment, perfection,
   and priority are governed by the Commercial Code. See People v. Green, 125 Cal.
25  App. 4th 360, 365 (2004). Here, the retainer agreements complied with Rule 3-300
26  and—while the Green Parties never obtained litigation proceeds to which any
   charging lien attached—Eastman APLC and Eastman McCartney perfected their
27  retainer-agreements liens in the Green Parties' assets when they filed the UCC-1
28  (footnote continues...)

On September 22, 2017—prior to a hearing set for that day regarding motions *in limine,* sanctions, and summary judgment—Mr. Eastman filed an *ex parte* application to withdraw as counsel. (Eastman Decl. ¶ 9 at 4 & Ex. E; Req. Jud. Not. No. 1(b); Doc. # 278.) At the time, the Green Parties owed Eastman APLC and Eastman McCartney almost $500,000 in attorneys' fees and costs in connection with this action. (Eastman Decl. ¶ 9 at 4.) Despite multiple demands for payment, the Green Parties advised Mr. Eastman that they were unable to pay any amounts toward the substantial balances owing. (Id.) Thus, Mr. Eastman predicated his application on the grounds that the Green Parties had "continuously failed to pay counsel the agreed-upon attorney's fees, resulting in a substantial outstanding balance." (Id. Ex. E lns. 1-2 at 58; see also id. ¶¶ 3 & 4 at 64.) Further, Mr. Eastman had tragically lost his 24-year-old son on December 30, 2016, and his ensuing leave of absence resulted in a significant downturn in his business and the loss of several associates. (Id. ¶ 5 at 64.) Accordingly, Mr. Eastman lacked the practical and financial resources to continue carrying the Green Parties without payment. (Id. ¶ 6 at 64.)

At the September 22, 2017, hearing the Court advised Mr. Eastman that, while the Court had not read the application to withdraw entirely, the Court was:

> of the mind that the motions I've acted on here today were fully briefed while counsel was in the case and that should dispose of these motions. Any you're in for a penny you're in for a pound. That's my general take on it counsel. But in just gleaning your reasons, I think we need to - - I need to reflect on it more. [¶] But even hav[ing] done that, the Court is squarely of the mind that these matters have been fully briefed. This case has been going on for a while, and these matters need to be disposed of; and I intend to dispose of pending matters. [¶] And Spectrum may want to respond to the motion, and I'll set a briefing schedule on that particular motion.

(Eastman Decl. ¶ 10 at 4 & Ex. F lns. 10-24 at 69; Req. Jud. Not. 1(c).)

The Court ordered a briefing schedule and set a hearing date for Mr. Eastman's application to withdraw. (Eastman Decl. Ex. F lns. 6-15 at 70.) Spectrum filed

_____

Financing Statement and took possession of the Green Parties non-cash assets.

opposition to the application on October 10, 2017. (Eastman Decl. ¶ 11 at 4 & Ex. G; Doc. # 282; Req. Jud. Not. 1(d).)  Therein, Spectrum accused Mr. Eastman of running up the costs of the "expensive litigation" and chastised him for not having raised the "payment problem" sooner.  (Id.)  While no trial date had yet been set, Spectrum agued:

> The parties are now on the verge of trial, with hefty legal bills on both sides because of Eastman's vexatious litigation filings.  With the case now ready for final resolution, the Court should not allow Eastman to again delay resolution while escaping the consequences of his expensive and aggressive lawyering tactics.  The Court should require him to see this case to its end, which is now finally in sight.

(Eastman Decl. Ex. G lns. 15-19 at [2].)

Spectrum speculated that Mr. Eastman had benefitted from the risk he had assumed in representing a corporate client because he had "receive[d] fees for at least some period(s) of time and a contingency fee possibility on Greens' failed tort claims," (Eastman Decl. Ex. G. lns. 6-9 at 75), but noted, "If Eastman has never received any payment from [the Green Parties], then he acquiesced and his motion is six years too late," (id. Ex. G n.1 at 75).

Prior to the hearing on October 16, 2017, Mr. Eastman spoke with Mr. Green and worked out a resolution that would allow Mr. Eastman to remain as counsel. (Eastman Decl. ¶ 12 at 4.)  The resolution was that—in consideration for Mr. Eastman withdrawing the motion to withdraw as counsel, continuing to represent the Green Parties through trial, and forbearing on further collection efforts until after trial—the Green Parties would grant Eastman APLC and Eastman McCartney (in addition to the attorney liens they already enjoyed) a security interest in their assets.  (Id.)  Therefore, at the hearing on October 16, 2017, Mr. Eastman advised the Court:

> I've considered the comments by the Court in our last in-person meeting, and I've considered the opposition to my motion to withdraw.  And with regard to the expeditious resolution of this matter, I'd like to withdraw my motion to withdraw as counsel. [¶]  This has been hanging for six years on your calendar, and I can imagine that despite the economic disincentive for me to handle this case through trial, I believe I owe it to the court and my opposing counsel to put it to bed one way or another. [¶]  I appreciate

the opportunity to have briefed that and your opportunity to hear it, *but I just spoke with Mr. Green before coming in here today, and I think **we've worked out a resolution to allow this to go through trial.***

(Eastman Decl. ¶ 13 at 5 & Ex. H lns. 1-17 at 82 (emphasis added); Req. Jud. Not. 1(e).)

The Court accepted the motion to withdraw as counsel as being withdrawn, (see Eastman Decl. Ex. H lns. 15-17 at 82; see also Eastman Decl. ¶ 14 at 5 & Ex. I ¶ 4 lns. 3-5 at 88; Doc. # 285; Req. Jud. Not. 1(f)); scheduled a status conference for December 4, 2017, to set a trial date; and scheduled the pretrial conference for January 22, 2018, (Eastman Decl. Ex. H lns. 12-20 at 85).

On November 29, 2017, the parties filed a joint motion proposing pretrial deadlines, including a trial date—none having been previously set—of February 13, 2018. (See Doc. # 287; Req. Jud. Not. 1.) On December 14, 2017, the Court granted the joint motion. (Eastman Decl. ¶ 15 at 5 & Ex. J; Doc. # 288; Req. Jud. Not. 1(g).)

Prior to January 10, 2018, Eastman APLC and Eastman McCartney retained their own counsel—Ajay Gupta, Esq. of the law firm of Gupta Evans and Associates, PC ("Mr. Gupta")—to document and effectuate the resolution that Mr. Eastman and Mr. Green had agreed upon to allow Mr. Eastman to remain as the Green Parties' attorney through trial. (Eastman Decl. ¶ 16 at 5.) On January 10, 2018—some five weeks before trial was set to commence and more than six weeks before the Court issued the Order—Eastman APLC and Eastman McCartney, on the one hand as "Attorney," and the Green Parties, on the other hand as "Client," executed a First Amendment to Attorney Client Agreement (the "First Amendment"). (Eastman Decl. ¶ 16 at 5 & Ex. K.) The First Amendment recited that the Green Parties had "fallen significantly behind on payments owed to Attorney pursuant to the Retainer Agreement, and trial in [this action] is approaching, which will create significant additional costs to be incurred by Attorney with respect to its representation of Client." (Eastman Decl. Ex. K at 93.) The First Amendment further recited:

/ / /

in exchange for Attorney to continue to represent Client through trial, Attorney and Client by way of this Amendment, desire to amend the Retainer Agreement to (i) provide for the grant of a security interest to Attorney from Client, (ii) to affirm and acknowledge the outstanding balance currently owes to Attorney for legal services rendered pursuant to the Retainer Agreement and (iii) to release Attorney from any and all past and present claims that Client may have against Attorney.

(Eastman Decl. Ex. K at 93.)

In the First Amendment, the Green Parties granted Eastman APLC and Eastman McCartney:

a security interest in all business assets of Client now owned or hereinafter acquired, including but not limited to, the following: any and all of Client's real property and tangible personal property, fixtures, leasehold improvements, trade fixtures, equipment, inventory and any and all other personal property; any and all of Client's inventory, merchandise and accounts receivable resulting from the sale thereof; any and all of Client's motor vehicles, vessels, mobile homes, or commercial coaches used as equipment of a going business; any and all of Client's accounts receivable, deposit accounts and final money judgments; any and all of

Client's general intangibles, including but not limited to, the inventory of Client's trademarks, trade names, goodwill, phone number, website and URL (www.drgreens.com), and all patents, copyrights and trademarks, customer lists, and trade secrets incorporated therein, all product designs and descriptions, and other assets identified in the list attached hereto as **Exhibit "A,"** which is incorporated herein by this reference; any and all of Client's cash and non-cash proceeds (including insurance proceeds) and property in a safe-deposit box; all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof (collectively, the **"Collateral"**).

(Eastman Decl. Ex. K at 93 (bolding original).)[5]

The First Amendment further provided that:

This security interest is granted to secure any and all debt owed by Client to Attorney pursuant to the Retainer Agreement, including, but not limited to, the Outstanding Balance and all costs and expenses incurred by Attorney in the collection of the debt.

(Eastman Decl. Ex. K at 93.)

The First Amendment gave Eastman APLC and Eastman McCartney the right to

---

[5]  The First Amendment references Exhibits A-D.  In fact, there were only three exhibits: 1) Exhibit A—the list of items included as Collateral; 2) Exhibit B—a proposed UCC-1 financing statement; and 3) Exhibit C, mistakenly denoted Exhibit D—the invoices reflecting the then Outstanding Balance.  (Eastman Decl. Ex. K.)

file "one or more financing statements under the California Uniform Commercial Code, naming Client as a debtor and Attorney as secured party and indicating the collateral specified in this Amendment." (Eastman Decl. Ex. K at 94.)  The First Amendment appointed Eastman APLC and Eastman McCartney as attorney-in-fact of the Green Parties, including to "protect, preserve and realize upon the Collateral and Attorney's security interest therein." (Id.)  The First Amendment provided that the outstanding balance then owed by the Green Parties for attorneys' fees and costs was $491,373.11.  (Id.)  Finally, the First Amendment—in bolded provisions initialed by Mr. Green—provided in pertinent part that:

> **By signing below, Client agrees that the statements and representations contained in this Amendment are to be considered contractual in nature.  Additionally, Client acknowledges Attorney is NOT representing Client as an attorney with regard to the Retainer Agreement and this Amendment and in Client's review and consideration of the foregoing and Client's decision whether to sign below and enter in the terms set forth herein, including the above-described release.**

> **By signing below, Client further acknowledges and represents that Client has had the opportunity to consult with legal counsel of its own choice with respect to the execution and legal effect of this Amendment, including the release, and that Client has not relied upon any representations or warranties of any other party hereto.**

(Eastman Decl. Ex. K ¶¶ 6(a) & 6(b) at 95 (bolding original).)[6]

This matter went to trial before a jury on February 13, 2018.  (Eastman Decl. ¶ 17 at 5; Req. Jud. Not. 1.)  On the morning of February 23, 2018—after the close of the evidence but before the jury returned its verdict—Mr. Eastman instructed Mr. Gupta to proceed with perfecting the security interest reflected in the First Amendment. (Id.)  At approximately 1:53 p.m. the jury returned its verdict.  (Id. & Ex. M ln. 2 at 102; Req.

---

[6]      Then operative Rule 3-300 of the California Rules of Professional Conduct provided that an attorney could not acquire a security interest adverse to a client unless: 1) the transaction was fair and reasonable to the client and fully disclosed in writing; 2) the client was advised in writing that the client may seek the advice of independent counsel; and 3) the client thereafter consented in writing.  Cal. R. Prof'l Cond. 3-300; accord Cal. R. Prof'l Cond. 1.8.1 (current). The First Amendment complied with these requirements.

Jud. Not. 1(i).)  The jury's verdict was adverse to the Green Parties in all respects. (See id. Ex. L; Req. Jud. Not. 1(h).)  After the verdict was read and the jury discharged, the following exchange took place:

> The Court:  Counsel, let's do this.  It's been a long week for all of us.  I suggest a telephone call next week to talk about going forward if there are any outstanding issues we need to address, so we can have a telephone conference to line those up. [¶] I can do this Monday afternoon if you're available for a telephone conference.
>
> Mr. Cupar:  That should work.
>
> The Court:  Counsel.
>
> Mr. Eastman:  Your honor, just to make sure that's when we're going to entertain the unclean hands?
>
> The Court:  Yes.  We'll discuss those outstanding issues, everything we need to to discuss at that time, and determine how we move forward with those issues.  Yes.
>
> Mr. Eastman:  All Right.  Thank you, your honor, that will work.

(Eastman Decl. Ex. M lns. 5-22 at 107.)

At that point, instead of proceeding with the seemingly agreed-upon adjournment as suggested by the Court—and without any prior notice; without filing or serving either a written application for a right to attach order and a writ of attachment or a written motion for a temporary protective order pending such an application; without proffering any evidence of great or irreparable injury; and without posting or offering to post an undertaking—Spectrum brought an "oral motion" that gave rise to the Order.  (See Eastman Decl. ¶ 18 at 5 & Ex. M ln. 23 at 107 to ln. 13 at 108.)  That is, Spectrum's counsel stated:

> And, your honor, I'd like to move just by an oral motion now for an injunction against the transfer of assets by Mr. Green and Dr. Greens, Inc. *I can follow up with a written motion.*  [¶]  And my idea there is this: there was a motion to withdraw that Mr. Eastman filed a few months ago, but then subsequently withdrew.  My concern is - - based on nonpayment. [¶]  My concern is is that Mr. Green, either personally or through his company, *is going to transfer large amounts of money to make himself judgment-proof here.  So we'd ask that this Court enter an injunction on*

/ / /

*that basis to prevent him **from transferring any large amounts of money from one account to another.***

(Eastman Decl. Ex. M ln. 23 at 107 to ln. 11 at 108 (emphasis added).)

Without eliciting any opposition from the Green Parties, the Court ruled:

At this juncture, the Court will issue a temporary stay, Mr. Green, as well as Dr. Greens, Inc., from ***transferring any monies from any accounts held***, *whether personal accounts, business accounts, other entities controlled or owned by Dr. Greens or you, outside of ordinary, routine business expenses that you've been paying to keep your business going between now and until further order of the Court. [¶]* We can discuss whether or not there needs to be some briefing on that on Monday as well.

(Eastman Decl. Ex. M. ln. 20 at 108 to ln. 4 at 109 (emphasis added); <u>see also</u> Doc. # 329 ("Plaintiff Stephens oral motion for injunction re *transfer of **funds** by the **defendant**: the Court grants temporary stay of any **transfer of funds**.*" (emphasis added); Req. Jud. Not. 1.)

The Court did not otherwise set a hearing or a briefing schedule to hear either an application for a right to attach order and issuance a writ of attachment or a written motion for issuance of a temporary protective order pending such application. (Eastman Decl. ¶ 18 at 6 & Ex. M.) Nor did Spectrum request such a hearing or briefing schedule. (<u>Id.</u>) The hearing adjourned and, approximately one hour later, the Secretary of State recorded the UCC-1 financing statement per Mr. Eastman's prior request to his attorney. (Eastman Decl. ¶ 19 at 6 & Exs. M & N.)

On February 26, 2018, the Court convened a telephonic status conference. (<u>See</u> Eastman Decl. ¶ 20 at 6 & Ex. O; Rea. Jud. Not. # 1(j).) At the outset, the Court indicated that it would "like to just revisit the issue with respect to the stay and how to move forward with that." (<u>Id.</u> Ex. O lns. 18-20 at 121.) Significantly, when addressing the issue, Mr. Eastman and the Court both treated the prior order as having issued as a state-law attachment remedy. (<u>See</u> Ex. O lns. 8-11 at 128 ("<u>Mr. Eastman</u>: . . . . I think the writ of attachment that was effectively the stay that you identified at the close of our discussions last week was a bit of a surprise."); <u>id.</u> lns. 23-24 ("<u>The Court</u>: Mr. Cupar, with your writ of attachment, is the status quo sufficient, in your mind?").)

Indeed, in response to the latter question, Mr. Cupar stated:

> I think so, your honor. *There is nothing specific we know about. I looked up California law before the jury verdict*, and I mean, it - - it does follow here, as long as there is good cause here for the request, which there is, based on that initial withdrawal. [¶ And to the extent that, you know, Mr. Eastman's client is refusing to pay him for legal services, you know, obviously we're a bit concerned on two levels. Number one, that this gentleman and this company have a propensity not to pay their bills, No. 1. And then, No. 2, the other issue is just making sure, because if he's already got some sort of A.R., or accounts receivable, out there with his counsel, you know, he might play games in terms of refusing to pay us. [¶] So the point is, I think it just makes a lot of sense *to maintain what we have here, in terms of a stay and ensure he's not going to **move money from bank accounts on a personal and corporate level***.

(Eastman Decl. Ex. O ln.25 at 128 to ln. 16 at 129 (emphasis added).)

Spectrum agreed with the Court that any "deposition" of the Green Parties regarding their "assets [] in a personal and corporate level," (Eastman Decl. Ex. O lns. 17-18 at 129), could be "handled post-final judgment, with respect to enforcing the judgment," (id. lns. 1-3 at 130), "so long as . . . the stay stays in place, (id. ln. 13 at 130). Accordingly, the Court ruled that the order of February 23, 2018 would be "le[ft] as it is." (Id. Ex. O ln. 15 at 130.)

Thereafter, Spectrum never requested a hearing or a briefing schedule to hear either an application for a right to attach order and a writ of attachment or issuance of a temporary protective order pending such application. (Eastman Decl. ¶ 21 at 6.) Spectrum has never filed or served a written application for a right to attach order and writ of attachment. (Id.) Nor has Spectrum ever filed a written motion for a temporary protective order pending such an application; proffered any evidence of great or irreparable injury in support of such a motion; or posted an undertaking in support of such a temporary protective order. (Id.) At no time did the Court issue—and Spectrum never sought, obtained, or served—any protective order enjoining third-party creditors generally, or Mr. Eastman, Eastman APLC, or Eastman McCartney in particular, from collecting on debts owing by the Green Parties or obtaining, perfecting, or enforcing security interests in the Green Parties' assets. (Id. ¶ 21 at 6-7.)

On June 11, 2018, Mr. Eastman created AR Acquisitions, LLC, a limited

liability company organized and existing under the laws of the State of California ("AR Acquisitions"). (Eastman Decl. ¶ 22 at 7 & Ex. P; Req. Jud. Not. 3(c).) On June 14, 2018, Mr. Gupta—as counsel for AR Acquisitions—wrote a letter to attorney Phil Dyson, Esq.—as independent counsel for the Green Parties—to obtain a conflict waiver and the Green Parties' informed, written consent to Eastman, APLC and Eastman McCartney assigning to AR Acquisitions for collection the accounts owing by the Green Parties and the security interests. (Eastman Decl. ¶ 23 at 7 & Ex. Q.) On June 11, 2018, the Green Parties executed the conflict waiver, and on June 15, 2018, Mr. Dyson executed his approval of the conflict waiver. (Id. Ex. Q at 135.) On June 19, 2018, Eastman APLC and Eastman McCartney assigned to AR Acquisitions: 1) the receivables owing by the Green Parties, (Eastman Decl. ¶ 24 at 7 & Ex. R); 2) the right to receive the sum of at least $820,928 thereon, (id.); 3) the power of attorney over Dr. Greens, Inc., (id.); and 4) all security interests in the assets of Dr. Greens, Inc., (id.).

On June 21, 2018, AR Acquisitions filed suit against the Green Parties in the action entitled *AR Acquisitions, LLC, etc. v. Dr. Greens, Inc., etc., et al.*, San Diego Superior Court Case No. 37-2018-000309-CU-BC-CTL. (the "Collection Action") (Eastman Decl. ¶ 25 at 7-8 & Ex. S; Req. Jud. Not. 2(a).) Therein, AR Acquisitions sought damages in the principal amount of at least $820,928 for the outstanding legal bills then owed by the Green Parties. (Id. Ex. S lns. 10-11 at 140.) As with the conflict waiver, the Green Parties were represented by Mr. Dyson in connection with the Collection Action. (Eastman Decl. ¶ 25 at 8.)

On August 7, 2018, AR Acquisitions deposed the Green Parties in the Collection Action. (Eastman Decl. ¶ 26 at 8 & Ex. T ln. 10 at 167 to ln. 21 at 175; Req. Jud. Not. 2(b).) During the deposition, the Green Parties admitted their debt owing for attorneys' fees and costs; the security interest; and the assignment to AR Acquisitions. (See id. Ex. T ln. 4 at 176 to ln. 22 at 183.) Further, the Green Parties ceded to AR Acquisitions possession and/or control of the Dr. Greens website; Dr. Greens' computer systems, phone numbers, and e-mail; and Dr. Greens' inventory, (see id. Ex.

T ln. 1 at 184 to ln. 20 at 202.)

On or about August 17, 2018, AR Acquisitions leased commercial space in San Diego. (Eastman Decl. ¶ 27 at 8 & Ex. U.) Thereafter, AR Acquisitions took possession of and relocated Dr. Greens' inventory to the leased premises. (Eastman Decl. ¶ 27 at 8.) On September 19, 2019, AR Acquisitions obtained a third-party valuation of the Dr. Greens business from Vantage Point Advisors, Inc. (the "Valuation"). (Id.¶ 28 at 8 & Ex. V.) The Valuation was as of August 7, 2018—the date that AR Acquisitions had deposed the Green Parties and taken possession and/or control over Dr. Greens' non-cash assets. (Eastman Decl. ¶ 28 at 8.) The Valuation valued the Dr. Greens business at $42,686.00 as of August 7, 2018. (Id.)

On September 19, 2019, AR Acquisitions—through Mr. Gupta's office—caused a duly noticed public sale of the assets of the Green Parties pledged as security for the debts to Eastman APLC and Eastman McCartney assigned to AR Acquisitions. (Eastman Decl. ¶ 29 at 8-9 & Ex. W; Req. Jud. Not. 3(d).) At the public sale, AR Acquisitions made an opening credit bid of $42,686.00 for the assets of the Green Parties. (Id.) There were no other bids, and the Green Parties' personal property was conveyed to AR Acquisitions. (Id.) The Green Parties have received a $42,686.00 credit against the amounts owing to Eastman McCartney. (Id.)

In the meanwhile, on July 1, 2019, the Governor of the State of California had approved Assembly Bill 851, approving Health & Safety Code section 24135 to become effective January 1, 2020. (Eastman Decl. ¶ 30 at 9 & Ex. X; Req. Jud. Not. 4.) Mr. Eastman was aware of the pendency of Assembly Bill 851 because Section 24135 would make the distribution, delivery, sale, or possession with intent to distribute, deliver or sell "drug masking products," i.e. "synthetic urine," illegal in California. (Id.) The sale of synthetic urine was a cornerstone of the Dr. Greens business, and thus the newly-acquired business of AR Acquisitions. (Id.)

The distribution, delivery and sale of synthetic urine are not unlawful in the State of Washington. (Eastman Decl. ¶ 31 at 9.) Because AR Acquisitions' business

would no longer be viable in California as of January 1, 2020, Mr. Eastman set about moving AR Acquisitions' business operations to the State of Washington. (Id.) On December 5, 2019, Mr. Eastman caused Pacific Inventory Services, LLC, a limited liability company organized and existing under the laws of the State of Washington, to be formed ("Pacific Inventory"). (Id. ¶ 31 at 9 & Ex. Y; Req. Jud. Not. 3(e).) On December 5, 2019, Pacific Inventory leased commercial property in Vancouver, Washington, (Id. ¶ 32 at 9 & Ex. Z), and obtained a business license, (id. ¶ 33 at 10 & Ex. AA; Req. Jud. Not. 3(f)). Pacific Inventory runs the business operations—promoting and processing sales; filling orders; maintaining payroll, inventory, and the website; hiring and managing employees, etc.—in Vancouver on behalf of AR Acquisitions. (Id. ¶ 34 at 10.)

At no time since February 23, 2018—whether in the ordinary course of business, or otherwise—did the Green Parties transfer to Mr. Eastman; Eastman APLC; Eastman McCartney; AR Acquisitions; Pacific Inventory; or any of their officers, directors, shareholders, partners, members, managers, employees, agents, assigns or other affiliates (collectively the "Eastman Affiliates"), any cash, money, funds, or deposit accounts. (Eastman Decl. ¶ 35 at 10.)

## III.   DISCUSSION

### A.   There Has Been No Transfer of "Money" or "Funds."

"An injunction must be 'specific in terms' and describe 'in reasonable detail' the acts sought to be restrained. Fed. R. Civ. P. 65(d). "Specificity in the terms of [injunctions] is a predicate to a finding of contempt." Gates v. Shinn, 98 F.3d 463, 467-68 (9th Cir. 1996)(citing Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 889 (9th Cir. 1982)); Harris v. City of Phila., 47 F.3d 1342, 1349 (3rd Cir. 1995)); accord Int'l Longshoremen's Ass'n. v. Phila. Marine Trade Ass'n, 389 U.S. 64, 76, (1967)(Congress "requir[es] that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid."). Indeed, a court may only find the meaning of an injunction "'within its four

corners' and not by reference to the court's purpose or the purpose of the party seeking to hold the other in contempt." <u>Gates</u>, 98 F.3d at 468 (citing <u>United States v. Armour & Co.</u>, 402 U.S. 673, 681-82 (1971)).   Thus, "[i]f an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt." <u>Gates</u>, 98 F.3d at 468.

Here, the Order specifically and clearly enjoined "Mr. Green, as well as Dr. Green, Inc., from *transferring any **monies** from any account* . . . outside of ordinary, routine business expenses." (Eastman Decl. Ex. M. ln. 20 at 108 to ln. 4 at 109 (emphasis added); <u>see</u> <u>also</u> Doc. # 329 ("the Court grants temporary stay of any *transfer of funds*." (emphasis added).)[7]   At no time since the Order did the Green Parties transfer any monies or funds outside the ordinary course of business.   Indeed, since the Order, the Green Parties never transferred any money, funds, or deposit accounts to any Eastman Affiliate.   (Eastman Decl. ¶ 35 at 10.)

**1.    Any Transfer of "Assets" by the Green Parties Predated the Order.**

Spectrum's motion belies a fundamental misapprehension of the nature of secured transactions generally, and the creation, attachment, and perfection of security

---

[7]    Since initiating these proceedings, Spectrum has—tellingly beyond its four corners—repeatedly mischaracterized the Order as having broadly enjoined the Green Parties from transferring any "business" or "assets." (<u>See</u> Doc. # 366 lns. 8-12 at 2 (contempt predicated on Mr. Eastman and Green Parties having "(i) mov[ed] the Dr. Green's . . . *business and its related assets* out-of-state [sic], and (ii) transferr[ed] Dr. Green's *business assets* into a company called 'AR Acquisitions, LLC.'"); <u>id.</u> lns. 14-16 at 2 ("Mr. Eastman appears to have completed the *transfer of assets*"); <u>id.</u> lns. 1-2 at 4 ("this Court had ordered Dr. Greens not to *move any assets*"); <u>id.</u> lns. 24-26 at 4 ("all of these actions of *moving assets* . . . is a clear violation of the Court's order"); <u>id.</u> lns. 22-23 at 5 ("In direction violation of this Court's Order, Dr. Greens, Mr. Green, and Mr. Eastman, have *moved assets*"); <u>id.</u> lns. 25-26 at 5 ("Mr. Eastman filed the UCC security guarantee (and perfected a *transfer of assets*) a mere hour after this Court ordered him and his clients not to *move any assets*"); <u>id.</u> ln. 28 at 5 to ln. 2 at 6 ("By filing a UCC security guarantee *transferring assets* to Mr. Eastman, moving the *business out of state, its inventory, and presumably all of its other assets*"); Doc. # 369 ln. 27 at 1 to ln. 1 at 2 ("Have Dr. Greens and Mr. Mathew Green, with the active participation of their trial counsel, Mr. Gary Eastman, violated the Court's February 23, 2018, order not to *move assets*?"); <u>id.</u> ln. 12 at 2 ("Eastman personally worked with defendants on the *asset transfer*"); <u>id.</u> ln. 21 at 3 ("Eastman also is the mastermind behind securitizing Dr. Green's *assets*"); <u>id.</u> lns. 26-27 at 4 ("The Court agreed and ordered Eastman and Greens not [sic] *transfer assets*")(all italics added).)

interests in personal property in particular.   <u>See</u> <u>generally</u> 4 B.E. Witkin, et al., Summary of California Law, Secured Transactions in Personal Property §§ 34-103 (11th Ed. 2018). A security interest is an interest in personal property or fixtures that secures payment or performance of an obligation. Cal. Comm. Code § 1201(b)(35).)  A security interest is created by a "security agreement" describing the collateral. Cal. Comm. Code § 9102(a)(74). A security interest "attaches" to collateral when it becomes enforceable against the debtor with respect to the collateral.  Cal. Comm. Code § 9203(a).   To be enforceable, against the debtor and third parties three conditions must be satisfied: 1) value must be given, Cal. Comm. Code § 9203(b)(1); 2) the debtor must have rights in the collateral or the power to transfer rights in the collateral to a secured party, Cal. Comm. Code § 9203(b)(2); and 3) there must be a valid security agreement, Cal. Comm. Code § 9203(b)(3).  A valid security agreement includes one that is "authenticated" by the debtor's signature.  Cal. Comm. Code §§ 9102(a)(7) &  9203(b)(3)(A).  It is the creation and attachment of a security interest which effectuates a transfer of the security interest to the creditor; the security interest thereby becomes enforceable against the debtor.  <u>See</u> Cal. Comm. Code § 9203(a); <u>Raleigh Indus. of Am., Inc. v. Tassone</u>, 74 Cal. App. 3d 692, 698 (1977)(debtor transferred unperfected security interest to creditor upon attachment); Ellen A. Friedman, Secured Transactions in California Commercial Law Practice § 3.2 (CEB 2d Ed. 2020)[hereinafter "Secured Transactions"].

Here, the only "transfers" between the Green Parties, on the one hand, and Eastman APLC and Eastman McCartney, on the other hand, was when: 1) the Green Parties executed the retainer agreements granting attorney liens; and 2) executed the First Amendment.[8]  The latter of these transfers took place *five weeks prior to trial*.

---

[8]      Neither the attorney liens nor the First Amendment were fraudulent as to Spectrum. Although a creditor may intend by a transfer of his or her assets to remove assets and make impossible the collection of a particular creditor's judgment, if the transfer operates only as a preference of one creditor of the transferor over another, the transfer is not subject to attack except by a trustee in bankruptcy.  <u>See Aggregates Assoc., Inc. v. Packwood</u>, 58 Cal. 2d 580, 591 (1962); <u>Economy Ref. & Serv. Co. v.</u>
(footnote continues...)

Indeed, in withdrawing his motion to be relieved as counsel, Mr. Eastman advised the Court that he had "spoke[n] with Mr. Green . . . and . . . we've *worked out a resolution* to allow this to go through trial." (Eastman Decl. ¶ 13 at 5 & Ex. H lns. 1-17 at 82 (italics added).) Thus, months before trial and the Order, Spectrum was on notice that the Green Parties had likely agreed to pledge their assets to secure their debt.

**2.      The Perfection of the Security Interest Was Not a Transfer of Money.**

Spectrum argues, without citation to authority, that the UCC-1 Financing Statement was some type of "transfer" of the Green Parties' assets and thereby makes much of the fact that it was filed an hour after the Order. (See Doc. # 366 lns. 25-26 at 5 ("Mr. Eastman filed the UCC security guarantee (and perfected a *transfer of assets*) a mere hour after this Court ordered him and his clients not to move any assets." (italics added).) Wholly apart from the fact the Order in no way enjoined "asset" transfers, Spectrum clearly misapprehends the nature of perfection of a security interest.

In a non-bankruptcy context, perfection of a security interest is not a "transfer" of collateral. Quite to the contrary:

> Perfection of a security interest in collateral is the means by which a creditor may seek to have superior rights to other creditors. Because more than one creditor may "perfect" its interest in the same collateral, Division 9 [of the Commercial Code] also sets forth rules of priority among creditors.

Secured Transactions § 3.6.

Here, well prior to the jury's verdict and the subsequent Order, Mr. Eastman instructed his lawyer to perfect the security interest in the Green Parties' assets that had attached months prior by filing the UCC-1 Financing Statement. (Eastman Decl. ¶ 17 at 5.) While Mr. Gupta did not effectuate the filing until an hour after the Order

---

Royal Nat'l Bank, 20 Cal. App. 3d 434 (1971); see Cal. Civ. Code § 3432 (debtor may pay one creditor in preference to another or give one creditor security in preference to another). Even though a preference may hinder or delay other creditors in the collection of their claims, it is not, thereby, rendered void; even if the preferred creditor had knowledge that such a consequence would follow, United States Fid. & Guar. Co. v. Postel, 64 Cal. App. 2d 567, 571-72 (1944), or that the non-preferred creditor's action to enforce the debtor's indebtedness was pending at the time of the transfer, see Arnold v. Hadgis, 102 Cal. App. 2d 88, 92 (1951).

issued, nothing nefarious can be inferred from that timing; it was an exercise that had already been put in motion months prior. (Id. ¶ 19 at 6 & Ex. N; Req. Jud. Not. 3(b).) More to the point, the Order did not enjoin any creditor of the Green Parties, including Mr. Eastman, from perfecting security interests, and the filing of the UCC-1 Financing Statement in no way can be characterized as a transfer, far less a transfer of money or funds. Indeed, a security interest in money or a deposit account *cannot be* perfected by filing a UCC-1 financing statement. See Cal. Comm. Code § 9312(b)(1)("A security interest in a deposit account may be perfected only by control under Section 9314."); Cal. Comm. Code § 9312(b)(3)("A security interest in money may be perfected only by the secured party's taking possession under Section 9313."); Green, 125 Cal. App. 4th at 365 (despite valid security agreement and filing of financing statement, attorney could not perfect security interest in client's cash because government was in possession).

### 3. The Assignment; the Collection Action; the Foreclosure Sale; and the Move to Washington Were Not Transfers of Money.

Having created a duly-attached security interest prior to the Order, and having perfected that security interest in due course, Mr. Eastman and his affiliates were entitled to enforce the security interest. Their doing so in no way constituted a transfer of money violative of the Order. The assignment to AR Acquisitions was not a transfer of any money by the Green Parties. See N. Cntys. Bank v. Earl Himovitz & Sons Livestock Co., 216 Cal. App. 2d 849, 855 (1963)(antecedent debt ample consideration for assignment). Neither the Collection Action nor the deposition of the Green Parties constituted the transfer of any money.[9] Quite to the contrary, it was by

---

[9]    Nor, seemingly, would the privileged acts of filing a civil lawsuit be actionable as a contempt. See Freeman v. Lasky, Haas & Kohler, 410 F.3d 1180, 1184 (9th Cir. 2005)(pleadings and papers filed with the court, defensive discovery misconduct, witness intimidation, and subornation of perjury privileged under *Noerr-Pennington* doctrine); Sosa v. DIRECTV, Inc., 437 F.3d 923, 933-35 (9th Cir. 2006)(same as to mass mailing of demand letters to induce settlements); Cal. Civ. Code § 47(b)(absolute litigation privilege); Rusheen v. Cohen, 37 Cal. 4th 1048, 1052 (2006)(acts in connection with obtaining and levying writ of execution privileged).

(footnote continues…)

1  those acts of taking control and possession of the Green Parties' non-cash assets, e.g.
2  the website and inventory, that AR Acquisitions further perfected its security interests.
3  See Cal. Comm. Code §§ 9312-9313 (perfection of security interest in goods by
4  possession).   The public sale did not constitute a transfer of money for the simple
5  reason that no such money was foreclosed upon.   Finally, moving the business
6  acquired by AR Acquisition to Washington did not constitute a transfer of money. To
7  the contrary, it was a necessary act to avoid violating the law. See Cal. Health &
8  Safety Code § 24135.

9  **B.      The Order Was Invalid and Has Expired.**

10        Generally, the invalidity of a federal injunction is not a defense to a charge of
11  civil contempt. See GTE Sylvania, Inc. v. Consumer's Union of United States, Inc.,
12  445 U.S. 375, 386 (1980); Zapon v. United States Dep't of Justice, 53 F.3d 283, 285
13  (9th Cir. 1995). However, there are two exceptions recognized under federal law where
14  the invalidity of an allegedly-violated injunction can be raised to a charge of
15  contempt.   First, "where the injunction was transparently invalid or had only a
16  frivolous pretense to validity" its validity may be raised as a defense to
17  contempt.  Walker v. City of Birmingham, 388 U.S. 307, 315 (1967); Irwin v. Mascott,
18  370 F.3d 924, 931 (9th Cir. 2004); FTC v. Am. Nat'l Cellular, 868 F.2d 315, 317
19  (1989); Thomas, Head & Greisen Emps. Trust v. Buster, 95 F.3d 1449, 1456 (9th Cir.
20  1996). [10]   Second, where an injunction is no longer in effect, its expiration can be

21

_____

22       [10]     Similarly, under California law, the invalidity of an injunction may be
    raised in the first instance when a charge of contempt is brought where the injunction is
23  challenged as being void or in excess of the issuing court's jurisdiction. People v.
    Gonzalez, 12 Cal. 4th 804, 823-24 (1996)(violation order in excess of the jurisdiction
24  cannot produce a valid judgment of contempt; such "jurisdiction" extends to any acts
    exceeding statutorily-defined power of a court)(quoting In re Berry, 68 Cal. 2d 137,
25  147 (1968)); Gonzalez, 12 Cal. 4th at 819 ("California courts continue to reject the
    collateral bar rule adopted by other jurisdictions. Instead, they apply the rule that in the
26  contempt proceeding, the contemner may, for the first time, collaterally challenge the
    validity of the order he or she is charged with violating."); accord Zal v. Steppe, 968
27  F.2d 924, 927 (9th Cir. 1992)("[A]lthough a state *may* adopt the  collateral bar rule, it
    need not do so as a matter of federal law. . . . California has explicitly elected not to do
28  so." (italics original; citation of Berry omitted)). Davidson v. Superior Court, 70 Cal.
                                                              (footnote continues...)

raised as a defense to a contempt charge. <u>Klett v. Pim</u>, 965 F.2d 587, 590 (8th Cir. 1992)(compensatory contempt cannot lie after underlying injunction mooted by legislation); <u>Scott & Fetzer Co. v. Dile</u>, 643 F.2d 670, 675 (9th Cir. 1981)(neither coercive nor remedial civil contempt can survive invalidation of underlying injunction). Here, the Order was transparently invalid, expired long ago, and cannot be the subject of contempt.

### 1.    The Order Was Void *Ab Initio* and Transparently Invalid.

A district court's power to issue provisional remedies and injunctions is proscribed by Federal Rules of Civil Procedure 64 and 65 respectively. Here—while it is clear from the record that the parties and the Court considered Spectrum's application for provisional relief to be pursuant to California's Attachment Law under Rule 64, (<u>see</u> Eastman Decl. Ex. O ln. 8 at 128 to ln. 4 at 129), the Order is invalid under either rule.

### a.    The Order Was Void *Ab Initio* Per California Attachment Law.

Rule 64 provides that every remedy under state law for "seizing . . . property to secure satisfaction of the potential judgment" is available in a federal action, including "attachment." Fed. R. Civ. Proc. 64. Thus, Rule 64 borrows state provisional remedies provided they meet constitutional due process requirements. <u>See</u> <u>generally</u> 13 Moore's Federal Practice - Civil § 64.14 (2019). Originally, California's attachment statute was declared unconstitutional for lack of notice and a hearing sufficient to satisfy due process. <u>Randone v. Appellate Dep't of Superior Court</u>, 5 Cal. 3d 536, 564 (1971)(citing <u>Sniadach v. Family Finance Corp.</u>, 395 U.S. 337 (1969)). In response, California adopted a comprehensive statutory scheme which exclusively governs

App. 4th 514, 528-29 (1999)(order noncompliant with statute void, in excess of court's jurisdiction, and could not be basis for contempt). Insofar as the Court's power to issue provisional remedies under Rule 64 is governed by state law, it is not clear that federal law governs the ability of the responding parties to challenge the validity of the order. To the extent that California's rejection of the collateral bar rule is substantive law, it applies with equal force here. <u>See</u> <u>generally</u> 13 Moore's Federal Practice - Civil § 64.12 (2019)(under Rule 64, state law determines use of provisional remedies but underlying action continues subject to the Federal Rules of Civil Procedure.)

attachment. Cal. Civ. Proc. Code §§ 481.010-493.060.

Because California's Attachment Law is purely statutory, it must be strictly construed. VFS Fin., Inc. v. CHF Express, LLC, 620 F. Supp. 2d 1092, 1095 (C.D. Cal. 2009). Thus, the plaintiff has the burden of establishing grounds for an attachment order, Pos-A-Traction, Inc. v. Kelly-Springfield Tire Co., 112 F. Supp. 2d 1178, 1181 (C.D. Cal. 2000), and must do so with admissible evidence, VFS, 620 F. Supp. 2d at 1096-97. Further, the courts may not create their own attachment remedies not authorized by statute. Brun v. Evans, 197 Cal. 439, 443 (1925)("[Former attachment law] does not empower the court to create a lien where none exists, nor to revive a lien which has ceased to exist."); see Doyka v. Superior Court, 233 Cal. App. 3d 1134, 1136-37 (1991)(superior court exceeded its authority in enjoining defendant from using any funds on deposit because injunction was "in effect, a prejudgment attachment without meeting the requirements for such attachment.").

While it is true that plaintiffs can apply *ex parte* for a right to attach order and issuance of a writ of attachment or for temporary protective order pending a noticed motion for a right to attach order and a writ of attachment, see Alan M. Ahart, California Practice Guide: Enforcing Judgments and Debts ¶¶ [4:299]-[4:376] (2019)[hereinafter "Ahart"], substantively they must show they will suffer "great or irreparable injury," Cal. Civ. Proc. Code § 485.010, and that attachment is otherwise proper, Cal. Civ. Proc. Code § 486.020. Procedurally, there must be a noticed, written motion for a right to attach order and issuance of a writ of attachment; a written application for a temporary protective order; both applications must be supported by a competent declaration, a memorandum, and a proposed order; the applications must identify the property to be levied upon and/or enjoined within California; both applications must be served on all parties at the first reasonable opportunity; the plaintiff must post an undertaking in compliance with the Bond and Undertaking Law, Cal. Civ. Proc. Code §§ 995.010 - 996.560; and, upon issuance, the written temporary protective order must be personally served on the defendant. Ahart, ¶¶ [4:299]-[4:376]

& [4:543].[11] The failure to post an undertaking is fatal, and any remedy mistakenly issued without an undertaking is void *ab initio*. <u>See</u> Cal. Civ. Proc. Code § 489.210; <u>Vershbow v. Reiner</u>, 231 Cal. App. 3d 879, 882-83 (1991).

Here, it is obvious that Spectrum did not come close to meeting—didn't even try to meet—its burdens. Spectrum made no written application for a right to attach order and issuance of a writ of attachment; made no written application for a temporary protective order; posted no undertaking; proffered no admissible evidence; and never served any temporary protective order.  Indeed, Spectrum not only relied upon the incompetent, speculative "concern" of its attorney that, because the Green Parties' attorney had sought to withdraw for non-payment, there was a possibility that the Green Parties would transfer large amounts of money to make themselves judgment proof, (<u>see</u> Eastman Decl. Ex. M lns. 2-11 at 108), at the subsequent hearing Spectrum's attorney openly admitted "there is nothing specific we know about" warranting relief. (Eastman Decl. Ex. O ln. 25 at 128 to ln.1 at 129.)  For these reasons, the Order was void *ab initio*; did not comport with the minimum requirements of due process; and was transparently invalid such that it cannot be the basis for contempt.

### b. Any Temporary Protective Order Has Long Expired.

Even if oral, *ex parte* temporary protective orders issued without prior notice, a meaningful opportunity to respond, written application, a showing of great or irreparable injury by admissible evidence, an undertaking, a pending application for a right to attach order and issuance of a writ of attachment, and service thereof could be validly issued (which they cannot)—any such order has long expired.  Temporary protective orders under the Attachment Law expire 40 days after issuance unless an earlier date is prescribed.  Cal. Civ. Proc. Code § 486.090(a); <u>see</u> <u>also</u> Cal. Civ. Proc. Code § 484.080 (temporary protective order can be extended by request if hearing on

---

[11]    While optional, the Judicial Council has promulgated several forms to assist litigants in complying with with complex procedures required for attachment remedies, including temporary protective orders.  (Eastman Decl. Ex. BB; Req. Jud. Not. 3(g).)

1   application for right to attach order and writ of attachment continued).

2         Here, Spectrum never filed an application for a right to attach order and a writ of

3   attachment.  Nor did Spectrum ever request that the Order be extended pending such an

4   application.  The Order issued on February 23, 2018, and expired 40 days later on

5   April 4, 2018.  It cannot serve as the basis for a contempt charge, far less after almost

6   two years of laches!  See Melendres v. Arpaio, 154 F. Supp. 3d 845, 849-50 (D. Ariz.

7   2016)(laches as defense to contempt upon showing of delay and prejudice).

8         **2.**     **The Order Is Not Salvageable Under Rule 65.**

9         Rule 65 governs the general injunction power of the federal courts.  Thus, to

10   meet minimum due process, a federal court may issue a temporary restraining order or

11   preliminary injunction only after: notice to the adverse party or, as to a restraining

12   order, a specific showing by affidavit of good cause excusing notice, Fed. R. Civ. Proc.

13   65(a)(1) & 65(b), and the movant posts security in a proper amount, id. 65(c).  Further,

14   upon issuance, a restraining order or an injunction must state: the reasons why it was

15   issued; its specific terms; and, in reasonable detail, the act or acts restrained.  Fed. R.

16   Civ. Proc. 65(d).[12]  Here—just as it did with respect to the minimum due process

17   requirements to obtain an attachment remedy—Spectrum never even attempted to

18   comply with any of these due process requirements to obtain a restraining order or

19   preliminary injunction under Rule 65.  Improper notice is a defense to a contempt

20   charge.  See Whittaker Corp. v. Execuair Corp., 953 F.2d 510, 517 (9th Cir. 1992).

21         Moreover, in an action at law for money damages, district courts lack authority

22   under Rule 65 to issue injunctions preventing a party from transferring assets in order

23   to preserve assets against which a money judgment could later be enforced. Grupo

24

25       [12]    The due process requirements of Rule 65 are similar to those required for
injunctive relief under California law.  To obtain injunctive relief under California law,

26   the plaintiff must comply with the minimum due process requirements codified in
California law for obtaining temporary restraining orders and preliminary injunctions.

27   See Cal. Civ. Code §§ 3420-3424; Cal. Civ. Proc. Code §§ 525-526, 529, 532 & 533;
Cal. R. Ct. 3.1150; see generally Lee Smalley Edmon & Curtis E.A. Karnoa, California

28   Practice Guide: Civil Procedure Before Trial ¶¶ [9:560]-[9:670] (2019).

Mexicano De Desarrollo v. Alliance Bond Fund, 527 U.S. 308 (1999); United States *ex rel.* Rahman v. Oncology Assocs., 198 F.3d 489, 495-99 (9th Cir. 1999); Zhenhua Logistics (H.K. ) Co. v. Metamining, Inc., No. C-13-2658 EMC, 2013 U.S. Dist. LEXIS 87089, at *11-*12 (N.D. Cal. June 20, 2013)(denying under Grupo TRO freezing defendant's assets in a breach-of-contract case, as "preliminary injunctive relief may issue to freeze a defendant's assets only to the extent that they are related to the property at issue in the case."); JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003)(denying preliminary injunction freezing defendant's assets, as the injunction would simply be "in aid of the collection of a money judgment, not final equitable relief, an outcome barred by Grupo Mexicano.").[13]

Here, Spectrum has never sought relief in equity claiming an interest in any specific, identifiable property of the Green Parties; they sued only in law for damages and, upon obtaining a verdict, sought to enjoin the Green Parties from transferring assets for the stated purpose of preserving them to collect a money judgment. Such an injunction is transparently invalid, and cannot be the basis of a contempt charge.[14]

---

[13]   In Grupo, investors sued for breach of contract on secured notes. Based on the perceived risk of petitioner's insolvency and its preference for certain Mexican creditors, the investors requested a preliminary injunction restraining petitioner from transferring assets or receivables from the sale of those assets. The district court entered a temporary restraining order preventing petitioners from transferring certain assets. Ten days later the district court entered a preliminary injunction enjoining petitioner "from dissipating, disbursing, transferring, conveying, encumbering or otherwise distributing" its assets, and required the investors to post a $50,000 bond in light of such provisional remedy. Grupo, 311 U.S. at 312-13. The Supreme Court held that such injunctions could not issue to preserve assets to which a party did not yet have a legal claim. Id. at 332. The high court contrasted this general rule with exceptional circumstances involving fraudulent conveyances, bankruptcy, and where a plaintiff seeks to enjoin specific property in which the plaintiff claims an equitable interest. Matters. Id. at 319-20; cf., e.g., Deckert v. Independence Shares Corp., 311 U.S. 282, 285 (1940); Rahman, 198 F.3d at 499. As the high court noted, were such a provisional remedy granted under Rule 65, Rule 64 would be rendered superfluous. See Grupo 311 U.S. at 330-31 ("Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?").

[14]   Similar to Grupo and Deckert, California courts also may not use their general injunctive power to provisionally seize or otherwise prevent the disposition of
(footnote continues...)

C.    **Spectrum's Proposed Remedies Are Frivolous.**

Without any citation to authority, Spectrum requests this Court:

> use its inherent authority to: (i) void the transaction; (ii) preserve the assets for judgment, and (iii) order that Gary Eastman (personally and his law firm), AR Acquisitions, Pacific Inventory Services, LLC, and any other entity to which Mr. Eastman, Mr. Green, or Dr. Greens have transferred assets are *all liable for the entire judgment entered in this case.*

(Doc. # 366 lns. 5-9 at 6 (italics added).

The request for these remedies is frivolous for several reasons.  First, arguments unsupported by substantive reasoning or citation to valid legal authority are waived.  United States v. Cazares, 788 F.3d 956, 983 (9th Cir. 2015); Johannes v. Johannes, No. 15-CV-2598-AJB-BGS, 2017 U.S. Dist. LEXIS 62110, at *15 n.8 (S.D. Cal. Apr. 21, 2017)(Battaglia, J.)  Second, as to Spectrum's demand that the Court void the UCC-1

a defendant's assets without first complying with California's Attachment Law.  Doyka, 233 Cal. App. 3d at 1136-37 (superior court exceeded its authority in enjoining defendant from using any funds on deposit because injunction was "in effect, a prejudgment attachment without meeting the requirements for such attachment.");  CHoPP Computer Corp. v. United States, 5 F.3d 1344, 1349 (9th Cir. 1993)("California discourages the use of equitable remedies to ward off competing prior lienholders.")(citing *inter alia* Doyka as holding "general injunction freezing defendant's assets pending litigation invalid as amounting to a prejudgment attachment without meeting requirements for attachment."); cf. Chemoil Corp. v. Cunningham Holdings, Inc., No. E068157, 2018 Cal. App. Unpub. LEXIS 8653, at *24-25 (Cal. Ct. App. Dec. 20, 2018)(injunction permitted to preserve assets already subject to attachment); Doyka, 233 Cal. App. 3d at 1136 (injunction can issue to prevent the disposition of "readily identifiable assets" in which the plaintiff claims an interest)(citing West Coast Constr. Co. v. Oceano Sanitary Dist., 17 Cal. App. 3d 693, 700 (1971); Lenard v. Edmonds, 151 Cal. App. 2d 764, 769 (1957)); City of San Diego v. Pac. Beach Recreation Council, Inc., No. D041232, 2003 Cal. App. Unpub. LEXIS 11796, at *16-17 (Cal. Ct. App. Dec. 17, 2003)(Iron, J.)(trial court "properly granted the TRO and preliminary injunction to restrain use of 'readily identifiable' assets in specified bank accounts."). Chemoil and City of San Diego are unpublished cases not citeable in California; however, they may be cited as persuasive authority here. See Beeman v. Anthem Prescription Mgmt., LLC, 689 F.3d 1002, 1008 n.2 (9th Cir. 2012)("Although they are not precedent under California [law], we may nonetheless rely on the unpublished opinions [of the California Court of Appeal] to 'lend support' to the contention that [published opinion of the California Court of Appeal] 'accurately represents California law.'")(quoting Emp'rs Ins. of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003)); MGM Grand Hotel, Inc. v. Imperial Glass Co., 533 F.2d 486, 489 n.5 (9th Cir. 1976)(approving review of unpublished opinion of Nevada trial court as persuasive, but not binding, authority regarding state law); but see Loftis v. Almager, 704 F.3d 645, 657 n.4 (9th Cir. 2012)("unpublished decisions of the California intermediate appellate courts are not precedential — they cannot be relied on as authoritative pronouncements of California law.").

Financing Statement, California courts recognize that there is no procedure to do so. <u>People v. Gruber</u>, No. F047525, 2006 Cal. App. Unpub. LEXIS 8448, at *14 (Cal. Ct. App. Sep. 22, 2006). Third, Spectrum's request that the Court preserve assets for judgment would violate <u>Grupo</u> and its progeny. Finally, the request to have Mr. Eastman; his law firm; and "any other entity" to which Eastman or the Green Parties have transferred assets held liable for the entire judgment offends basic due process.

There was no transfer of money or an injunction restraining the transfer of non-cash assets. The anticipated judgment—which has yet to be entered, far less finalized—is anticipated to award Spectrum nearly $4 million. Mr. Eastman has done nothing that would warrant imposition of such liability on him personally. The alleged infringement that gave rise to the enhanced verdict in this action ceased in early 2011. He certainly had nothing to do with that infringement, and Spectrum has presented no argument or evidence suggesting otherwise. The same holds true for all of the Eastman Affiliates. Indeed, Eastman, APLC; Eastman McCartney; AR Acquisitions; and Pacific Inventory are not parties to this or any other action. No summons has been issued or served, no complaint has been filed or served, no order has been served, and these entities are not subject to the Court's jurisdiction.

## IV.   CONCLUSION

Neither Mr. Eastman nor his clients have violated any order of this Court. The Court should find that Mr. Eastman and the Green Parties have shown good cause why they should not be held in contempt of the Order. They should be discharged from the Order to Show Cause.

Dated: February 14, 2020

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation

By:   *s/ Robert P. Allenby*
E-mail: *allenby@sullivanhill.com*
Attorneys for Respondent GARY L. EASTMAN